Rick Richmond (SBN 194962)
*rrichmond@larsonllp.com*
Caroline G. Glennie-Smith (SBN 331359)
*cglennie-smith@larsonllp.com*
Donna Zamora-Stevens (SBN 318525)
*dzamora-stevens@larsonllp.com*
**LARSON LLP**
555 South Flower Street, 30th Floor
Los Angeles, California 90071
Telephone:   (213) 436-4888
Facsimile:   (213) 623-2000

Attorneys for Plaintiff RAYMOND FRANK
CHRISTIE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYMOND FRANK CHRISTIE, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| COUNTY OF HUMBOLDT, a local public entity; TRAVIS MENDES, in his individual and official capacity; ADRIAN CHARLES KAMADA, in his individual and official capacity; WILLIAM HONSAL, in his individual and official capacity; and DOES 1-10, in their individual and official capacities, | |
| Defendants. | |

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 3

JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT ...................... 22

PARTIES .......................................................................................................... 23

FACTUAL ALLEGATIONS .............................................................................. 24

    A.    Ray Has Cared for Animals All His Life ............................................ 24

    B.    Humboldt County Cattle Ranchers Operate in a Dysfunctional System ................. 26

        1.    Cows Die ................................................................................ 26

        2.    Everyone Knew Ray Purchased Unwanted Cattle ................ 26

        3.    There is No Rendering Plant to Dispose Carcasses .................... 28

        4.    Ray Took in Dying Cattle and Rehabilitated Them ................ 29

    C.    Ray's Operation Became a Target in Humboldt County .................... 31

        1.    Livestock Deputies Inspected Ray's Operation for Decades and Never Found Animal Abuse ................. 31

        2.    Ray is Acquitted at a Cockfighting Trial ................ 33

        3.    An Unauthorized and Intrusive Drone Flyover Puts Ray on the Map ........ 34

    D.    Mendes Becomes Livestock Deputy and Immediately Pursues Ray ............ 34

    E.    Mendes, Kamada, and Honsal's Five-Month Investigation Culminated in the 2018 Raid ................. 37

        1.    Deputy Mendes Leads a SWAT-Style Raid with Dozens of Agents .......... 37

        2.    Deputy Mendes Secretly Records Custodial Interrogation of Ray .............. 38

        3.    Cows are Delivered Hours Before the Raid ................ 43

        4.    Deputy Mendes, Deputy DA Kamada, and Sheriff Honsal Searched Unlawfully and Mishandled Evidence ................. 44

    F.    Ray is Under Felony Charges for Five Years Before the District Attorney Dismisses ................. 48

        1.    The Felony Animal Abuse Allegations Generate Significant Local Attention ................. 48

        2.    The Sheriff's Office's 2021 Raid Found No Evidence of Neglect .............. 49

LARSON
LOS ANGELES

3.     The 2022 District Attorney's Race Reveals the Extent of Deputy DA Kamada's Prosecutorial Misconduct................................................53

4.     The District Attorney Dismisses the Felony Charges Against Ray in December 2023 ................................................54

G.     Nothing Has Changed in Humboldt County, and Sheriff Honsal, the Sheriff's Office, and the District Attorney's Office Continue to Ignore Animal Abuse by Others ................................................55

CLAIMS FOR RELIEF ................................................59

RELIEF REQUESTED ................................................65

DEMAND FOR JURY TRIAL................................................67

LARSON
LOS ANGELES

# INTRODUCTION

1.      Ray Christie's civil rights were violated by Travis Mendes and Adrian Kamada, with the support of William Honsal and Humboldt County.  At the time, Travis Mendes was a Deputy Sheriff in the Humboldt County Sheriff's Office, acting under color of state law in his role as Livestock Deputy.  Adrian Kamada was a Deputy District Attorney in the Humboldt County District Attorney's Office, acting under color of state law as a county prosecutor.  William Honsal was the Sheriff of Humbolt County, acting under color of state law as Sheriff.

2.      Ray was unlawfully investigated and unlawfully arrested.  Ray and his ranch properties were unreasonably searched.  Ray's property was unlawfully seized.  Ray was wrongfully and maliciously prosecuted as an alleged animal abuser for several years, until the District Attorney had no choice but to dismiss those felony charges in the face of insurmountable evidentiary challenges.   Working together, Deputy Mendes, Deputy DA Kamada, and Sheriff Honsal caused and inflicted these civil rights violations on Ray, without probable cause and with the intent to harass and intimidate Ray and to interfere with Ray's exercise of his constitutional rights.  Ray seeks compensatory and punitive damages for these violations, pursuant to the United States Constitution and federal law.

3.      Ray is a fourth-generation cattle rancher.  His great-grandfather worked on a dairy farm in Ireland, his grandfather established a dairy farm as an early settler in Humboldt County near McKinleyville, and his father was a beef and dairy cattle rancher in McKinleyville.  Ray has spent his entire life in Humboldt County raising cattle, and caring for animals of all kinds.  Ray is well known in Humboldt County.  He is a big, buff, hearty, gregarious, and larger-than-life character.  Most people personally know him, or know about him, because Ray runs one of the largest cattle operations in the area.  During the relevant timeframe, Ray cared for his cattle on 20 properties around Humboldt County, covering about 3,000 acres.  Ray ran approximately 35,000 cattle through his properties on an annual basis.  At any given time, there were about 4,000 cattle in Ray's herds.  Many of Ray's cattle grazed in pastures in high-visibility areas, along scenic Route 101, up and down the coast, and in the lush and beautiful area outside of Eureka known as the Arcata Bottoms.  Local residents, tourists, and visitors alike were, and still are likely to see

1 some of Ray's cattle, as they live in, explore, or pass through the area.

2   4. Ray's cattle business is based on the age-old wisdom of "buy low, sell high."  The cheapest cattle for sale in Humboldt County are those that have been culled from the herds at other cattle ranches and dairy farms.  The culled cattle are sick, weak, skinny, and injured.  Ranchers in Humboldt County cull those undesirable animals out of their herds and sell them at the Humboldt Auction Yard in Fortuna and at other similar auction yards in the region.  Those were and are the animals Ray would "buy low" when he attended the weekly auctions, in search of new cattle for his herds.

   5. Once in his possession and control, Ray did his best to rehabilitate these unfortunate animals.  Ray is something of a "cow whisperer."  He has a special gift for determining which animals bought at auction need what kind of care and attention to bring them back from their deplorable condition to good health.  In other words, Ray knows how to "beef up" the subpar animals culled out of other ranchers' and dairy farmers' herds.  Ray's ability to feed his family and succeed as a businessman depends on him caring for his animals in an active manner.  Intentional or even passive neglect of animals would be against Ray's business interests.  Neglecting his animals would make no sense.  And neglecting his animals would go against everything Ray was, is, and will ever be.  Ray is an animal lover.

   6. Ray spends nearly $1 million each year taking care of his cattle, spending the money on hay, medicines, and ranch hands to watch over and care for the animals.  He also employs a man whose full-time job is to maintain and repair the fencing around Ray's pastures.  Once the subpar animals initially bought at the auction yards are beefed up, Ray can put those healthy cattle to good use as breeding stock, or as desirable animals for sale to other ranchers, dairy farmers, and meat producers.  Ray sells his beefed up cattle at much higher prices than what he spent to buy them and rehabilitate them.  Buy low, sell high.  That is a good and responsible business model.  And it is a model that provides the once-culled cattle with a much better life than what they had experienced previously.

   7. Sometimes, Ray buys and rehabilitates animals for his own personal enjoyment, and for the general enjoyment of those in the local community.  Just across from the ranch house

1    in which Ray lives, for example, Ray maintains a pasture devoted to exotic cattle and other

2    animals that have been abandoned.  That pasture is almost like a zoo.  Ray spends time and money

3    caring for those animals, for no monetary gain, so he can step out onto his front porch and enjoy

4    his private zoo.  Anyone else on the public road, which separates Ray's ranch house from the zoo

5    pasture by only a few feet, can enjoy Ray's zoo as they pass by on foot, on bicycles, on

6    motorcycles, and in cars and trucks.  Ray's animal-centered life and cattle business are not hidden

7    from public view.  They are wide open and visible to all.

8        8.    The local cattle ranching community was well aware of the condition of the culled

9    cattle brought to the auction yards.  That ranching community included Humboldt County law

10   enforcement personnel.  In Humboldt County, one of the deputy sheriffs is typically designated as

11   the Livestock Deputy.  During most of the relevant time, Travis Mendes was the Livestock Deputy

12   for Humboldt County.  Deputy Mendes was usually at the Humboldt Auction Yard every

13   Wednesday when the animals were auctioned.  With his own eyes, Deputy Mendes saw the kinds

14   of animals being brought to the auction yard by other ranchers.  Deputy Mendes saw that Ray was

15   buying those animals.  Deputy Mendes knew that the herds on the other ranches and farms in

16   Humboldt County looked relatively better with the subpar animals culled out of them, while the

17   herds on Ray's pastures looked relatively worse with the addition of the auction-bought animals.

18       9.    The Livestock Deputies who preceded Deputy Mendes were well aware of how the

19   animals in Ray's herds might look to passersby, as compared to the remaining, non-culled animals

20   in other herds.  For at least 15 years, the Livestock Deputies had received occasional public

21   complaints about animals on Ray's pastures looking less desirable than animals on other pastures.

22   Sometimes people complained that an animal was loose and needed to be brought back into a

23   rancher's pasture.  In all of their written reports, the Livestock Deputies reported on their

24   investigations of these complaints.  They explained why they dismissed those complaints and took

25   no action on them.  None of Deputy Mendes' predecessors concluded Ray was neglecting his

26   animals or was an animal abuser.  And none who have held the Livestock Deputy position since

27   Deputy Mendes has believed Ray was an animal abuser.  To the contrary, they all knew how and

28   why Ray's herds looked the way they did at any given time.  The subpar animals in Ray's pastures

1  were in the process of being beefed up, not abused.  It was Deputy Mendes, and Deputy Mendes

2  alone, who claimed Ray was an animal abuser.  One might wonder why.

3         10.    A local reporter described Deputy Mendes as a "wannabe cowboy."[1]  This

4  wannabe cowboy was no passive observer at the auctions, but was an active participant.  He

5  interacted with the people and the animals, acting more like a rancher or an auction hand than the

6  law enforcement officer he was supposed to be.  He helped move the animals out of the ranchers'

7  trucks, down the ramps, through the gates, into and out of the auction arena, and into their pens

8  after they were sold and waiting to be picked up.



---

[1] John Chiv, *Travis Mendes seems obsessed with being a wannabe cowboy. Maybe he is just jealous that Ray Christie is living the life he wants?*, John Chiv, April 25, 2022, https://johnchiv.blogspot.com/2022/04/travis-mendes-seems-obsessed-with-being.html.





1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



These photos show Deputy Mendes at the Humboldt Auction Yard on April 24, 2018, working like he was an auction worker tasked with moving animals around instead of ensuring animals were protected and ranchers and auction personnel were obeying the law. Here, Deputy Mendes is seen carrying a cattle "paddle," which is like a very large baby rattle. These paddles are the proper means to help move cattle from one place to another. But in this same timeframe, Deputy Mendes

was sometimes dissatisfied with how the cattle reacted to his use of a cattle paddle and was seen using an electric cattle prod to move along subpar animals when they were stumbling, standing still, or lying down, unable to walk as he wished they would.  An electric cattle prod is the equivalent of a human stun gun.  Most cattle ranchers consider it abusive to use an electric prod to shock a sick or weakened animal into unnatural activity.

11.    It is unlawful for ranchers to drop off non-ambulatory animals at auction.  It is unlawful for auction yards to accept them.  Yet, that practice of dropping off and accepting non-ambulatory animals happened consistently and persistently at the Humboldt Auction Yard.  Ray and other ranchers in the area have taken hundreds of photos and videos at the Humboldt Auction Yard that prove the unlawful practice has been allowed to continue in Humboldt County for years, perhaps even decades.  Deputy Mendes was not just seeing the unlawful activity take place, he was an active participant in the process.  Other governmental officials, such as the state brand inspector and the state veterinarian who were on-site, watched the same unlawful practice, over and over again.

12.    Deputy Mendes apparently developed a jealous desire to take Ray down.  Perhaps Deputy Mendes envisioned himself as some sort of Wild West competitor who could improperly use his Livestock Deputy position to force Ray out of the cattle business and take his place. Imagine a real-life villain determined to ruin the likes of a real-life rancher, such as what the fictional cattle rancher John Dutton faced in the famous *Yellowstone* series from several wannabe cattle rancher competitors.

13.    As reflected in his investigative report, and in his own words, immediately after being appointed as Livestock Deputy, Deputy Mendes began an active investigation into Ray's cattle business and practices.  In his report, Deputy Mendes claims to have talked with his Livestock Deputy predecessors during his five-month investigation.  If that was true, and if he had actually read their numerous written reports documenting their responses to complaints they had investigated over the prior 15 years, Deputy Mendes would have confirmed what he already knew. Ray's herds were filled with the culled cattle Ray bought at the Humboldt Auction Yard.  Those subpar animals were skinny, sick, weak, and injured.  Those poor looking animals were on full

LARSON
LOS ANGELES

public display in Ray's prominent pastures.  Complaints about downed animals or animals that looked skinny, weak, or sick in Ray's pastures, were investigated and dismissed with no action. Everyone knew why some of the animals in Ray's herds looked that way, as Ray worked hard to beef them up.  Complaints about loose animals were also largely dismissed.  With 4,000 head of cattle scattered over 3,000 acres on 20 pastures, it was inevitable an animal could get loose, for a variety of reasons.  Often the loose animals came from other pastures and were not even part of Ray's herds.

14.    If Deputy Mendes had been doing his job without any personal animus, he would have also recognized that dead cattle carcasses on a ranch property are not evidence of anything. Cattle are not the hardy creatures they might appear to be.  They regularly get sick or injured and die.  A "closed" herd, meaning one that is self-contained and self-perpetuating through in-herd reproduction, typically has a 10% mortality rate.  An "open" herd of cattle like those Ray maintained would have a higher mortality rate, due to constant additions of culled cattle from other herds, which were already sick and diseased.  If a rancher moved 35,000 cattle through his operation in a year, and had around 4,000 on hand at any given time, one would reasonably expect him to end up with hundreds of cattle carcasses every year.  Those carcasses would not prove, much less even suggest or hint at neglect or abuse.  As has been officially reported, Humboldt County has about 71,000 cattle scattered across various pastures in the county, which would include Ray's 4,000 cattle.  Imagine all the cattle carcasses, year after year.  Where do all those cattle carcasses go?

15.    In Humboldt County, there is no good answer.  The local rendering plants were closed decades ago.  No new ones have ever been built.  Promises by Humboldt County Supervisors like Rex Bohn to address this problem, and fix it, are like many politicians' promises. The Humboldt County "promises" prove to be empty and meaningless.  There is no place for the carcasses to go in Humboldt County.  Cattle ranchers like Ray have no choice but to make "dead piles" on their properties or bury the carcasses as best they can.

16.    Even worse, if particular cows happen to die too close to sloughs or other waterways, the ranchers can potentially be cited for "littering" a state-protected waterway.  In

California, protected state waterways can mean just about anything, especially in the Arcata Bottoms. The lowlands of the Arcata Bottoms are below sea level. During the rainy winter season, it is difficult to be 150 feet away from standing water anywhere in that area. During the wet and rainy winter season, the mud is so thick and deep, vehicles cannot pull animal carcasses weighing thousands of pounds out of the muck. It is an impossible task to clean up carcasses in the Arcata Bottoms. All cattle ranchers or dairy farmers in Humboldt County face the same problem with disposal of their cattle carcasses.

17.    On information and belief, no other cattle ranchers or dairy farmers in Humboldt County have been investigated and prosecuted for animal cruelty, on the bases that a handful of their animals looked skinny, sick, or weak or that cattle carcasses were seen on their properties. Nor have any other ranchers or farmers been investigated or charged with littering, on the basis that some of their animal carcasses ended up being too close to state waterways.

18.    In spite of his personal knowledge about the source of the subpar culled cattle added to Ray's herds, and about the difficulties with carcass disposal, Deputy Mendes singled Ray out for investigation. Planning and scheming for five months, Deputy Mendes orchestrated and



LARSON
LOS ANGELES

then led a raiding party onto Ray's properties during the pre-dawn hours of a March 2018 wintery day, during a particularly rainy season. Deputy DA Kamada was part of that 30-person raiding party as they descended on Ray and his ranch house. SWAT-type personnel were in full gear, with automatic assault weapons aimed at Ray and his girlfriend as they were groggily dragged out of the ranch house onto an almost freezing porch. Shivering for 30 minutes in the cold, damp air, they were held under armed guard while the ranch house was searched. Ray was barefoot, dressed in boxers and a T-shirt. His girlfriend was also barefoot, dressed in a thin, satin slip made for sleeping, with nothing on underneath the slip. Ray asked to speak to a lawyer.

19.     Rather than calling a lawyer for him, law enforcement ensured news media would be on the scene. News reports were filed throughout the day, including photos of some of the raiding party.[2]



20.     Once the ranch house was cleared, Ray and his girlfriend were ordered back into the house and seated on a couch. Ray was placed under arrest and a member of the raiding party started to

_____

[2] Hank Sims, *Cops Raid Notorious Ranch in the Arcata Bottoms; Rancher Ray Christie Arrested at the Scene*, Lost Coast Outpost, Monday, March 19, 2018, 11:47 a.m., https://lostcoastoutpost.com/2018/mar/19/around-20-officers-multiple-agencies-descend-notor/.

put handcuffs on Ray.  Deputy Mendes stopped him, saying "this one is all mine."  Deputy Mendes produced a set of handcuffs with his name engraved on them and smugly snapped them onto Ray's wrists.  The other set of handcuffs was put on Ray's girlfriend, who was finally provided with a blanket.

21.    Ray again asked to speak with a lawyer.  Undeterred, and in obvious affront to the Ray's constitutional rights, Deputy Mendes, Deputy DA Kamada, and other members of the raiding party interrogated Ray while he sat on the couch.  They tried to trap Ray into discussing his procedures for caring for subpar animals, like the ones brought to the property in the middle of the night, just hours before the raiding party arrived.  The answers to those questions go right to the heart of animal cruelty charges pursued against Ray, which required proof that Ray "deprived" his animals of "necessary sustenance, drink, or shelter" or "otherwise subjects an animal to needless suffering" or "in any manner abuses an animal."  Deputy Mendes secretly recorded these unconstitutional inquiries on his cell phone and then hid the recording for the next one and a half years, until it was revealed during his cross-examination in the Humboldt County courthouse.  When Deputy Mendes continued to seek answers, Ray tried to explain that the truck outside, which was still backed up to the loading chute, indicated a load of cattle must have been delivered from auction in the middle of the night.  When that happens, cattle are sometimes already dead or dying, while others are sick, weak, injured, hungry, thirsty, and tired.  Ray's explanation fell on deaf ears.

22.    When Ray's unconstitutional interrogation ended, Ray's girlfriend asked if she could get dressed.  Deputy Mendes ordered that she could do so in the physical presence of a member of the raiding party.  She struggled to walk sideways up the steep staircase to the bedroom, clutching her mid-thigh slip against her leg to protect herself from the prying eyes of male raiding party members following her up the stairs.  A female member of the raiding party finally persuaded Deputy Mendes to allow Ray's girlfriend to get dressed in the bedroom closet.  After remaining in on-site custody for a significant period of time, Ray was finally escorted out of the ranch house, put into a law enforcement SUV, and transported for booking to the Sheriff's

1   Office in downtown Eureka.[3]



23.     Meanwhile, the animals at and near the ranch house were neglected for several hours.  Some of those animals had just come from auction.  They were hungry, thirsty, tired, sick, skinny, and weak.  Ray's ranch hands were prevented from their normal feeding and caring for the animals, especially those that had arrived from auction overnight.  The two state veterinarians on the scene did nothing.  Not one of the 30 members of the raiding party fed or watered any of the animals.  Apparently, none of them personally cared about animal neglect or abuse.

---

[3] Hank Sims, *Cops Raid Notorious Ranch in the Arcata Bottoms; Rancher Ray Christie Arrested at the Scene*, Lost Coast Outpost, Monday, March 19, 2018, 11:47 a.m., https://lostcoastoutpost.com/2018/mar/19/around-20-officers-multiple-agencies-descend-notor/.

24.    Apparently, no one on the scene believed any animals needed to be taken away for any care, except with respect to one lonely goose.  The goose had its wing shot off, presumably by hunters or poachers, and it had managed a "lame duck" landing near Ray's ranch house.  The goose was a "free-loader" that roamed the hundreds of acres of pastures around Ray's ranch house and joined the free range chickens and other birds who ate the feed Ray put out for them.  That Canadian goose had never previously been locked up, until Deputy Mendes' raiding party locked the poor goose in a cage and took it away, never to be seen again.[4]



25.    Ray was photographed, fingerprinted, and booked at the Sheriff's Office.  The raiding party led by Deputy Mendes had achieved its objective.  Rather than aiding any supposedly abused animals that day, they had their man, who was already charged, convicted, and

---

[4] Hank Sims, *Cops Raid Notorious Ranch in the Arcata Bottoms; Rancher Ray Christie Arrested at the Scene*, Lost Coast Outpost, Monday, March 19, 2018, 11:47 a.m., https://lostcoastoutpost.com/2018/mar/19/around-20-officers-multiple-agencies-descend-notor/.

1  incarcerated in their own minds.  After posting bail, Ray was finally allowed to return to the ranch

2  house.  Ray and his ranch hands spent all that night and the next day trying to round up and

3  segregate the animals the raiding party had recklessly allowed to roam out of their proper pens and

4  pastures.  Several hundred animals were indiscriminately mingled together, with no regard for

5  their relative health or recovery needs.  While Ray was trying to clean up the mess left by the

6  raiding party, the raiders moved on to the other properties that same day and the next.  At one of

7  those other properties, Deputy Mendes boasted to Ray's ranch hand about what was happening.

8  Deputy Mendes gestured in a sweeping motion to the large number of people in his raiding party,

9  then bragged:  "Do you see this?  This is all because of me."  Later, while the felony animal abuse

10 charges were still pending against Ray, the father of Deputy Mendes, who was also a law

11 enforcement officer with the Ferndale Police Department, boasted to a local cattle rancher that

12 "my son Travis took Ray Christie down."  Deputy Mendes began to acquire his own cattle and




LARSON
LOS ANGELES

dress and act like a cowboy.[5]  He was essentially out of control, believing he could treat anyone in any fashion, all under color of state law.  For instance, Deputy Mendes beat up a reporter covering a story in the Redwood forest, which resulted in Humboldt County making a substantial payment of taxpayer money to settle a civil rights action brought by the reporter against Deputy Mendes and another officer.[6]



26.     While gathering evidence of supposed animal abuse over those two days of the March 2018 raid, Deputy Mendes was so eager to take Ray down that he intentionally altered evidence, in violation of Ray's Fourteenth Amendment rights.  For instance, before taking a

[5] John Chiv, *Travis Mendes seems obsessed with being a wannabe cowboy. Maybe he is just jealous that Ray Christie is living the life he wants?*, John Chiv, April 25, 2022, https://johnchiv.blogspot.com/2022/04/travis-mendes-seems-obsessed-with-being.html.
[6] Kym Kemp, *The Civil Liberties Defense Center Filed Suit Against Humboldt County and Two Sheriff's Deputies Alleging Police Brutality Against a Journalist*, Redheaded Blackbelt, April 15, 2020, https://kymkemp.com/2020/04/15/today-the-civil-liberties-defense-center-filed-suit-against-humboldt-county-and-two-sheriffs-deputies-alleging-police-brutality-against-a-journalist/.

supposed evidentiary photo, Deputy Mendes moved a cattle ear tag so it would look like it was associated with a bleached out skull on the ground. He also moved a wheelbarrow to take a more dramatic photo of a cow carcass. Worse, Deputy Mendes later lied under oath in the Humboldt Courthouse about the sources of "evidence" he gathered. For instance, he claimed only three devices were used to collect photo and video evidence on those two days. But the remaining metadata associated with the photos and videotapes produced by the District Attorney's Office, and eventually used in Ray's prosecution, proved that at least 18 devices had been used. As another example, eight photos were shown to Deputy Mendes while he was on the witness stand. He testified under oath he had personally taken those photos during the March 2018 raid. But the remaining metadata associated with those photos proved they had been altered months earlier, with no way to tell when the photos had actually been taken.

27.    Deputy DA Kamada was also guilty of sloppy or intentional alteration of evidence in Ray's investigation and prosecution. Deputy DA Kamada had been ordered by the Humboldt Superior Court to personally preserve whatever evidence was gathered in the raid. Six electronic devices were seized during the raid, some of which were Ray's and some were his girlfriend's. None of those six devices has been returned to this day. A preservation expert's examination of those six devices revealed that at least one had been "wiped" clean, potentially destroying exculpatory evidence that would be favorable to Ray. Deputy DA Kamada was later publicly accused by a colleague in the District Attorney's Office as being reckless or perhaps negligent in his handling of evidence in criminal cases.

28.    When Ray's attorneys sought to examine Deputy DA Kamada in the Humboldt Courthouse about his handling of the evidence, he resisted providing any testimony and growled in a stage-whisper to Ray, sitting beside his attorney at counsel table, "you're a fuckin' joke." Deputy DA Kamada was later fired by the elected District Attorney for violating office policy and procedure with respect to involving himself in an investigation in a way that would make him a potential witness, which is not altogether different from what he did during the raid when he participated in Ray's unconstitutional interrogation.

29.    The raiding party also confiscated four guns at the ranch house during. Three of

1   the guns were shotguns, which were used for self-protection. The fourth gun was a rifle, which

2   was used for the sad, but occasionally necessary euthanization of a suffering animal. None of

3   those six guns has ever been returned to Ray.

4         30.     Ray was charged by Deputy DA Kamada with several counts of felony animal

5   abuse, based on the physical condition of fewer than 10 cows, which were never fed nor medically

6   treated or taken away during the March 2018 raid. Those few "abused" cows were among the

7   4,000 cattle in Ray's herds that were searched those two days by the 30-member raiding party.

8   Many of them had arrived during the middle of the night from auction and were already in poor

9   condition. Deputy DA Kamada also charged Ray with several misdemeanor counts of littering

10  state waterways, based on various carcasses that were allegedly located within 150 feet of a state

11  waterway.

12        31.     In Ray's 2019 trial, the jury hung on the felony animal abuse counts. The jury

13  convicted on some of the littering counts, acquitted on some of them, and hung on others. As a

14  second trial approached in late 2021, Ray's attorneys challenged the legality of the evidence

15  collected during the March 2018 raid and during a second raid conducted in the fall of 2021.

16  During court proceedings to consider those challenges, the court threw out all of the evidence from

17  the second raid in the fall of 2021 and allowed Ray's attorneys to elicit evidence of Deputy

18  Mendes' unconstitutional evidence collection and false testimony about what happened during the

19  first raid in March 2018.

20        32.     Following those challenges by Ray's attorneys, the District Attorney's Office

21  dropped all of the felony animal abuse charges against Ray in the late fall of 2023. It also

22  dismissed the remaining littering charges against Ray, and agreed to allow Ray to make a $12,000

23  donation to a local non-profit called Redwood Pals Rescue in lieu of any fine or other penalty for

24  littering. The littering charges were later set aside pursuant to a California statute that is roughly

25  the equivalent of expungement.

26        33.     Between the time of the March 2018 raid, and the District Attorney's dismissal

27  of the felony animal abuse charges in late 2023, Ray and his girlfriend and their two young boys

28  suffered in so many ways. For one thing, Ray was attacked by the local press and public. In their

LARSON
LOS ANGELES

19
COMPLAINT

eyes, he was guilty until proven innocent.  Ray was openly mocked and belittled as a callous animal abuser.  Virtually every press account showed Ray's booking photo and one dead cow in a pasture, as visual proof that Ray was an animal abuser.  The dead cow was 18 years old when it died, not from abuse or neglect, but from old age.  That particular cow was one of the exotic animals in the zoo pasture across the street from Ray's ranch house.  It was a rare Watusi, found in the eastern and central parts of Africa.  Ray loved that animal and cared for it the entire time it was in Ray's possession.  Rather than provide those kinds of facts, the North Coast Journal chose instead to publish a cartoon "intended as a commentary on the criminal allegations currently facing local rancher Ray Christie," which depicted a dead cow in a stall at the Humboldt County fair, described as the entry from the Christie ranch.[7]



---

[7] North Coast Journal Staff, *Christie Ranch Entry at the County Fair*, North Coast Journal, August 23, 2018, https://www.northcoastjournal.com/humor/christie-ranch-entry-at-the-county-fair-10574542/; North Coast Journal Staff, *Clarification*, North Coast Journal, September 13, 2018, https://www.northcoastjournal.com/news-2/clarification-10947507/.

34.     As a result of this onslaught of negative publicity, people would drive by Ray's ranch house, honking their horns, shaking their fists, and yelling and cursing at Ray about what a terrible person he was and how he was nothing more than a useless animal abuser.  Ray's young boys saw and heard these troubling attacks on their father.

35.     A second raid in late 2021 had caused even more terror in the Christie ranch house every time someone banged on the door.  Plenty of times, the person banging on the door was a law enforcement officer, supposedly checking up on a report of a downed, sick, or escaped animal on one of Ray's pastures.

36.     Ray's health suffered.  He contracted cancer and a heart condition, which prevented him from clearing his name in a second trial due to trial continuances while his attorneys uncovered the fatal evidentiary deficiencies in the District Attorney's case against Ray.

37.     Ray spent hundreds and hundreds of thousands of dollars in attorney's fees during those 5 ½ years and continues to spend money on lawyers as he attempts to vindicate his constitutional rights in this lawsuit.

38.     Ray's business efforts suffered and continue to suffer.  As just one example, Ray suffered immediate and lasting damage to his relationships with beef processors.  His primary buyer at the time of the raid was Jay Houser at Walt's Wholesale Meats in Woodland Washington.  Mr. Houser called Ray to tell him one of Walt's most important customers, Costco, had called to ask about Ray.  When Costco confirmed that Ray supplied Walt's with beef, Costco said they would no longer buy meat from Walt's if Ray continued to be one of the suppliers.  Mr. Houser informed Ray he could no longer buy Ray's beef, which was devastating for Ray and his cattle business.

39.     As another example, several loans have been denied to Ray after the underwriters performed their due diligence on Ray.  Not knowing any better, they consider an "animal abuser" to be a risky proposition, not worth the risk.  Even to this day, if loan underwriters or other people search for Ray Christie on the internet, they will read all about the charges against him.  But, other than the thorough local reporting by John Chiv, there is no hint, not even a whisper, that the animal abuse charges against Ray were all dismissed.  Many people in the local community, and

elsewhere, continue to believe Ray is an animal abuser. Ray is innocent, and no one but John Chiv apparently recognizes that fact. The truth is Ray is an animal lover. At this point, Ray has no other realistic choice but to bring this lawsuit to clear his name and defend his rights.

40.     The criminal investigation of Ray was pretextual. The allegations against Ray were knowingly false, misleading, and not credible. Deputy Mendes did not have probable cause to arrest Ray. Deputy DA Kamada did not have a good faith basis for pursuing a felony animal abuse case against Ray, in light of the known facts and the unconstitutional methods used in collecting and preserving the "evidence" against Ray. Under color of state law, Deputy Mendes and Deputy DA Kamada acted for the sole purpose of unlawfully and improperly retaliating against, harassing, and punishing Ray for Ray's exercise of his constitutional right to access and defend himself in court in the cockfighting matter.

41.     Deputy Mendes' and Deputy DA Kamada's wanton disregard of Ray's constitutional rights violates the United States Constitution and 42 U.S.C. § 1983. As a direct and proximate result of their actions, Ray has suffered and will continue to suffer damages. For these reasons, and as set forth below, Ray is entitled to compensatory damages, punitive damages, attorneys' fees and costs, pre-judgment interest, and all other relief provided by law.

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

42.     This suit is brought under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

43.     Venue is proper under 28 U.S.C. § 1391(b) because, on information and belief, both Deputy Mendes and Deputy DA Kamada reside in this judicial district, a substantial part of the events giving rise to this complaint occurred in this district, and the properties searched during the March 2018 raid are located in this district.

44.     Pursuant to Civil Local Rule 3-2(c), assignment of this suit to the Eureka Division of the United States District Court, Northern District of California is proper because the events giving rise to the claims alleged occurred in Humboldt County. Plaintiff does not consent to having his case assigned to the Eureka Division. *See* Civil L.R. 73.

1

**PARTIES**

2    45.    Plaintiff Raymond Frank Christie is an individual residing in Arcata, California.

3  He is a cattle rancher who owns, leases, and maintains various ranches in Humboldt County,

4  California.

5    46.    Defendant County of Humboldt ("Humboldt County") is a municipal corporation

6  organized and existing under the laws of the State of California.  Humboldt County is, and was at

7  all relevant times mentioned herein, responsible for all the actions and/or omissions and the

8  policies, procedures, customs, and practices of the Humboldt County Sheriff's Office, the

9  Humboldt County District Attorney's Office, and their respective employees, agents, and officers.

10    47.    At all relevant times, Defendant Travis Mendes was the Humboldt County Sheriff's

11  Office's Livestock Deputy ("Deputy Mendes").  Deputy Mendes is sued in his individual and

12  official capacity.

13    48.    At all relevant times, Defendant Adrian Kamada was a Humboldt County Deputy

14  District Attorney ("Deputy DA Kamada").  Deputy DA Kamada is sued in his individual and

15  official capacity.

16    49.    At all relevant times, Defendant Sheriff William "Billy" Honsal was the Sheriff of

17  the Humboldt County Sheriff's Office's ("Sheriff Honsal").  Sheriff Honsal is sued in his

18  individual and official capacity.

19    50.    Ray is ignorant of the true names and capacities of defendants sued herein as Does

20  1-10, inclusive, and therefore sues these defendants by fictitious names.  Ray is informed and

21  believes, and therefore alleges, that Does 1 through 10 are in some manner responsible for the acts

22  and occurrences set forth herein and are legally liable to Ray.  Ray will seek leave to amend this

23  complaint to allege the true names and capacities of those fictitiously named defendants, together

24  with the appropriate allegations, when ascertained.

25    51.    On information and belief, at all relevant times, each defendant was the agent,

26  servant, and/or employee of each and every other defendant, and the acts of such defendants were

27  within the course and scope of said agency and/or employment.

28

1

## FACTUAL ALLEGATIONS

2

    **A.**    **Ray Has Cared for Animals All His Life**

3

    52.    Ray is a fourth-generation cattle rancher, who has lived his entire life in Humboldt

4

County, California.  His great-grandfather was a dairy farmer in Ireland.  His grandfather

5

emigrated from Ireland and entered the dairy business in Humboldt County.  Ray's father raised

6

and cared for dairy and beef cattle in the area.

7

    53.    Ray grew up on his family's ranch on Crannell Road in McKinleyville and has

8

been taking care of animals his entire life.  From a young age, Ray developed particular interest in

9

and skill with tending to weak, sick, little, hurt, and unwanted animals, both domesticated and

10

wild.  He began attending local livestock auctions when he was approximately thirteen years old,

11

where he acquired animals, such as ducks and chickens, that others no longer had use for.  Ray

12

raised these unwanted animals to be resold for a profit.

13

    54.    Ray operates his cattle ranching business on thousands of acres of pasture land in

14

and around Arcata in Humboldt County.  Ray ran tens of thousands of cattle through his operation

15

annually, and spent approximately a million dollars each year to provide food, medicine, hay, and

16

care to his herd and to run his operation.

17

    55.    Ray's ranch house and related barns and pastures are located in the Arcata Bottoms.

18

This is where the initial unloading, evaluation, rehabilitation, medicating, and branding of cattle

19

from auctions takes places.  The land in this area consists of creeks, sloughs, tidelands, and

20

wetlands along the Humboldt Bay.  The Arcata Bottoms were salt marsh prior to reclamation of

21

the land for agricultural use by draining, diking, and damming in the late 1800s.  Lumber and

22

dairying were the two largest industries in the area.  Ray's properties in this area, which he owns

23

as well as leases from others, are at or below sea level.  The Arcata Bottoms area floods

24

throughout the year due to rain and snowmelt, especially during the wet winter months.

25

    56.    Ray's business model is different and unique in Humboldt County.  While other

26

cattle ranchers and dairy farmers are eager to cull the subpar cattle from their herds, Ray built his

27

herds with the culled cattle he bought principally at the auction yards and sometimes directly from

28

other ranchers.  Ray acquired the cull cattle at reduced prices.  Other ranchers would also give

their subpar and unwanted cattle to Ray by leaving the animals in a pen in Ferndale where Ray and his workers would collect them, or by leaving them at Jackson Road Ranch, Ray's home and main ranch.  Some of the cattle left in the pen would be dead by the time Ray picked them up; some of the cattle would die after other ranchers dropped them off at Jackson Road Ranch.  If Ray was able to rehabilitate a cow given to him and eventually sell it, he would share the proceeds with the person who gave him the cow.

57.    The cattle Ray acquired were often weak, sick, or malnourished.  Ray would rehabilitate these subpar animals and beef them up for future sale at higher prices.  Unlike many other cattle operations, Ray did not work on a rigid timeline for readying his herd for sale.  He had the land and resources to nurse cattle back to health, move them from pens to pastures to feedlots, and eventually sell them.  With decades of experience in the cattle industry and the resources required to operate a large cattle operation, Ray cornered the "buy low, sell high" market in the area.  Ray's business model was neither improper nor illegal, and in fact provided an important service and humane contribution to the overall livestock industry by addressing the issue of subpar cattle that are culled from other ranchers' herds.

58.    Ray is at least the fourth generation in his family to work with cattle.  Ray has a gift—something like a "cow whisperer"—for assessing what is wrong with a particular animal and then figuring out what treatment that animal needs to survive and then thrive.  Ray is able to determine which cows might be kept in organic status and which ones need to be transitioned into conventional status to allow them to be treated with appropriate medicines.  This assessment process starts at the auctions, where Ray made snap decisions about which animals to buy based on a brief observation during the rapid-fire auction process.  For many years at the local auction yard—the Humboldt Auction Yard in Fortuna—Ray bought most of the animals offered by other ranchers every week.  Ray also purchased cattle from other auctions in the region, such as the Shasta Livestock Auction.  With his decades of experience working with cattle, Ray created a very successful business rehabilitating others' castoffs.  The local community took notice.

59.    Ray's lifelong presence in the tight-knit ranching community in Humboldt County would likely be enough for him to be known locally.  Regardless, Ray is not one to fade into the

background.  Ray's love for animals—from pet dogs and pot-bellied pigs, to the cattle he raises—has led him to bring home and care for animals of all kinds.  For example, across the road from his house he maintains a herd of exotic livestock, including Scottish Highland cattle and Texas Longhorns.  Ray is not the only one to who appreciates these animals.  A busy public road runs along this field, and locals and tourists alike often slow down and appreciate the unexpected sight of exotic cows in the middle of the redwoods.

      **B.**      **<u>Humboldt County Cattle Ranchers Operate in a Dysfunctional System</u>**

             1.    <u>Cows Die</u>

60.    All cattle herds have significant mortality rates, and cows dying in cattle herds does not constitute animal abuse.  Even though cattle may look sturdy and robust when seen out in the pastures, they are surprisingly vulnerable to a host of natural ailments.  They get sick from eating poisonous plants, contract diseases, get injured, become weak, and die.

61.    Healthy, closed cattle herds experience an annual mortality rate of approximately 10%.  Closed herds are bred, born, and raised in contained pastures.  Cattle in closed herds do not mix with bulls, cows, and calves from other herds, so the risks of contagious disease are reduced. The math is obvious.  If a rancher had a closed herd of 4,000 cattle (which is the approximate number of cattle in Ray's herds at the time of the March 2018 raid), one might expect 400 of them to die in the normal course.

62.    For a cattle rancher like Ray who bought and sold cattle all year long, he might run 30,000-40,000 cattle through his operation in a year.  Again, the math is obvious.  One would expect at least 3,000 of the cattle to die every year, assuming the typical 10% mortality rate applied to an open herd the same way it applies to a closed herd.  That same mortality rate would obviously not apply, however, because the mortality rate for an open herd would be as high as 20%.  In other words, in one year of Ray's operations, one might expect 3,000 to 8,000 cows to die of natural causes.

             2.    <u>Everyone Knew Ray Purchased Unwanted Cattle</u>

63.    A widely known and inescapable fact about Ray's cattle operation is that the undesirable, subpar cattle Ray acquired inevitably resulted in a herd with higher sickness and

1    mortality rates than would be expected in otherwise healthy herds.

2        64.    Ray operated his cattle business within a dysfunctional system that existed and

3    continues to exist in Humboldt County.  Cattle were and continue to be routinely mistreated and

4    uncared for by other ranchers, dairymen, and farmers, then sold at auction to Ray when the

5    animals were no longer desirable or profitable.  If the animals could not be sold at auction because

6    they were in too poor of a condition, community members would get rid of their unwanted junk

7    cattle by off-loading them directly to Ray.  That way, they did not have to deal with properly

8    disposing of the subpar cattle or their resulting carcasses, which is a significant challenge in

9    Humboldt County.  Ray built his business by taking a chance on cattle others did not want and

10   then by rehabilitating them for eventual sale or breeding use.  Everyone involved in the cattle

11   industry in Humboldt County knew that this was Ray's practice, and many benefitted from it.

12       65.    Organic dairy cows, old breeding bulls, sick cattle, injured cattle, herd and

13   individual livestock dispersal, and also healthy cattle are sold weekly at local livestock auction

14   yards.  The older, sick, lame, and injured cattle sell for the lowest price per pound.

15       66.    The Livestock Deputies, state veterinarians, and state brand inspectors regularly

16   attended the weekly auctions at the Humboldt Auction Yard.  The Livestock Deputies who

17   attended the weekly auctions during the time period relevant to this case were Deputy Mendes and

18   Sergeant Joshua McCall.  The county and state officials saw the poor condition of the cattle that

19   were being brought to the auction and sold, and saw *who* sold these subpar animals at auction.

20   Federal regulations require livestock auction yards to maintain detailed records regarding the

21   brand information for cattle bought and sold and to have these records available for inspection, so

22   this information was readily accessible to the county and state officials attending the auction.

23       67.    For years before the 2018 raid, during the pendency of Ray's criminal case, and to

24   the present day, local ranchers and dairymen who purchased animals at the weekly auction, and

25   who sometimes worked with Ray, reported to the Sheriff's Office the problems with the livestock

26   being sold at auction.  They sent photos, videos, and detailed descriptions of their observations.

27   They implored Sheriff Billy Honsal himself, along with Sergeant McCall and others, to take action

28   to address the neglected, sick, skinny, lame, and weak cattle being sold at the auction.  The

1  Sheriff's Office did not seriously pursue these reports.  Sheriff Honsal dismissed the complaints,

2  stating that he knew that the person reporting them was a friend of Ray, and wished him "Good

3  luck my friend."

4                3.        There is No Rendering Plant to Dispose Carcasses

5        68.        The best way to dispose of cattle carcasses is to send them to a rendering plant,

6  where the animals can be safely processed into hides, tallow, grease, and meal by-products.  There

7  are no such rendering plants in Humboldt County, and none have existed more than 20 years.  The

8  Eureka Protein Company was the last local rendering plant in the area.  It was housed in the

9  Tallow Works building, which has been publicly reviled for its stench and "long deemed a

10 nuisance by the city and a thorn in its side."  That plant closed in February 2003.  No others have

11 been built since then.

12       69.        In 2015, a rendering service that picked up carcasses ceased operation in the area.

13 At that time, County Supervisor Rex Bohn and officials from Humboldt County Environmental

14 Health, the agricultural commissioner's office, Humboldt Waste Management Authority, and other

15 county officials promised an immediate solution.  They proposed using a plant in Sacramento or

16 shipping the byproducts to landfills that took Humboldt County waste.  Those plans never

17 happened, and a decade later Humbolt County still has no plan for carcass disposal.

18       70.        There are no other rendering plants nearby.  The closest ones are in Sacramento and

19 Petaluma, which are both nearly 300 miles away over mountainous roads, or in Portland, over 400

20 miles away.  It is cost prohibitive and realistically impossible to transport cattle carcasses over that

21 distance on a regular basis before the carcasses deteriorate to the point they cannot be used.

22       71.        On information and belief, many, if not all, Humboldt County ranchers and dairy

23 farmers have dead piles and carcass pits on their properties.  There is no other way to dispose of

24 the carcasses.  The ranchers and farmers are constrained by a host of conflicting regulations about

25 disposal of carcasses, which come from the state, the county, and environmental commissions like

26 the Coastal Commission.  State regulations prevent carcasses from being moved more than three

27 miles from where they died.  County regulations dictate that carcasses should be left "a minimum

28 of 150 feet from the high-water mark of any watercourse or body of surface water" and "at least 5

1    feet above the seasonally highest level of groundwater.  In other words, locate the burial site on

2    the highest ground available."

3         72.    Ray's main ranch is out on the Arcata Bottoms.  Much of the land is at or below sea

4    level.  During the rainy winter season, there is no way to move animal carcasses when cattle die

5    out in the low-lying pastures, which are wet, muddy, and soggy.  Mature cows weigh 1,000-2,000

6    pounds.  Their carcasses cannot be easily moved, even when it is dry, and it is impossible to move

7    them during the wet winters.  Ranches, farms, and dairies in low-lying land sometimes have no

8    better option than to leave a carcass in the field until conditions are dry enough to collect it.

9    Trucks frequently get stuck in the mud attempting to retrieve cattle carcasses.

10        73.    At the time of the 2018 raid, there were approximately 71,000 cattle in Humboldt

11   County.  At the 10% mortality rate typical to healthy, closed herds, one would expect 7,100 cattle

12   to die in Humboldt County with no way to dispose of them, aside from burying them.  But many of

13   the cattle in Humbolt County are sick and mistreated, and on information and belief, a greater than

14   average amount die annually.

15        74.    In an area where raising cattle for dairy and beef is a longtime main industry, the

16   closure of the rendering plant left ranchers in an impossible position.  County, local, and state

17   agencies have been aware for decades that Humboldt County's lack of a rendering plant is a

18   significant problem, yet have failed to do anything about it.  County, local, and state laws and

19   policies do not address the realities and environmental conditions in Humboldt County that make

20   proper disposal of carcasses challenging if not impossible.  With tens of thousands of cattle raised

21   and living in the region, it is a failure of Humboldt County not to implement a means of carcass

22   disposal.  The lack of carcass disposal options leaves local ranchers and dairymen in an untenable

23   and unsustainable position.  Thousands of cattle raised in these operations inevitably die, and there

24   is nowhere legal to dispose them.  Yet Humboldt County does nothing to address the issue.

25              4.    Ray Took in Dying Cattle and Rehabilitated Them

26        75.    Ray added new cattle to his herd multiple times per week, often daily.  Animals

27   bought at the auction yards were first delivered in cattle trucks to Jackson Road Ranch.  Drivers

28   for Ray regularly delivered cattle between midnight and 4 a.m.  The cattle were unloaded by the

truck drivers and immediately segregated by the experienced drivers, and ranch hands if available, into different movable and adjustable pens based on their size, health, and strength.

76.    Several of Ray's workers live on the Jackson Road Ranch in trailers Ray has provided for them.  These workers would get up early in the morning and begin processing the cows that arrived overnight.  Ray then made his own further assessment about which animals should be sent out to pasture, which ones should be combined with other existing herds on various properties, and which ones should be kept under close supervision at the barn and "sick pen" near the ranch house.  Because Ray maintained an open herd, with cattle continuously added to the herd from other cattle operations, all cattle received multiple vaccinations and deworming treatment when they entered Ray's herd.

77.    Under Ray's supervision, many of the cull cattle were rehabilitated.  But not all.  Some, for obvious reasons, died.  And, while in the process of being rehabilitated, many of the cattle in Ray's herds looked relatively skinny, sick, weak, and lame, especially compared to the herds from which those animals were culled.

78.    In 2018, when the events giving rise to Ray's civil rights claims arose, Ray kept cattle on approximately 3,000 acres of land in 20 different locations in Humboldt County.  While Ray kept most of his herd in Humboldt County, he also maintained cattle operations on approximately 15,000 acres of land outside of Humboldt County.

79.    Every day, Ray maintained thousands of cattle in his pastures in the Arcata area.  Ray and his workers checked the fences surrounding these pastures daily.  The approximately 3,000 acres of land on which Ray maintained cattle were enclosed by thousands and thousands of feet of fencing.  Ray had a worker whose sole job was to inspect, maintain, and repair fencing.  The pastures were typically subdivided to make smaller areas for containing cattle, which increased the amount of fencing to maintain.  Additionally, many of the enclosed pastures are double-fenced, with an electric fence inside and a barbed wire fence several feet back.  This buffer allows goats to do their work between the two fences, eating the noxious weeds before they infected the pastures, many of which can be deadly to cattle, so that the cattle can graze on the uninfected grass.

80.     The fences needed to be maintained constantly.  Wild elk destroyed them.  In the wet winter months, fences would often wash out after storms or when the rivers, creeks, and sloughs would flood.  Trespassing fishermen and hunters stepped on the fences and cut wires to illegally enter Ray's land to hunt and fish.  Thieves stole the solar equipment used to power the electric fences, causing the fences to die and the cattle to escape.  Some of Ray's pastures abutted hiking and walking trails, where walkers would take their dogs off leash and permit them to run around and chase Ray's cattle.  This scared the cattle, who would run through the fences—even the electric ones—to escape the dogs.  On Ray's pastures along the 101 Highway, cars crashed and broke through the fences.  Due to the size and scope of Ray's cattle operation, Ray was so well known to the California Highway Patrol that they would come knock on his door or call him in the middle of the night to notify him if cows got loose in the area.  Ray would assist the highway patrol officers by rounding the cattle up, even if they were not his, and would help identify their owner.

81.     Every day, Ray and his workers would give the cows food and water and check on their overall wellbeing.  For cattle at Jackson Road Ranch, Ray and his workers would provide the animals with fresh hay bedding, food, and water, and tend to the sick or weak cattle held in the sick pen and the barn.  The sick pen is near Ray's ranch house, which is very close to the main road, and Ray kept other cattle needing close supervision in a pasture near his home.  Anyone driving by can see these cattle, which are the worst in Ray's herd.  Because of this, passersby would occasionally report Ray's operation to the Sheriff's Office, which would investigate the complaint.

**C.      Ray's Operation Became a Target in Humboldt County**

      1.      Livestock Deputies Inspected Ray's Operation for Decades and Never Found Animal Abuse

82.     The Sheriff's Office has been monitoring and investigating Ray's cattle business for decades.  The Sheriff's Office investigation records provided by Deputy DA Kamada to Ray during his criminal prosecution date back to 2004.  The investigations followed an identical fact pattern: people drive by Ray's ranch, make assumptions, and report Ray.  Multiple Sheriff's

1   Office investigative reports reflect that Ray acquired subpar animals and rehabilitated them.

2   Livestock Deputies and other Sheriff's Office deputies visited Ray's properties many times in

3   response to complaints concerned about the condition of the cattle in his herd and calls regarding

4   loose livestock from his pastures.  With thousands of cattle in Ray's herd, some cattle would break

5   through fences and gates and get loose.  Locals would contact the Sheriff's Office regarding the

6   loose cattle.

7          83.    Each time, the Livestock Deputy or other deputy investigating found no issues with

8   Ray's operation.  Given their numerous visits to Ray's multiple properties, and their knowledge of

9   his cattle operation and livestock purchases, the Livestock Deputies understood Ray's business in

10  the context in which it operated.  Livestock Deputy Todd Fulton, for example, "personally saw"

11  Ray purchase animals "in poor health" every week "for a low price at the auction," and observed

12  that the animals put on weight after Ray acquired them.  Ray "takes them home, worms them,

13  gives them any antibiotics, medications or supplements they may need. i.e. vitamins and minerals,

14  checks there [sic] feet then turns them out on pasture.  Where they are expected to gain weight to

15  be resold at a later date or kept depending on the sex for breeding purposes."  The Livestock

16  Deputies knew that some of the cattle Ray acquired were "in <u>extremely poor health when</u>

17  <u>purchased</u>.  He doctors these animals after purchasing them and turns them out in hopes they gain

18  weight to be resold or added to his personal herd at a later date." (emphasis in original).

19         84.    For years, Livestock Deputies Todd Fulton and Kevin Kastler "found no neglect of

20  any animals that I observed on the Christie Ranch."  Repeatedly, over the years, they "did not see

21  any signs of criminal neglect of the animals."  They knew for 15 years before the March 2018 raid

22  that Ray did not "purchase the healthiest cattle at the auction, because he doesn't make any money

23  purchasing the expensive livestock.  After purchasing the cattle he vaccinates them and places

24  them in the field located closest to the rd (Jackson Ranch rd.)."  They knew that "people who pass

25  by immediately think he doesn't feed or care for his livestock at this location."  That, as observed

26  by Livestock Deputy Phillip Buihner, during the rainy winter season, "there is mud everywhere

27  livestock are being fed" and the pastures often flood.  The animals the Livestock Deputies

28  observed on Ray's ranch had sufficient food and water, and the "cattle and horses did not appear

1   to be overly thin." In response to the Sheriff's Office's inquiries and investigations, Ray provided

2   detailed documentation of where the animals came from via auction and veterinary records, and

3   showed officers the sick pen near his home, where he kept a close watch on the highest-need

4   animals in his herd, the ones that had recently arrived from other ranchers, dairies, and the local

5   auctions.

6          2.      Ray is Acquitted at a Cockfighting Trial

7          85.     In 2008, Ray was investigated by the Sheriff's Office for running a supposed

8   cockfighting operation on his properties. After hearing these suspicions by word of mouth, the

9   Sheriff's Office raided two of Ray's properties. While officers did not uncover any cockfighting,

10  they found paraphernalia that they suspected to be related to cockfighting. Armed with this

11  circumstantial evidence, they obtained an arrest warrant for Ray.

12         86.     News regarding Ray's cockfighting case spread quickly through the community.

13  Ray entered his not guilty plea in a courtroom packed with community members who came to

14  observe the proceedings, including law enforcement personnel from the Sheriff's Office and

15  prosecutors from the District Attorney's Office. This fervor continued throughout Ray's case.

16  The controversial trial drew an array of colorful characters, including a Humane Society official, a

17  cockfighting expert, and even one of Ray's own brothers, who was set to testify in court. On the

18  day the jury delivered its verdict, the courtroom was again packed with many community

19  members, once again including law enforcement personnel from the Sheriff's Office and

20  prosecutors from the District Attorney's Office, who were invested in the case and had convinced

21  themselves of Ray's guilt.

22         87.     The jury acquitted Ray. The court declared a mistrial. The District Attorney

23  evaluated the evidence leading to trial, the trial itself, and the outcome. The District Attorney

24  elected not to retry the case. Many in the community were upset that Ray had not been convicted,

25  convinced by the media coverage and publicity that Ray must be guilty. Ray was displeased and,

26  not one to fade into the background, he celebrated his vindication by ordering large, custom-made

27  decals of a rooster to adorn the front fenders of trucks he drove around town.

28

LARSON
LOS ANGELES

3.    An Unauthorized and Intrusive Drone Flyover Puts Ray on the Map

88.    In April 2015, local news site *The Lost Coast Outpost* posted an article titled "(VIDEO) Drone Flight Reveals Mass Open Grave of Cattle Carcasses in Arcata Bottoms."  The article contained a video taken by a drone, which flew low over Ray's property without authorization, of a pile of cattle carcasses on Ray's ranch.

89.    Ray maintained the pile of carcasses on the highest spot of land at Jackson Road Ranch in an effort to comply with Humboldt County's disposal guidelines, which mandated that carcasses should be buried at least five feet above the seasonally highest level of groundwater, i.e. the highest ground available.  At the time, the Humboldt County Environmental Health Director acknowledged that Humboldt County's disposal guidelines "would prohibit him from burying cows anywhere on his property."

90.    Notably, the Sheriff's Office did not investigate Ray following the release of the footage.  Although the Sheriff's Office did not investigate, the 2015 drone footage led to heightened community scrutiny of Ray's operations and increased the negative public perception of Ray and his business.

**D.    Mendes Becomes Livestock Deputy and Immediately Pursues Ray**

91.    In late 2017, the Sheriff's Office's investigations of Ray changed when Deputy Mendes assumed the role of Livestock Deputy on November 5, 2017.  Deputy Mendes immediately began investigating Ray.  He made his first contact with Ray three days after starting in his new assignment.  Deputy Mendes claimed he had spoken with prior Livestock Deputies Fulton, Kastler, and Wilcox regarding Ray's cattle operation.  These Livestock Deputies, as well as former Livestock Deputy Phillip Buihner, had interacted with Ray many times and visited his property many times in response to various reports regarding Ray, his herd, and his ranch.  These Livestock Deputies, who had interacted with Ray since at least the early 2000s, never found animal abuse or neglect.

92.    Deputy Mendes observed Ray's purchases at the Humboldt Auction Yard, watching as sick, lame, weak, and malnourished cattle from other ranches' and dairies' herds passed through the ring before Ray purchased them and transported them back to his ranch.

Deputy Mendes did not just observe Ray's buying practices at the auctions. Deputy Mendes frequently participated in moving cattle around the auction yard. On multiple occasions, Deputy Mendes utilized an electric prod to do so.

93. Deputy Mendes wanted to be a cattle rancher. Sometime before Deputy Mendes became the Livestock Deputy, Deputy Mendes' father, Alan Mendes, a former Humboldt County Sheriff's Deputy, who was now an officer with the Ferndale Police Department, approached Ray regarding Ray's business. He told Ray that his son, Travis, was interested in entering the cattle business and wanted to know how Ray acquired animals from local ranchers and dairies.

94. It was only after the inexperienced Livestock Deputy, Travis Mendes, supported by the vindictive Sheriff's Office and a rogue prosecutor, Adrian Kamada, launched a crusade to single out Ray, that this case truly began. Deputy Mendes did not even attempt to hide his fascination with Ray, whose job he craved and whose vindication in the cockfighting case struck Deputy Mendes as particularly infuriating. Deputy Mendes' first action as Livestock Deputy was to review prior Sheriff's Office investigative reports related to Ray and speak with prior Livestock Deputies about him. Deputy Mendes also spoke with Deputy DA Kamada about the 2015 drone footage of Ray's property. Sheriff Honsal became Sheriff of the Sheriff's Office in May 2017 and made Deputy Mendes his Livestock Deputy in November 2017.

95. In tandem, they worked to piece together an investigation of Ray. Deputy DA Kamada, who would go on to be selected as the 2017 Wildlife Prosecutor of the Year several months after the 2018 raid, was eager to make a name for himself so he could eventually throw his hat in the ring as a candidate for the top position of elected District Attorney. On information and belief, Sheriff Honsal, the new sheriff in town, wanted to win over the community's goodwill by finally taking down Ray. Ray was an easy target for an environmentally-focused investigation, because Ray maintained cattle on his land, and his land often flooded. When Ray's land flooded, all of it could be deemed a waterway under state law. If Ray had carcasses on his land, which Deputy Mendes and Deputy DA Kamada knew he did, then Ray would be liable for misdemeanor violations of California Fish and Game Code section 5652(a), which prohibits the disposal of refuse in state waterways. This code provision functions essentially as a strict-liability statute—if

1  Ray had a carcass or even an old cattle bone on any part of his property that had water on it, he

2  was guilty.

3     96.    While Deputy Mendes wanted to be a rancher, Deputy DA Kamada played

4  investigator rather than staying in his lane as a prosecutor.  This proved to be a dangerous mix:

5  state actors who had an abnormally personal interest in trying to bring Ray down due Ray's

6  victory in the cockfighting trial and Ray's successful business, coupled with the community's

7  growing resentment of Ray's ongoing success despite his acquittal.  Together, these factors led

8  Deputy Mendes and Deputy DA Kamada to pursue Ray's prosecution as an animal abuser, single-

9  mindedly, and with gradually increasing tunnel vision.

10    97.    Deputy Mendes investigated Ray's cattle operation at Ray's various properties at

11  least 20 times between November 2017 and March 2018—an average of once per week.  In the

12  more than a dozen years leading up to Deputy Mendes' start as Livestock Deputy, Livestock

13  Deputies investigated Ray's operation an average of 1 ½ times per year.  In Deputy Mendes'

14  reports detailing his investigations of Ray, Deputy Mendes cited every conceivable local, county,

15  and state violation, civil or criminal, that he could think of to recommend to Deputy DA Kamada

16  to bring charges.

17    98.    In December 2017, three months before the March 2018 raid, Deputy Mendes

18  visited Ray's property in McKinleyville after receiving a report that a cow was in distress while

19  giving birth.  Both Deputy Mendes and the ranch hand who resided at the property agree that

20  Deputy Mendes was there in the barn, saw a dead cow whose carcass had not been moved during

21  the wet winter, and saw a cow that was struggling to give birth, with two of the calf's legs sticking

22  out of the cow.  The ranch hand says Deputy Mendes put on some gloves and began pulling with

23  all of his might to drag the calf out by the hooves.  Deputy Mendes says it was the ranch hand who

24  attempted to pull the calf out.  But both agree that Ray was called, talked with Deputy Mendes,

25  and Deputy Mendes left the barn and never returned or did anything else while the animal was in

26  distress.

27    99.    When Ray arrived, he instantly determined the calf was in a breech position, turned

28  it around so that it could come out headfirst, and tried to assist with the birth.  By that time,

1    however, the cow had lost too much blood and both animals died.

2    100.    Deputy Mendes and Deputy DA Kamada later used this evidence in support of

3    felony charges against Ray and at Ray's trial.  During the March 2018 raid, Deputy Mendes took

4    photos of the cow carcasses in the barn.  Deputy DA Kamada used this evidence for one of the

5    felony counts, alleging that these cows were abused by Ray in some undisclosed way.

6        E.    **Mendes, Kamada, and Honsal's Five-Month Investigation Culminated in the**

7             **2018 Raid**

8    101.    Deputy Mendes' "five-month investigation" of Ray, as it was described in a press

9    release issued by the Sheriff's Office following the raid, commenced the moment Deputy Mendes

10   started the job and culminated in a two-day, multiagency raid of Ray's properties.

11            1.    Deputy Mendes Leads a SWAT-Style Raid with Dozens of Agents

12   102.    The raid began around approximately 7:00 am on March 19, 2018.  Even though

13   the Sheriff's Office's investigation of Ray did not involve weapons, drugs, or violence, more than

14   30 armed law enforcement personnel from nine different local, state, and federal agencies

15   descended on Ray and his girlfriend, who were asleep in the ranch house.  These included

16   members of the Humboldt County Sheriff's Office Special Services Division; members of the

17   Humboldt County District Attorney's Office, including Deputy DA Kamada; members of the

18   Humboldt County Drug Task Force; members of the Humboldt County Code Enforcement;

19   members of the Humboldt County Department of Health and Human Services; members of the

20   California Department of Food and Agriculture; members of the California Department of Fish

21   and Wildlife; members of the US Bureau of Land Management; and members of the United States

22   Department of Agriculture.

23   103.    This 30-member raiding team descended on Jackson Road Ranch.  Officers

24   surrounded the home's entrance and Deputy Mendes banged on the side of the home, demanding

25   entry. It was still dark and Ray and his girlfriend, who were inside the home asleep, were startled

26   awake.  Ray's girlfriend initially thought that an officer reporting a loose cow was at the door.

27   Then she looked outside and saw more than a dozen law enforcement vehicles in the road, with a

28   swarm of armed figures moving toward them.

**LARSON**
LOS ANGELES

1    104.    Ray and his girlfriend immediately went downstairs to the door.  Ray wore boxers

2    and a T-shirt; his girlfriend wore only a thin, mid-thigh length satin night slip with a light robe of

3    the same length.

4    105.    Armed officers greeted them at the door.  They were dressed in full tactical SWAT-

5    style gear with helmets, bullet proof vests, and assault rifles drawn.  The officers grabbed Ray and

6    his girlfriend roughly by their arms and yanked them out onto the porch.  As Ray asked what was

7    going on, the raiders burst into their home and began ransacking it.

8    106.    The raiders detained Ray and his girlfriend outside on the porch for approximately

9    30 minutes while law enforcement personnel tore their home apart during the search, purportedly

10    to secure the property.  They used assault rifles and other automatic firearms to guard the area,

11    occasionally pointing those weapons at Ray and his girlfriend.  Dawn was just breaking and, on

12    information and belief, it was only 40 degrees Fahrenheit.  Both Ray and his girlfriend were

13    shoeless, and his girlfriend, nearly naked, shivered while they waited outside in the damp cold.

14    107.    Quickly after the raid began, press showed up at Jackson Road Ranch.  The porch

15    where Ray and his girlfriend stood was only several feet from the main road, and they were in full

16    view.

17    108.    In executing the search warrant, the raid party forcibly kicked doors open, breaking

18    doors, door locks, and door frames.  By the end of the search, the raid party had completely

19    ransacked Ray's residence.  The raiders' unnecessary and excessive displays of force and absolute

20    disregard for their home demeaned and traumatized Ray and his girlfriend.

21    109.    Eventually, Ray and his girlfriend were brought back inside, where they were

22    ordered to sit on their living room couch.  Ray stated that he wanted to talk to a lawyer.

23    110.    A member of the raiding party started to handcuff Ray while Ray sat on the couch.

24    Deputy Mendes immediately stopped him, saying "this one is all mine."  Deputy Mendes then put

25    custom-made handcuffs engraved with Deputy Mendes' name on Ray.  Ray's girlfriend was also

26    handcuffed, and someone finally brought her a blanket to wrap around herself.

27         2.    Deputy Mendes Secretly Records Custodial Interrogation of Ray

28    111.    Ray, having invoked his constitutional right to speak to his attorney, sat silently on

his couch wearing only his underwear and Deputy Mendes' personalized handcuffs as the agents continued to ransack his home.  Ray was soon surrounded by Deputy DA Kamada, Deputy Mendes, and DA Investigator Wayne Cox.

112.    Deputy DA Kamada, Deputy Mendes, and DA Investigator Wayne Cox began to interrogate Ray.  Investigator Cox began the questioning by acknowledging that "[he] underst[ood] that . . . [Ray] want[ed] to talk to [his] attorney," and that he thus did not "want to talk to [him] about [his] case."  With this empty caveat, Investigator Cox, Deputy DA Kamada, and Deputy Mendes proceeded to just that, bulldozing ahead to question Ray regarding issues that went to the heart of the case.

113.    Investigator Cox, Deputy DA Kamada, and Deputy Mendes interrogated Ray specifically about the cows later identified in the felony charges.  The three men informed Ray that four of his cows were in dire shape, and that veterinarians who were part of the raid indicated that those four animals should be put down.  Ray responded that he did not know which cows they were questioning him about or the condition of the cattle because the cows had just arrived from auction at Jackson Road Ranch.  Investigator Cox acknowledged this and asked Ray where the cows that "came in last night" had been placed.

114.    In the midst of his questioning, Investigator Cox again acknowledged that "[Ray] had said [he] wanted to talk to [his] attorney," and that Investigator Cox did not "want to violate that in any way."  Yet, he continued to interrogate Ray about the cows at issue.  Ray repeatedly responded that he did not know which cows they were asking him about, or what the conditions of the cows were, because the cows had just arrived in the middle of the night.  Refusing to take this as an answer, Investigator Cox asked Ray "how would [he] do it if [he] were going to do it," meaning how he would put a cow down.  He also asked Ray about his care of his animals—namely, if he treated cows himself or if he had a local vet.  He also pressed Ray about what he would do if veterinarians said "ethically and morally" a cow needed to be put down.

115.    After nearly eight minutes of this custodial interrogation, Ray, still in his underwear and T-shirt, asked if he could put on clothes so he could check on the cows himself, rather than continue to be interrogated.  Investigator Cox, Deputy DA Kamada, and Deputy

1  Mendes told Ray not to "worry about it," and ended their interrogation.

2      116.    Deputy Mendes secretly recorded the interrogation on his cell phone.  It is

3  unknown exactly when this interrogation happened because Deputy Mendes and Deputy DA

4  Kamada did not preserve the evidence.  Deputy Mendes hid this recording on his cell phone for a

5  year and a half before turning it over during trial.  In obvious contravention to his obligations to

6  accurately document the execution of the search warrant and the raid, Deputy Mendes' 14-page

7  investigative report detailing the raid does not reference this secretly recorded interrogation.

8  Deputy Mendes' report includes one cherry-picked reference to the conversation, as Deputy

9  Mendes writes that Ray was asked if he wanted to call his veterinarian but declined.  Deputy

10  Mendes never mentioned that it was Deputy DA Kamada who asked Ray this question after Ray

11  invoked his right to an attorney, and Investigator Cox, with Deputy Mendes and Deputy DA

12  Kamada present, twice stated that he understood that Ray had asked for his attorney.

13      117.    After Deputy Mendes disclosed the interrogation evidence during Ray's trial in

14  November 2019, DA Inspector Aubuchon documented the evidence in an investigative report.

15  Inspector Aubuchon said the quality of the recording was so "poor" that he had to re-record it

16  using a handheld recorder.  Thus, the original recording was never turned over to Ray.  Any

17  metadata contained in the file Deputy Mendes provided to Inspector Aubuchon was lost.

18  Inspector Aubuchon's rerecording further altered the evidence in contravention of the Sheriff's

19  Office's evidence preservation policies and standard chain-of-custody procedures for evidence

20  preservation.  Deputy Mendes and Deputy DA Kamada knew about this evidence from the time it

21  was created because Deputy Mendes, Deputy DA Kamada, and Investigator Cox conducted the

22  interrogation.  Investigator Aubuchon tried to hide Deputy DA Kamada's name and involvement

23  in the investigative report documenting the receipt of this evidence, instead describing the

24  conversation as having occurred between Deputy Mendes, "Chief Investigator Wayne Cox

25  (possibly one additional person) and Christie."

26      118.    Deputy Mendes and Deputy DA Kamada's failure to turn over this crucial

27  exculpatory evidence to Ray constituted prosecutorial misconduct and violated Ray's right to a

28  fair trial.

LARSON
LOS ANGELES

119.     Sometime after the improper interrogation, Deputy Mendes allowed Ray's girlfriend to get dressed.  The home was filled with armed law enforcement personnel, who were mostly male and led by Deputy Mendes.  Ray's girlfriend felt very uncomfortable and vulnerable going up the steep stairs to her bedroom.  Concerned that law enforcement officers below her could see that she was not wearing anything under her night slip, she went up the stairs sideways, clutching her slip to her leg.  Deputy Mendes and Sheriff's Officer Megan Nims followed her up the stairs, where Deputy Mendes removed her handcuffs.  Deputy Mendes instructed Officer Nims to stand in the bedroom with Ray's girlfriend while she dressed.  Officer Nims expressed her discomfort in watching her get dressed, and stayed near the hallway with Deputy Mendes while she changed her clothes inside of her closet.  Ray's girlfriend was not a target of the investigation.  Yet law enforcement tore apart her closet, searched through her handbags, and left her possessions in complete disarray.

120.     Soon after, Deputy Mendes arrested Ray and took him away for booking.  The officers informed Ray's girlfriend that she was released and free to go.  During the raid, Ray's girlfriend had her iPhone with her the whole time before they released her.  The officers had not taken her phone as evidence and had no reason to do so.

121.     Ray's girlfriend left the home to get into her car.  A Sheriff's Deputy followed her outside and stood by her car window after she got in.  She began to call Ray's brother.  The Sheriff's Deputy, watching her use her phone, ripped the door open and snatched her phone out of her hand.  He asked her what she was doing and she replied that she was calling Ray's brother to try to figure out how to get Ray out of jail.  The Deputy Sheriff to give her back her phone and kept it.  The phone has never been returned.  This, despite the fact that Ray's girlfriend was not named in the warrant, was not a subject of the investigation, and had already been released and told by the Sheriff's Office she was free to go.  She did not have the phone number for Ray's brother memorized and now had no way to contact him for help.

122.     Raiding party personnel prevented Ray and his ranch hands from feeding, watering, caring for, or assisting the cows for at least eight hours during the raid.  Because some of the animals had been dropped off mere hours before the raid and were in sick, weak condition

when they arrived, it was especially important for Ray and his ranch hands to take care of these high-needs cattle.  The raiding officers did not allow them to care for these animals, compounding their suffering.  Raid personnel did nothing for the animals during the raid.  They did not put one pitchfork of hay or one bucket of water anywhere near any of the animals they claimed were suffering.  They did not provide any medication to cows that they alleged were sick and in need of treatment.  They did not remove any cattle from the property for care and treatment.  Indeed, the only animal taken away during the raid was an injured free range Canadian goose that roamed around Ray's pastures and ate the food Ray put out for free range chickens.  The goose was never seen again.  Neither the veterinarians nor the other raiders collected any evidence from the cattle carcasses or test the carcasses, and accordingly never investigated or attempted to determine the causes of death.  The veterinarians never treated the animals, removed the animals, or put them down, even though they were supposedly convinced some of the new auction animals needed to be put out of their misery.

123.    When Ray and his workers were finally allowed to care for the cattle in the evening once the raid had concluded, they found the ranch in complete disarray.  Cows were everywhere, in places where they were not supposed to be, crowded in pens and loose in fields that the raiders permitted them to enter by leaving gates open and latches undone.  Ray and his ranch hands worked late into the night, re-sorting cattle into the proper pens and pastures, tracking down loose cattle, and fixing destroyed fences.

124.    The 2018 raid occurred during a period of unusually wet weather.  It had been raining for weeks, and Jackson Road Ranch and Ray's other properties were extremely wet and muddy at the time.  Dr. Gallego, one of the on-site veterinarians during the raid, noted the wet conditions at the ranch and commented it would be good to return in drier weather to assess the conditions then.  He emphasized that he only observed Ray's properties on one day.  At Jackson Road Ranch, Dr. Gallego observed approximately 60 "very healthy" cattle that appeared ready for market.  These cattle "had good conditioning" and Dr. Gallego stated "that if we are interpreting th[ese cattle] in light of what Mr. Christie's practice is, he buys everyone's junk at the auction yard.  All the cattle that don't have a useful production life and the highest bidder will purchase

LARSON
LOS ANGELES

1    them.  In the context of that, the animals in the corral had good flesh and were useful."

2        125.    The raiding party also searched several other properties on which Ray maintained

3    cattle.  Tenants resided in homes on some of the properties. The raiders showed up at their homes

4    with more than a dozen vehicles, detaining and handcuffing the tenants.  At the McKinleyville

5    property where Deputy Mendes had pulled on the calf's legs in the barn a few months before, the

6    raiders forced Ray's ranch hand and his wife and young child to wait outside their home for hours.

7    When Deputy Mendes arrived at the McKinleyville property supported by multiple law

8    enforcement vehicles and personnel, he boasted to the ranch hand about the raid, saying "You see

9    all of this, you see all these people?  It's all because of me."

10            3.        Cows are Delivered Hours Before the Raid

11        126.    On the evening of March 18, 2018, Ray's ranch hand was at Jackson Road Ranch,

12    feeding the cattle and laying down hay, checking on the property, and walking the fence line,

13    checking for holes.  The ranch hand left the gates on the paddocks and pens closed.

14        127.    Using a semi-truck Ray borrowed from a friend, an experienced driver for Ray

15    picked up, transported, and delivered cows from a far-off auction yard and from the pens in

16    Ferndale during the night.  They were dropped off at 2:00 am or 3:00 am, just a few hours before

17    the raid began.

18        128.    The driver first picked up cattle from the Shasta Livestock Auction Yard and took

19    them back to Jackson Road Ranch.  The animals from the Shasta auction were a mix of healthy

20    and sick, weak, and hurt cattle.  The driver then picked up cattle from the Ferndale pens, where

21    another rancher had left several cattle earlier that day for Ray to pick up.  The cows in the

22    Ferndale pen were in terrible condition.  Several of the calves were already dead when the driver

23    arrived.  As Ray and his workers always did for community members who left subpar cattle in the

24    Ferndale pen, the driver collected the cattle, dead and alive, and brought them back to Jackson

25    Road Ranch.

26        129.    At the ranch, the truck driver created temporary pens with movable cattle pen

27    panels so that he could segregate different categories of animals.  He put a mother and a calf in a

28    separate pen to protect them from being crushed by other larger cattle.  He put the sick and weak

1  cattle in the barn.  He laid some dead calf carcasses next to the ranch house, in violation of Ray's

2  protocol for handling dead cattle, because he was too tired to take them to the dead pile behind the

3  barn.

4        130.  The driver left the borrowed truck at the ranch in front of the cattle chute near the

5  barn.  The raiding party descended on the property not long thereafter.

6              4.  <u>Deputy Mendes, Deputy DA Kamada, and Sheriff Honsal Searched</u>

7                  <u>Unlawfully and Mishandled Evidence</u>

8        131.  The evidence collected and presented at trial by Deputy Mendes and Deputy DA

9  Kamada was rife with problems.  The myriad issues included the following detailed below.

10        132.  While Ray and his girlfriend were detained, the dozens of raid personnel fanned out

11  across Jackson Road Ranch.  They searched the barn, pens, paddocks, and fields, opening gates,

12  undoing latches, and allowing cattle to move into areas of Jackson Road Ranch where they should

13  not be.

14        133.  Many raiders took photos and videos during their search.  A forensic expert proved

15  that as many as 13 different devices were used to take the photos and videos.  The first video

16  taken, which the District Attorney's office provided in discovery, begins at 8:10 a.m., which, on

17  information and belief, was at least an hour after the raid began.  It is not presently known what

18  the raiding party was up to before they started filming, other than their detainment of Ray and his

19  girlfriend and unconstitutional interrogation by Deputy Mendes and Deputy DA Kamada.

20        134.  What is known is that cattle were in different places than where the driver

21  delivering them had left them hours before the raid.  The raiding party opened gates, which

22  allowed cattle to go where they were not supposed to go and to crowd into pens on the property.

23  Ray's cattle were separated into different pens, paddocks, and pastures on his properties for good

24  reason – to keep them safe.  Segregating the sick, weak, and infirm cattle from the healthy,

25  vigorous cattle protects the weaker animals and helps prevent the spread of diseases.

26        135.  The raiders moved the animals around into different pens to make their

27  investigation movements easier, but took no care to segregate weak and sick and small animals

28  from larger healthier ones.  Because the raiders had unlatched and opened gates, which permitted

cows to move around the property, the cattle filmed during the raid, and the property generally, were not depicted as they had been left hours before the raid and how they would typically be housed on the property.

136.    For example, during the raid, a Sheriff's Deputy called the owner of the truck left by the driver at the ranch in the middle of the night, telling him to come pick up his truck.  When the truck owner arrived, the Sheriff's Deputy instructed him to move the truck and trailer away from the cattle chute where the driver had left it.  The owner refused.  He did not want to leave an opening for the cattle to get out.  The Sheriff's Deputy apparently did not care and would have allowed cattle to get loose.  The owner of the truck, who frequently visited Jackson Road Ranch and Ray's other properties and was very familiar with Ray's operations, saw the cattle gates opened and unlatched, and saw cows in places he did not typically see them at the ranch.

137.    Deputy Mendes "staged" at least two photographs taken during the 2018 raid and later used as evidence against Ray.  In one of the staged photographs, Deputy Mendes moved a cattle ear tag from its original location to a closer spot next to a cow skull, so that the resulting photograph would more strongly suggest the tag was associated with that animal.  The other photograph was taken of a carcass only after Deputy Mendes moved some items, including a wheelbarrow, to get a more dramatic photograph of the carcass.  When Deputy Mendes was examined under oath in the Humboldt County Courthouse, he did not tell the truth about how the evidence was collected and was dishonest about when and where the photos were taken.

138.    Deputy Mendes took two phones, two computers, and two iPads from the ranch house during the raid, including the pink iPhone and pink iPad of Ray's girlfriend, who was not under investigation and was not named in the warrant.  After Deputy Mendes seized a computer from upstairs in the ranch house, he ran down the stairs shouting "I got it, I got it!"  Deputy Mendes and Deputy DA Kamada never justified why they took Ray's girlfriend's possessions even though she was not a target of the investigation.  And the Sheriff's Office and the District Attorney's Office have never returned the seized property to Ray and his girlfriend, in spite of multiple requests from Ray and his counsel during the pendency of the criminal case.

139.    Sometime after the 2018 raid, Ray's iPad was "factory reset," meaning someone in

1  the Sheriff's Office or the District Attorney's Office wiped all of the data from Ray's iPad. On

2  information and belief, the iPad contained exculpatory evidence relevant to the felony charges,

3  which was forever deleted when the iPad was wiped clean.

4       140.    Similarly, the photographs and videos taken by law enforcement personnel during

5  the 2018 raid were not preserved under a proper chain of custody or supervision. Deputy Mendes

6  testified under oath at a so-called *Brady* hearing, which was the way Ray's attorneys challenged

7  the evidence from the raid, that only three devices were used to record photos and videos during

8  the raid. He claimed that all of the images from those three devices were personally transferred by

9  him to a memory stick in their native format. But a forensic expert at the *Brady* hearing proved

10  that up to 13 different devices were actually used to record the images, not three.

11       141.    Deputy Mendes lied about when some of the photographs were taken. During the

12  *Brady* hearing, Deputy Mendes was shown eight particular photographs of carcasses from the

13  People's exhibits. He swore he took the photographs himself during the 2018 raid. But a forensic

14  expert proved (with metadata) that the photographs had been taken months earlier and were last

15  modified two months before the 2018 raid.

16       142.    Deputy Mendes had responsibility for this evidence in the Sheriff's Office.

17  Someone in the Sheriff's Office or the District Attorney's Office stripped or modified the relevant

18  metadata from most of the photographs produced as evidence in this case. A forensic expert

19  proved that many of the photographs were modified in some unknown way before they were

20  produced to Ray's attorneys. The images on the memory stick were not original source electronic

21  images. As a result, most of the digital photograph and video evidence comprising the People's

22  exhibits was missing critical metadata.

23       143.    Despite their constitutional and statutory duties to provide all relevant evidence to

24  Ray, Deputy DA Kamada and the District Attorney's Office never produced the native files for the

25  evidence used to support a felony charge against Ray. The District Attorney's Office later

26  admitted that Deputy DA Kamada lost this critical video, which is the sole evidence used to

27  support one of the four felony charges against Ray. The evidence for this charge consists of a

28  photograph supposedly created from a still image from a video purportedly taken during the raid.

Deputy DA Kamada failed to produce the original video from which the still image is supposedly sourced, and provided no source information for this image. The only image Ray's attorneys received for this evidence is a scanned copy of a grainy still image with three hole punches along the top contained in an Adobe PDF file.

144.    Knowing that the evidence for Ray's case was scant and weak, Deputy DA Kamada sought to inflame the jury with dozens of inflammatory photographs of moldering cattle carcasses unrelated to the felony counts, despite agreeing to dismiss the remaining misdemeanor counts related to the cattle carcasses. He got the photographs admitted into evidence using the weak argument that the evidence suggested "that for some reason or other cattle in the area tended to be unhealthy and die." Deputy Mendes wrote in his report of the raid that "[b]ased on the fact that a large number of bovine carcasses and bone piles were located, I believe that the animals located on the properties may not be provided with the proper care and attention needed" and said in a media interview after the 2018 raid that the "number of deceased cattle located is very significant."

145.    During the raid, a Sheriff's Office officer named SA Miller stayed with Ray and his girlfriend while other officers and agents raided their home. SA Miller chatted with Ray during this time. Several months after the raid, SA Miller returned to Jackson Road Ranch and spoke with Ray. SA Miller told Ray that he did not know if Ray would remember him, but that SA Miller "babysat" Ray and his girlfriend during the 2018 raid. SA Miller admitted that what happened with the raid "wasn't right" and that the raiders "made a lot of mistakes."

146.    Deputy Mendes and Deputy DA Kamada knew that Ray's business model of buying others' junk cattle, which had a higher mortality rate, combined with Humboldt County's lack of carcass disposal options and the wet and muddy conditions on Ray's properties at the time of the 2018 raid, meant that Ray would inevitably have a higher number of carcasses on his land. They knew that the only way to deal with the carcasses was to pile them up and bury them. Deputy Mendes' predecessors, Livestock Deputies Buihner, Fulton, and Kastler, observed Ray's cattle operation for over a decade before Deputy Mendes and Deputy DA Kamada started their own "investigation." Each one of the previous Livestock Deputies understood the broader context

1  in which Ray's business operated and correctly concluded that Ray did not neglect his animals.  In

2  spite of this history, Deputy Mendes and Deputy DA Kamada were seemingly hell-bent on

3  harassing and intimidating Ray, for their own personal reasons, and all under color of state law.

4  They hurt his business, they ruined his reputation in the community, and they publicly blamed him

5  for the dysfunctional livestock industry that existed in Humboldt County at the time and continues

6  to exist today.

7      **F.**      **Ray is Under Felony Charges for Five Years Before the District Attorney**

8                  **Dismisses**

9              1.      The Felony Animal Abuse Allegations Generate Significant Local Attention

10     147.    Like the cockfighting investigation and trial, the 2018 raid and ensuing 2019 trial

11  of the felony animal cruelty and misdemeanor littering charges drew significant media attention in

12  Humboldt County.  Local news outlets extensively documented the 2018 raid and published

13  numerous photographs of the raid and Ray's properties.

14     148.    The felony animal cruelty charges subjected Ray, already well-known in his

15  community, to intense public scrutiny.  By the time Ray arrived at the Humboldt County

16  Courthouse for his arraignment, he was being heralded as a "cockfight kingpin" and a "notorious"

17  "accused animal abuser" in local newspapers.  His mugshot became synonymous with his family

18  name.

19     149.    Community backlash against Ray was swift.  Multiple area news outlets and local

20  journalists covered Ray's case, such as *The Times-Standard*, *The Lost Coast Outpost*, *The North*

21  *Coast Journal*, *Redheaded Blackbelt*, and John Chiv's *Words Worth*, which among all the local

22  media outlets, was the only balanced reporting available at the time.  Several of these outlets

23  maintain comment sections, where members of the community wrote about their hatred of Ray,

24  disparaging him, calling him an animal abuser, and advocating for his animals to be taken away

25  and for Ray to spend the rest of his life in prison.

26     150.    When Ray's trial occurred in late 2019, several local news outlets covered every

27  day of Ray's trial in extensive detail.  Their reporting on Ray's case was almost exclusively

28  negative.  This bad publicity further enflamed the already-strong community animus against Ray,

1  which had existed for at least a decade due to the cockfighting case. Ray's reputation in his

2  community was forever damaged.

3      151.    Following a month-long trial, the jury hung on the felony animal abuse charges.

4  The jury convicted on some of the misdemeanor littering counts, acquitted on some of them, and

5  hung on others. The court declared a mistrial on the felony charges, and Deputy DA Kamada

6  pledged to retry the felonies.

7      152.    The community was again outraged by Ray's acquittal.

8      153.    The Covid-19 pandemic delayed Ray's retrial. Deputy DA Kamada was fired from

9  the District Attorney's Office in 2020 for violating office policy and procedure, and new

10  prosecutors took over Ray's case. Ray then developed cancer, and a heart ailment, which

11  necessitated continuances of the trial while he received treatment.

12          2.    The Sheriff's Office's 2021 Raid Found No Evidence of Neglect

13      154.    During the pendency of Ray's criminal case, the Sheriff's Office continued to

14  pursue Ray, and only Ray. In October 2021, while the District Attorney's Office was still

15  preparing Ray's case for retrial, personnel from the Sheriff's Office, Humboldt County Animal

16  Control, and the California Department of Food and Agriculture tagged along for a raid in a

17  federal investigation conducted at Jackson Road Ranch and related properties. On information

18  and belief, of the approximately two dozen agents that conducted the 2021 raid, fourteen of the

19  agents were from the United States Department of Agriculture, three were from the California

20  Department of Food and Agriculture, and the remaining seven agents were from the Sheriff's

21  Office, including two officers from the Animal Control Division, as well as one from the Fortuna

22  Police Department. The USDA's warrant focused on a search for business records at located in

23  outbuildings on Ray's properties. It did not authorize a search of Ray's home or searches of any

24  other homes on Ray's properties. The agents unlawfully searched these residences anyway and

25  seized evidence from them.

26      155.    Like the 2018 raid, the agents arrived in full tactical gear with guns drawn,

27  including at least one AR-15 style semi-automatic rifle. And like the 2018 raid, the agents arrived

28  before daybreak, ensuring that they would startle Ray and his family in the dark. The agents

banged on the door of Ray's home, stating that they had a search warrant and demanding that the occupants open the door.  This time, Ray and his girlfriend were not alone.  Their two young sons were present.  The young children were traumatized by the armed agents who forcibly entered their home and, after forcing their father to put his hands up, detained the whole family.  The agents separated Ray and his girlfriend from their children.  A USDA agent insisted on supervising one of the children while he played in the playroom, instead of allowing Ray or his girlfriend to stay with their young son.  The playroom had a separate door to the outside, where agents were gathered.  The raid was so chaotic and disorganized that an agent standing outside of the playroom nearly shot the agent supervising Ray's son inside the playroom, mistaking her for an unidentified person.  The agent inside with Ray's son yelled "It's me!" and ran into the living room, looking very afraid.  She abandoned Ray's young son alone in the playroom, leaving the child unprotected in the event agents had burst in to subdue or detain her or worse.

156.    After the raid, Ray's children would get upset and cry whenever there was a knock on the door or visitors to the home, scared that the agents had returned.

157.    Following the federal raid, the USDA did not further investigate Ray, file charges against him, or return for additional evidence.

158.    The state agents, who did not have a warrant of their own, joined the 2021 raid with their own agenda.  Rather than assist the federal agents in their search for business records, the state agents sought evidence to save the State's prosecution of Ray.  The state agents inspected Ray's home, his dogs, and the cattle on the properties.  No one present for the 2021 raid issued Ray a *Miranda* warning.  In spite of this, Ray invoked his right to his attorney, stated that he would not speak to agents without his attorney, and insisted that his counsel had advised him not to answer their questions.  De facto Livestock Deputy Sergeant McCall attempted to question Ray anyway, in violation of Ray's constitutional rights.  Sergeant McCall approached Ray, pointed a recording device at him, and inquired about allegedly sick cows needing assistance.  In the famous words of Yogi Berra, this was "déjà vu all over again."  As during the 2018 raid, Ray asked Sergeant McCall if he was referring to cattle that had recently arrived from auction.  When Ray told Sergeant McCall that if he wanted the real culprit, he should look to the Humboldt Auction

1  yard, where the cows had recently come from, Sergeant McCall immediately turned off the

2  recorder and left.

3      159.    The new Deputy District Attorney on the case, Steven Steward, confirmed that the

4  state agents tagged along on the 2021 raid with the intent to gather evidence to prove that Ray had

5  continued his alleged practice of abusing animals during the pendency of his criminal case.

6  Deputy DA Steward also requested that Sergeant McCall provide Deputy DA Steward with his

7  investigative report so he could consider additional charges against Ray.

8      160.    Crucially, the Sheriff's Office and the District Attorney's Office knew well before

9  the 2021 raid that Ray did not have charge and custody of the cattle on his properties at that time.

10  In the aftermath of the 2018 raid, in 2019, Ray entered into a lease with another rancher so that the

11  other rancher would have responsibility for the future care and control of the cattle while the

12  criminal charges remained pending against Ray.  Still, the Sheriff's Office and the District

13  Attorney's Office moved forward, trying to build their case against Ray with whatever scraps of

14  evidence they could scrape up.

15      161.    The court identified numerous issues with the 2021 raid evidence and its potential

16  use in Ray's prosecution, and accordingly ruled to exclude all evidence from the 2021 raid at

17  Ray's retrial.

18      162.    The Sheriff's Office's investigation of Ray in the 2021 raid harassed and demeaned

19  Ray, and terrorized his family, but their unlawful effort to gather additional evidence against him

20  did not work.  The 2021 raid, however, provided insight into the Sheriff's Office's assessment of

21  the cattle on Ray's properties and Ray's operation.  The raid revealed that the Sheriff's Office

22  found no evidence of animal cruelty.

23      163.    Like the numerous Livestock Deputies who investigated Ray's cattle operation

24  before Deputy Mendes, who repeatedly found no evidence of animal cruelty, Sergeant McCall

25  similarly understood Ray's buying practices, herd makeup, and treatment of the livestock.

26      164.    In his report detailing the 2021 raid, Sergeant McCall found no evidence that the

27  animals on Ray's properties were willfully neglected.  Sergeant McCall acknowledged that the

28  livestock were under the other rancher's care, and noted that during his time handling livestock

investigations for the Sheriff's Office as the de facto Livestock Deputy, Sergeant McCall was aware that Ray "often purchases cows that are in poor condition with the presumed/alleged intent of trying to improve the animals [sic] health/condition for later sale." Sergeant McCall described ranch hands "supplying feed to the animals," including "placing feed in front of the animals that were unable to move." Sergeant McCall found that, "[b]ased on the condition of a majority of cows on the parcel not being of such a state that would suggest the animals are being willfully neglected, I am unable to determine if the documented cows in poor condition came onto the property in this condition or if the condition developed after."

165.   On information and belief, following the 2021 raid, Sergeant McCall spoke with the other rancher about the investigation and the cattle on Ray's properties. In this conversation, Sergeant McCall confirmed what the Sheriff's Office has known all along:

- That just because there's a downed animal does not mean that animal is being neglected or abused.

- That animals get sick, have issues, and die.

- That a typical closed herd mortality rate is 10%.

- That the majority of the animals in Ray's herd looked fine.

- That while there were some thin cows, Sergeant McCall could not say that they were not purchased in that condition.

- That if the cows were all being underfed, that there would be many more in that condition, rather than only a few here and there.

- That Ray cared for the sickest, weakest animals in his herd in a sick pen next to his home.

- That cows will sometimes go down, and it is difficult when running a cattle operation on multiple properties to be out with the cattle around the clock, so there must be leeway to allow for the operators to discover an issue and deal with it.

- That Ray's properties often flooded due to the water table level and that cattle would sometimes die by the waterways.

- That the closure of the tallow works caused a big hassle for local cattle operations,

and that a realistic or clear answer for carcass disposal no longer existed.

- That maintaining a pile of carcasses was a common local method of dealing with dead livestock and was not indicative of animal abuse.

- That Ray and his properties were subject to heightened scrutiny by those in the community, especially after the 2018 raid and felony charges.

- That people would drive by Ray's properties, see what they thought were downed cattle from the road, jump to conclusions, and report Ray.

- That when HCSO would investigate, either they did not find anything, or if there was a downed cow, it had not been down very long and was one downed cow of forty in the field.

- That cows got loose from their enclosures on Ray's properties, which angered neighbors.

- And that, fundamentally, investigating officers had to consider the letter of the law and the spirit of the law, and be realistic about how things worked in the Humboldt County livestock industry.

3. The 2022 District Attorney's Race Reveals the Extent of Deputy DA Kamada's Prosecutorial Misconduct

166. Deputy DA Kamada's lack of professionalism and habit of overstepping his prosecutorial position to take on the role of a rogue investigator—which were on full display during Ray's case—finally caught up to him. He was fired from the District Attorney's Office in 2020 due to his violation of ethical standards and office policies. In 2022, he went on to run for, and lose, the position of Humbolt County District Attorney in a contentious race.

167. During the race, the scope of Deputy DA Kamada's missteps came to light through revelations from Deputy DA Kamada's colleague, Deputy DA Roger Rees. Deputy DA Rees was the prosecutor who eventually took over Ray's case and responsibly dismissed it in light of Deputy Mendes' and Deputy DA Kamada's misdeeds. Deputy DA Rees bravely came forward to write a letter to the public in support of Stacy Eads, Deputy DA Kamada's opponent in the race, who serves today as the elected District Attorney for Humboldt County. Notably, Deputy DA

Rees emphasized Deputy DA Kamada's "inexperience and ineptitude," whose "pure hubris" led him to mismanage cases and department resources.  Deputy DA Rees explained that, after Deputy DA Kamada was fired, staff spent days trying to sort through and patch together the case files and evidence that Deputy DA Kamada has mishandled.  A subpoena clerk at the District Attorney's Office also came forward to write a letter to the public, explaining that Deputy DA Kamada did not know how courts operated and was willing to make false and uninformed statements.

168.    The circumstances of Deputy DA Kamada's firing came to light as well.  It was revealed that he had spoken with a potential witness alone and off the record, which is an unethical practice for a prosecutor as it jeopardizes the integrity of the case and risks its dismissal.  Instead of being receptive to his boss's critical feedback, Deputy DA Kamada doubled down and did not seem to appreciate that one cannot always forecast whether information will be material to the guilt or innocence of a defendant, and whether it will deprive a defendant of a fair trial.  This, coupled with Deputy DA Kamada's lack of professionalism, led to his dismissal.  The behavior that led to Deputy DA Kamada's firing is similar to the prosecutorial misconduct he committed in Ray's case.

169.    In addition, it was revealed that the improper preservation of evidence in Deputy DA Kamada's cases resulted in lost evidence in Ray's case. Before Ray's trial, the trial judge, Judge Wilson, publicly ordered Deputy DA Kamada to properly preserve evidence in Ray's case, stating, "I am going to order, Mr. Kamada, that evidence you are now in possession of is not destroyed or mayhemed in any way and that you be a good custodian – your office be a good custodian of that office."  In response, Deputy DA Kamada tried to push responsibility for the evidence onto the Sheriff's Office and even the Court itself, stating "to be clear, my office doesn't possess any of those things.  The sheriff's office has them and they're actually under the possession of the Court."  Judge Wilson reminded Deputy DA Kamada that "it is your case. . . . I'm looking at you, Mr. Kamada."  In the aftermath of Deputy DA Kamada's mishandling of Ray's case, the District Attorney's Office was forced to reveal that critical evidence was no longer available because it "appear[ed] to have been lost."

4.    <u>The District Attorney Dismisses the Felony Charges Against Ray in</u>

December 2023

170.    On December 1, 2023, nearly six years after the 2018 raid, the District Attorney's Office dismissed the four felony charges against Ray.  With respect to the misdemeanor convictions for littering, Ray paid a $12,000 donation to a local organization dedicated to the protection of animals in lieu of a fine.

171.    A year later, the court set Ray's guilty verdict for the misdemeanor littering convictions aside and dismissed the action, thereby clearing Ray's record related to the unlawful, yearslong campaign against him.

**G.    Nothing Has Changed in Humboldt County, and Sheriff Honsal, the Sheriff's Office, and the District Attorney's Office Continue to Ignore Animal Abuse by Others**

172.    While pursuing their frivolous animal abuse charges against Ray, Deputy Mendes and Deputy DA Kamada ignored the obvious signs of animal abuse in Humboldt County at Alexandre Family Farm, which is a nationwide supplier to stores including Whole Foods

173.    Alexandre is a family farm, run by generations of the Alexandres on multiple sites in Del Norte and Humboldt Counties.  One of the largest organic dairy farms in the country, Alexandre is renowned for its carefully curated marketing image of having happy, healthy cows.  Alexandre's business is validated by California Certified Organic Farmers, Certified Humane, and the Regenerative Organic Alliance.  Consumers seek out its high-quality products, feeling gratified that their splurge for Alexandre's higher sticker price means that they are, in their own way, promoting animal welfare.  If they were to visit Alexandre's sites, they would likely be presented with the serene scene of cows spending their days chewing grass and sleeping near the Pacific Ocean and the redwood forest.  However, the underbelly of Alexandre's operations reveals something more sinister.

174.    Despite its picture-perfect branding, Alexandre has faced a litany of accusations regarding animal abuse, which largely came to life thanks to whistleblowers who worked on the dairies and came forward.  The allegations include: a cow with mastitis having her teat cut off with a knife; a live, alert cow being dragged across the ground by a machine; a cow that could not walk

1   being left in a field for two weeks without being euthanized; cows being sprayed with diesel fuel

2   in an attempt to thwart flies; ailing cows being denied antibiotics for infections and illnesses

3   because of the economic incentive to maintain their milk as organic; cows with infections having

4   their eyes packed with salt then having denim patches glued to their skulls to hide their injuries;

5   adult cows being forcibly dehorned with a Sawzall, without anesthetics; dead animals being

6   composted—i.e. left out in a field, stacked in a pile, or buried in a pit—in pastures where livestock

7   grazed; a mass death that resulted from a herd of cows who, after being denied food for days,

8   trampled each other once feed was finally provided to them; the killing of approximately eighty

9   pregnant heifers due to their "[being] so skinny, and their calves . . . so big that the heifers

10  couldn't successfully calve" to support its economic endeavors.  Alexandre touted its 2023 cull

11  rate of 23%—nearly a quarter of its herd— as "relatively low for the industry and a testament to

12  the longevity in our herd."

13      175.   Alexandre sells its injured or otherwise unwanted cattle at the Humboldt Auction

14  Yard, where Ray purchased the cattle Alexandre neglected and attempted to rehabilitate them.

15  Some cattle, which came to the auction with cancerous eyes, infected udders, abscesses, and rotted

16  hooves, were too far gone to be saved.

17      176.   Multiple community members reported Alexandre's practices to the Sheriff's

18  Office for years, but those reports were and continue to be ignored.  Whether it was because of an

19  unwillingness to admit that Deputy Mendes and Deputy DA's prosecution of Ray was unjustified,

20  an allegiance to Alexandre, or a hesitancy to further open the Pandora's box of mistreatment of

21  cattle in a cattle-raising town, the Sheriff's Office delayed in opening a case against Alexandre.

22  When *The Atlantic* published an article in April 2024, "The Truth About Organic Milk," exposing

23  Alexandre's cruel practices—and thus making the scandal publicly known—the well-documented

24  abuses became national news.  This reporting, in conjunction with an investigation of Alexandre's

25  practices by Farm Forward, a nonprofit with a mission to reduce the suffering of farm animals,

26  eventually forced the Sheriff's Office to pay attention, at least superficially.  Farm Forward filed a

27  cruelty complaint with the Sheriff's Office in April 2024 and provided their investigative findings,

28  which included hundreds of photographs and videos documenting the condition of Alexandre's

1  cattle, properties, and the cows Alexandre sold at auction.  Alexandre vigorously denied these

2  claims publicly.

3      177.    In response, the Sheriff's Office opened a perfunctory investigation into the

4  allegations.  The Sheriff's Office's conclusory investigation claimed that there was no context

5  regarding who took the videos and photographs, when the videos and photographs were taken,

6  where the videos and photographs were taken, or how the cows came to be in that condition.  To

7  characterize this excuse as flimsy would be a compliment.  The photographs and videos contained

8  location data in their files.  Hundreds of videos and pictures documenting Alexandre's abuses

9  were provided to the Sheriff's Office, yet, on information and belief, the Sheriff's Office chose not

10  to investigate a single one.  The Sheriff's Office's assessment of the well-documented abuse at

11  Alexandre?  "Unfounded."  According to the Sheriff's Office, it "was unable to detect any

12  malicious or intentional harm done to dairy cows by the Alexandre Family Farm."

13      178.    The United States Department of Agriculture, however, determined the opposite.

14  Following the USDA's investigation of the allegations against Alexandre, Alexandre admitted to

15  most of the allegations of abuse and mistreatment as part of a settlement agreement.

16      179.    Deputy Mendes, Deputy DA Kamada, the Sheriff's Office, and the District

17  Attorney's Office, who were willing to build a whole case against Ray based on flimsy, defective

18  evidence and the unfounded pretext that cattle carcasses meant that "for some reason or other

19  cattle in the area tended to be unhealthy and die," chose to ignore mountains of evidence regarding

20  animal abuse perpetuated by Alexandre, which regularly brought subpar cattle to the Humboldt

21  Auction Yard for Ray to purchase and left dead or dying cattle in the Ferndale pen for Ray to

22  dispose.

23      180.    Nothing has changed all these years later.  The Humboldt Auction Yard continues

24  to put weak and injured cattle through the ring for sale, week after week, every Wednesday. On

25  information and belief, hundreds, and even thousands, of cattle in horrible condition have been run

26  through the Humboldt Auction Yard for sale since Deputy Mendes and Deputy DA Kamada began

27  their investigation of Ray in 2017.  Concerned community members continue to reach out to the

28  Sheriff's Office regarding the welfare of livestock at the Humboldt Auction Yard.  Sheriff Billy

Honsal came into office in May 2017.  Just a few months later he assigned Deputy Mendes to become the Livestock Deputy for Humboldt County.  In all the years since, Sheriff Honsal has turned a blind eye to the animal abuse apparently occurring on other dairy farms and ranches. Ranchers continue to cull their herds by taking the worst animals in their herds to the Humboldt Auction Yard, knowing that Ray will be there to purchase and rehabilitate them.

181.    And, of course, there is still no rendering plant in Humboldt County.  The closest rendering plants remain over a full working day's drive there and back, which is not economically feasible for dairy operators and cattle ranchers in the area.  As a result, dairy farmers and cattle ranchers have no choice but to dispose their cattle carcasses on their land—the very thing that got Ray into this case in the first place.  And the county, despite assuring the community years ago that they would look into solutions for the lack of a rendering plant, has utterly failed to address the problem.

182.    Deputy Mendes and Deputy DA Kamada singled Ray out and scapegoated him for the systemic issues created by the county's lack of planning and oversight.  In the absence of such planning and oversight, Ray served as the local trashman for unwanted, sick, and mistreated cattle that have been cast aside by local ranchers and dairy farmers when the animals lost their usefulness.  Rather than addressing the root of the systemic issues—potentially mistreated cattle being sold at the Humboldt Auction Yard, and the lack of a rendering plant forcing ranchers to dispose of carcasses on their land—Deputy Mendes and Deputy DA Kamada chose to target Ray as their scapegoat, for their own personal gain and all under the color of state law.  Ray was a visible, convenient, and satisfying target.  But in their overzealousness to bring Ray down, Deputy Mendes and Deputy DA Kamada's misconduct and obvious abuse of their positions of power violated Ray's constitutional rights.  Ray Christie, and the mistreated and ignored cattle of Humboldt County, deserved better.

## CLAIMS FOR RELIEF

### First Cause of Action

### (Unreasonable Seizure of Person – 42 U.S.C. § 1983)

### Against All Defendants

183.   Ray re-alleges and incorporates the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

184.   Defendants unlawfully arrested Ray and/or caused him to be arrested without probable cause and without a valid warrant.

185.   Defendants violated Ray's right to be secure in his person against unreasonable searches and seizures as guaranteed to Ray under the Fourth Amendment of the United States Constitution and applied to state actors by the Fourteenth Amendment.

186.   Defendants lacked probable cause to support an arrest of Ray.  Defendants knew that Ray was innocent, or were deliberately indifferent to Ray's innocence.  Defendants knew that Ray purchased injured and weak cattle at the Humboldt Auction Yard, and that Ray did not have access to a rendering plant to dispose of cow carcasses.  Nevertheless, they relied on the presence of injured and weak cattle, and carcasses, to improperly claim that this evidence constituted probable cause that Ray had committed a crime.

187.   Defendants' unlawful conduct caused Ray's injuries.  The harm to Ray from Defendants' illegal actions includes lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, physical harm, mental harm, emotional harm, psychological harm, and other compensatory damages, in an amount to be proven at trial. As a result of their misconduct, Defendants are liable for Ray's injuries.

188.   The conduct of Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Ray, and therefore warrants the imposition of exemplary and punitive damages.

189.   At all relevant times, Defendants were acting under the color of state law.

**Second Cause of Action**

**(Unreasonable Search and Seizure of Property – 42 U.S.C. § 1983)**

**Against All Defendants**

190.    Ray re-alleges and incorporates the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

191.    Defendants, acting with deliberate falsehood and reckless disregard for the truth, caused the unreasonable and unlawful seizure of Ray's property, without probable cause and without a valid warrant.  Defendants knew that Ray was innocent, or were deliberately indifferent to Ray's innocence.  Defendants knew that Ray purchased injured and weak cattle at the Humboldt Auction Yard, and that Ray did not have access to a rendering plant to dispose of cow carcasses.  Nevertheless, Defendants presented false and misleading information and/or omitted materials facts regarding Ray's operation to obtain a warrant and to search and seize Ray's property.

192.    Defendants violated Ray's right to be sure in his property against unreasonable seizures as guaranteed to Ray under the Fourth Amendment of the United States Constitution and applied to state actors by the Fourteenth Amendment.

193.    Ray was present at his residence during the 2018 search and had a reasonable expectation of privacy.  Defendants conducted the search of Ray's residence and properties with the intent to intimidate, punish, harass, and embarrass Ray and his family.  Defendants conducted the search of Ray's residence and properties in an unreasonable manner serving no legitimate law enforcement purpose.  Defendants lacked probable cause to search and seize Ray's property.  Further, their search and seizure of Ray's property exceed the scope of their invalid warrant.

194.    Defendants' unlawful conduct cause Ray's injuries.  The harm to Ray from Defendants' illegal actions includes lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, physical harm, mental harm, emotional harm, psychological harm, and other compensatory damages, in an amount to be proven at trial. As a result of their misconduct, Defendants are liable for Ray's injuries.

195.    The conduct of Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Ray, and therefore warrants the imposition of exemplary and

1   punitive damages.

2       196.    At all relevant times, Defendants were acting under the color of state law.

3                                      **Third Cause of Action**

4                          **(Malicious Prosecution – 42 U.S.C. § 1983)**

5                                     **Against All Defendants**

6       197.    Ray re-alleges and incorporates the allegations contained in the preceding

7   paragraphs of this complaint as though fully set forth herein.

8       198.    As alleged herein, the investigation of Ray was not undertaken to obtain evidence

9   of a crime, but instead to retaliate against Ray, and harass and punish Ray for exercising his

10  constitutional rights, including his right to access and defend himself in court in the cockfighting

11  case.

12      199.    Defendants, acting with deliberate falsehood or reckless disregard for the truth,

13  made false and misleading statements and/or withheld material information to pursue criminal

14  charges against Ray.  Defendants knew that Ray was innocent, or were deliberately indifferent to

15  Ray's innocence.  Defendants knew that Ray purchased injured and weak cattle at the Humboldt

16  Auction Yard, and that Ray did not have access to a rendering plant to dispose of cow carcasses.

17  Nevertheless, Defendants relied on the presence of the injured and weak cattle, and carcasses, to

18  illegally and maliciously prosecute Ray.

19      200.    Defendants violated Ray's rights against being subjected to malicious prosecution

20  as guaranteed to Ray under the Fourteenth Amendment to the United States Constitution.

21      201.    Defendants' unlawful conduct cause Ray's injuries.  The harm to Ray from

22  Defendants' illegal actions includes lost income, lost business opportunities, loss of reputation,

23  litigation expenses including attorneys' fees, physical harm, mental harm, emotional harm,

24  psychological harm, and other compensatory damages, in an amount to be proven at trial. A s a

25  result of their misconduct, Defendants are liable for Ray's injuries.

26      202.    The conduct of Defendants was willful, wanton, malicious, and done with reckless

27  disregard for the rights and safety of Ray, and therefore warrants the imposition of exemplary and

28  punitive damages.

203.    At all relevant times, Defendants were acting under the color of state law.

**Fourth Cause of Action**

**(Deliberate Fabrication of Evidence and Withholding of Material Information – 42 U.S.C. § 1983)**

**Against All Defendants**

204.    Ray re-alleges and incorporates the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

205.    As alleged above, Defendants fabricated evidence that was then used to criminally indict and prosecute Ray.  They also withheld material information in order to move forward with the indictment and prosecution of Ray.

206.    For example, Defendants knew that Ray purchased injured and weak cattle at the Humboldt Auction Yard, and that Ray did not have access to a rendering plant to dispose of cow carcasses.  Nevertheless, Defendants presented false and misleading information and/or omitted materials facts regarding Ray's operation to illegally and maliciously prosecute Ray.  Defendants withheld material evidence from Ray, Defendants destroyed material, exculpatory evidence favorable to Ray, Defendants deliberately failed to preserve material evidence, and Defendants altered and manufactured evidence against Ray.

207.    As alleged above, Defendants unlawfully continued their investigation of Ray and conducted a crimination investigation of Ray, despite the fact that they knew that Ray was innocent, or were deliberately indifferent to Ray's innocence, and the results of the investigation were then used to criminally indict and prosecute Ray.

208.    Defendants violated Ray's rights against being subjected to criminal charges without probable cause and on the basis of false or misleading evidence or material omissions as guaranteed to Ray under the Fourteenth Amendment to the United States Constitution.

209.    Defendants' unlawful conduct cause Ray's injuries.  The harm to Ray from Defendants' illegal actions includes lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, physical harm, mental harm, emotional harm, psychological harm, and other compensatory damages, in an amount to be proven at trial. As a

1    result of their misconduct, Defendants are liable for Ray's injuries.

2    210.    The conduct of Defendants was willful, wanton, malicious, and done with reckless

3    disregard for the rights and safety of Ray, and therefore warrants the imposition of exemplary and

4    punitive damages.

5    211.    At all relevant times, Defendants were acting under the color of state law.

6    **Fifth Cause of Action**

7    **(*Monell* Claim – 42 U.S.C. § 1983)**

8    **Against Defendant Humboldt County**

9    212.    Ray re-alleges and incorporates the allegations contained in the preceding

10   paragraphs of this Complaint as though fully set forth herein.

11   213.    Humboldt County's official policies, practices, customs, and/or usages violated

12   Ray's rights, and the rights of those similarly situated under the Fourth and the Fourteenth

13   Amendments.  Humboldt County's official policies, practices, customs, and/or usages directly and

14   proximately injured Ray, as alleged, entitling Ray to recover damages, pursuant to 42 U.S.C.

15   § 1983.

16   214.    Ray exercised his Fourteenth Amendment right to access and defend himself in

17   court in the cockfighting case.  The individual Defendants, acting under color of state law, then

18   retaliated against, harassed, and punished Ray in the manner alleged herein for Ray's exercise of

19   his Fourteenth Amendment right.

20   215.    Humboldt County had in place official, widespread, and/or longstanding policies,

21   practices, and/or customs that amounted to deliberate indifference to Ray's right to exercise his

22   constitutional rights.  These policies, practices, and/or customs were a moving force behind the

23   individual Defendants' illegal conduct.  For example, Humboldt County maintained or permitted

24   policies, practices, customs, and/or usages that included, but was not limited to, the following:

25   a.    Authorizing or permitting the District Attorney's Office to indiscriminately

26   use its law enforcement teams to execute search warrants without first evaluating the

27   reasonableness of their intrusion of individuals' reasonable expectation of privacy and/or their use

28   of heightened force;

        b.      Permitting, condoning, and/or ratifying Humboldt County employees, members of the District Attorney's Office, and/or members of the Sheriff's Office to execute unreasonable searches, seizures, and detentions of residences and persons in a manner intended to retaliate against, punish, harass, and embarrass individuals;

        c.      Condoning and encouraging officers to violate the rights of persons such as Ray with impunity and with intent to retaliate against, punish, harass, and embarrass individuals by imposing intrusive searches;

        d.      Failure to provide adequate training or protocols to the District Attorney's Office and/or the Sheriff's Office with respect to intrusion of individuals' reasonable expectation of privacy, threat assessment, and constitutional limits on the use of force;

        e.      Authorizing and encouraging members of the Sheriff's Office, and/or members of the District Attorney's Office, to withhold evidence from criminal defendants in order to retaliate against, harass, and punish them for exercising their constitutional rights, including their right to access and defend themselves in court;

        f.      Ratification by the highest levels of authority of the specific unconstitutional acts alleged in this Complaint.

216.    As a legal and proximate result of the described official policies, practices, customs, and/or usages, Humboldt County violated Ray's rights to privacy and to be free from unreasonable searches and seizures secured by the Fourth and Fourteenth Amendments.  Ray is therefore entitled to compensatory and punitive damages in an amount to be proven at trial.

217.    Humboldt County has and will continue to permit and/or execute each of the aforementioned policies, patterns, practices, customs, or usages in violation of Ray's civil rights and the civil rights of others.  Ray therefore also seeks injunctive relief from Humboldt County's ongoing policies, patterns, practices, customs, and/or usages alleged.

218.    As a result of Defendants' conduct, Ray suffered harm and is entitled to declaratory relief, injunctive relief, compensatory damages, punitive damages, attorneys' fees, costs, and any other available remedies and relief.

219.    Humboldt County's conduct was willful, wanton, malicious, and done with reckless

disregard for the rights and safety of Ray, and therefore warrants the imposition of exemplary and punitive damages.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff Raymond Frank Christie prays for the following relief and judgment against Defendants:

1.    A judgment declaring Humboldt County's policies, practices, customs, and usages unconstitutional;

2.    An order enjoining Humboldt County's policies, practices, customs, and usages as follows:

- An injunction prohibiting Humboldt County from allowing the District Attorney's Office to indiscriminately allow law enforcement teams to execute search warrants without first evaluating the reasonableness of intrusion of a reasonable expectation of privacy, and heightened force, on a case-by-case basis;

- An injunction prohibiting Humboldt County from allowing its employees, members of the District Attorney's Office, and/or members of the Sheriff's Office to execute unreasonable searches, seizures, and detentions of residences and persons as punishment, harassment, and embarrassment in retaliation for their having exercised their constitutional rights to access and defend themselves in court;

- An injunction prohibiting Humboldt County from failing to adequately train or provide protocols to the District Attorney's Office and/or the Sheriff's Office with respect to the intrusion of a reasonable expectation of privacy, threat assessment, and constitutional limits on the use of force;

- An injunction prohibiting Humboldt County from authorizing and encouraging members of the Sheriff's Office, and/or members of the District Attorney's Office, to withhold evidence from criminal defendants in order to retaliate against, harass, and punish them for exercising their constitutional rights, including their right to access and defend themselves in court;

- An injunction prohibiting Humboldt County from ratifying the specific

1    unconstitutional acts alleged herein; and

2        • Such further injunction as the Court shall find just and proper;

3    3.    Damages in an amount ultimately to be proven at trial, including, but not limited to:

4        a.    Compensatory damages, including for injury to person, emotional distress,

5    medical expenses, and loss of reputation; and

6        b.    Punitive damages under 42 U.S.C § 1983, federal, and state law in an

7    amount according to proof and which is fair, just, and reasonable;

8    4.    An award of reasonable attorneys' fees, costs, and expenses to Plaintiff, pursuant to

9    42 U.S.C. § 1988, in an amount to be proven at trial;

10    5.    Costs of suit herein incurred;

11    6.    Pre-judgment interest; and

12    7.    Such other and further relief as this Court shall find just and proper.

13

14    Dated:  December 1, 2025        LARSON LLP

15

16                    By:    _____
                                    */s/ Rick Richmond*
17                            Rick Richmond
                            Caroline G. Glennie-Smith
18                            Donna Zamora-Stevens
19                    Attorneys for Plaintiff Raymond Frank Christie

20

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury with respect to all issues and claims, asserted by any party, triable of right by a jury, in the above-captioned action.


Dated:  December 1, 2025                    LARSON LLP


                                            By:    _/s/ Rick Richmond_
                                                   Rick Richmond
                                                   Caroline G. Glennie-Smith
                                                   Donna Zamora-Stevens
                                            Attorneys for Plaintiff RAYMOND FRANK CHRISTIE