Rick Richmond (SBN 194962)
*rrichmond@larsonllp.com*
R.C. Harlan (SBN 234279)
*rharlan@larsonllp.com*
Caroline G. Glennie-Smith (SBN 331359)
*cglennie-smith@larsonllp.com*
Donna Zamora-Stevens (SBN 318525)
*dzamora-stevens@larsonllp.com*
**LARSON LLP**
555 South Flower Street, 30th Floor
Los Angeles, California 90071
Telephone: (213) 436-4888
Facsimile: (213) 623-2000

Attorneys for Plaintiff
RAYMOND FRANK CHRISTIE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYMOND FRANK CHRISTIE,<br><br>Plaintiff,<br><br>~~vs~~v.<br><br>COUNTY OF HUMBOLDT, a local public entity; TRAVIS MENDES, in his individual and official capacity; ADRIAN CHARLES KAMADA, in his individual and official capacity; WILLIAM HONSAL, in his individual and official capacity; and DOES 1-10, in their individual and official capacities,<br><br>Defendants. | Case No. 5:25-cv-10328-NW<br><br>**~~FIRST~~SECOND AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page**


~~INTRODUCTION ........ 1~~

~~JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT ........ 20~~

~~PARTIES ........ 20~~

~~FACTUAL ALLEGATIONS ........ 21~~

- ~~A. Ray Has Cared for Animals All His Life ........ 21~~
- ~~B. Humboldt County Cattle Ranchers Operate in a Dysfunctional System ........ 23~~
  - ~~1. Cows Die ........ 23~~
  - ~~2. Humboldt County Knew Ray Purchased Unwanted Cattle ........ 24~~
  - ~~3. There is No Rendering Plant in or Near Humboldt County ........ 25~~
  - ~~4. Ray Took in Dying Cattle and Rehabilitated Them ........ 28~~
- ~~C. Ray's Operation Became a Target in Humboldt County ........ 30~~
  - ~~1. Livestock Deputies Inspected Ray's Operation for Decades and Never Found Animal Abuse ........ 30~~
  - ~~2. Ray is Acquitted at a Cockfighting Trial ........ 32~~
  - ~~3. An Unauthorized and Intrusive Drone Flyover Puts Ray on the Map ........ 32~~
- ~~D. Mendes Becomes Livestock Deputy and Immediately Pursues Ray ........ 33~~
- ~~E. Deputy Mendes', Deputy DA Kamada's, and Sheriff Honsal's Five-Month Investigation Ends with the 2018 Raid ........ 36~~
  - ~~1. Lacking Probable Cause, Deputy Mendes and Deputy DA Kamada Intentionally or Recklessly Omit Material Information or Include Misstatements to Secure Search Warrants ........ 36~~
  - ~~2. Deputy Mendes Leads a SWAT-Style Raid with Dozens of Agents ........ 41~~
  - ~~3. Deputy Mendes Secretly Records Custodial Interrogation of Ray ........ 43~~
  - ~~4. Cows are Delivered Hours Before the Raid ........ 47~~
  - ~~5. Deputy Mendes, Deputy DA Kamada, and Sheriff Honsal Searched Unlawfully and Mishandled Evidence ........ 48~~
- ~~F. Ray is Under Felony Charges for Five Years Before the District Attorney Dismisses ........ 52~~
  - ~~1. The Felony Animal Abuse Allegations Generate Significant Local~~

Attention .......... 52

2. The Sheriff's Office's 2021 Raid Found No Evidence of Neglect .......... 53

3. The 2022 District Attorney's Race Reveals the Extent of Deputy DA Kamada's Prosecutorial Misconduct .......... 57

4. The District Attorney Dismisses the Felony Charges Against Ray in December 2023 .......... 59

G. Nothing Has Changed in Humboldt County, and Sheriff Honsal, the Sheriff's Office, and the District Attorney's Office Continue to Ignore Animal Abuse by Others .......... 59

CLAIMS FOR RELIEF .......... 63

RELIEF REQUESTED .......... 72

DEMAND FOR JURY TRIAL .......... 74

INTRODUCTION .......... 1

JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT .......... 24

PARTIES .......... 24

FACTUAL ALLEGATIONS .......... 25

A. Ray Has Cared for Animals All His Life .......... 25

B. Humboldt County Cattle Ranchers Operate in a Dysfunctional System .......... 28

1. Cattle Operators Dispose of Their Sick, Unhealthy, and Mistreated Animals .......... 28

2. Deputy Mendes Assists in the Sale of Sick, Unhealthy, and Mistreated Cattle .......... 30

3. Ray Buys and Nurses Sick, Unhealthy, and Mistreated Cattle .......... 31

4. While Ray Performs a Service for the Community, Not All Previously Mistreated Cattle Survive .......... 35

C. Ray's Operation Became a Target in Humboldt County .......... 39

1. Livestock Deputies Inspected Ray's Operation for Decades and Never Found Animal Abuse .......... 39

2. Ray is Acquitted at a Cockfighting Trial .......... 41

D. Defendants Formulate a "Game Plan" for "Christie's Day of Reckoning" .......... 42

1. Increased and Widespread Community Disdain for Ray Ignites Investigation .......... 42

2. Mendes Becomes Livestock Deputy and Immediately Pursues Ray ....43

E. Deputy Mendes', Deputy DA Kamada's, and Sheriff Honsal's Five-Month Investigation Ends with the 2018 Raid ....49

1. Lacking Probable Cause, Deputy Mendes and Deputy DA Kamada Intentionally or Recklessly Omit Material Information or Include Misstatements to Secure Search Warrants ....49

2. Deputy Mendes Leads a SWAT-Style Raid with Dozens of Agents ....56

3. Deputy Mendes Secretly Records Custodial Interrogation of Ray ....57

4. Cows are Delivered Hours Before the Raid ....62

5. Deputy Mendes, Deputy DA Kamada, and Sheriff Honsal Searched Unlawfully and Mishandled Evidence ....62

F. Ray is Under Felony Charges for Five Years Before the District Attorney Dismisses ....69

1. The Felony Animal Abuse Charges Generate Significant Local Attention ....70

2. The Sheriff's Office's 2021 Raid Found No Evidence of Neglect ....71

3. The 2022 District Attorney's Race Reveals the Extent of Deputy DA Kamada's Prosecutorial Misconduct ....75

4. The District Attorney Dismisses the Felony Charges Against Ray in December 2023, Resolving the Case in Ray's Favor ....76

G. Nothing Has Changed in Humboldt County, and Sheriff Honsal, the Sheriff's Office, and the District Attorney's Office Continue to Ignore Animal Abuse by Others ....77

1. The Humboldt County Sheriff's Office Failed to Investigate Other Cattle Owners ....77

2. The Humboldt County Sheriff's Office Failed to Investigate Animal Abuse Confirmed by the USDA at Well-Known Dairy Alexandre Family Farm ....79

3. The Humboldt County Sheriff's Office's Investigation of Allegations of Animal Abuse at Miranda Rescue ....82

4. The Humboldt County Sheriff's Office, the District Attorney's Office, and the County Continue to Ignore Mistreatment of Animals ....85

CLAIMS FOR RELIEF ....88

RELIEF REQUESTED ....104

DEMAND FOR JURY TRIAL ....107

## INTRODUCTION

~~1. Ray Christie's civil rights were violated by Travis Mendes and Adrian Kamada, with the support of William Honsal and Humboldt County. At the time, Travis Mendes was a Deputy Sheriff in the Humboldt County Sheriff's Office, acting under color of state law in his role as Livestock Deputy. Adrian Kamada was a Deputy District Attorney in the Humboldt County District Attorney's Office, acting under color of state law as a county prosecutor. William Honsal was the Sheriff of Humbolt County, acting under color of state law as Sheriff.~~

~~2. Ray was unlawfully investigated and unlawfully arrested. Ray and his ranch properties were unreasonably searched. Ray's property was unlawfully seized. Ray was wrongfully and maliciously prosecuted as an alleged animal abuser for several years, until the District Attorney had no choice but to dismiss those felony charges in the face of insurmountable evidentiary challenges. Working together, Deputy Mendes, Deputy DA Kamada, and Sheriff Honsal caused and inflicted these civil rights violations on Ray, without probable cause and with the intent to harass and intimidate Ray and to interfere with Ray's exercise of his constitutional rights. Ray seeks compensatory and punitive damages for these violations, pursuant to the United States Constitution and federal law.~~

~~3. Ray is a fourth-generation cattle rancher. His great-grandfather worked on a dairy farm in Ireland, his grandfather established a dairy farm as an early settler in Humboldt County near McKinleyville, and his father was a beef and dairy cattle rancher in McKinleyville. Ray has spent his entire life in Humboldt County raising cattle, and caring for animals of all kinds. Ray is well known in Humboldt County. He is a big, buff, hearty, gregarious, and larger-than-life character. Many people in the community personally know him, or know about him, because Ray runs one of the largest cattle operations in the area. During the relevant timeframe, Ray cared for his cattle on 20 properties around Humboldt County, covering about 3,000 acres. Ray ran approximately 35,000 cattle through his properties on an annual basis. At any given time, there were about 4,000 cattle in Ray's herds. Many of Ray's cattle grazed in pastures in high-visibility areas, along scenic Route 101, up and down the coast, and in the lush and beautiful area outside of Eureka known as the Arcata Bottoms. Local residents, tourists, and visitors alike were, and still~~

are, likely to see some of Ray's cattle, as they live in, explore, or pass through the area.

4. Ray's cattle business is based on the age-old wisdom of "buy low, sell high." The cheapest cattle for sale in Humboldt County are those that have been culled from the herds at other cattle ranches and dairy farms. The culled cattle are sick, weak, skinny, and injured. Ranchers in Humboldt County cull those undesirable animals out of their herds and sell them at the Humboldt Auction Yard in Fortuna and at other similar auction yards in the region. Those were and are the animals Ray would "buy low" when he attended the weekly auctions, in search of new cattle for his herds.

1. This is a civil rights action about a man criminally charged and prosecuted on the basis of evidence a sheriff's deputy deliberately fabricated. For four generations, the Christie family has raised cattle in Humboldt County. Raymond Frank Christie ("Ray") built his business on a simple and lawful model: he bought the sick, injured, and unwanted animals that other ranchers culled from their herds, and he nursed them back to health. For more than fifteen years, the Humboldt County Sheriff's Office investigated the periodic complaints that Ray's herds looked thin, or that carcasses were visible on his low-lying land, and every livestock deputy who looked reached the same conclusion: Ray was no animal abuser.

2. That changed when Travis Mendes became the Humboldt County Livestock Deputy in late 2017. Deputy Mendes targeted Ray from his first days on the job. Deputy Mendes personally disliked Ray and, despite knowing that Ray was innocent, set out to bring Ray down. When his raiding party descended on Ray's ranch in March 2018, Deputy Mendes pushed aside the officer who had begun to handcuff Ray, declared "this one is all mine," and snapped on a pair of handcuffs engraved with Mendes' own name.

3. To turn his animus into a criminal case, Deputy Mendes manufactured the appearance of a crime. He staged photographs—moving a cattle ear tag against an unrelated skull, and repositioning a wheelbarrow and other objects to make a carcass look more sinister—and then presented those images as true depictions of what he found. He stripped and altered the metadata of photographs so that images captured months before the raid would appear to document conditions on the day of it. He secretly recorded Ray's custodial interrogation and concealed the

recording for a year and a half. He slanted his warrant affidavits and reports, stating one-sided half-truths while burying the facts he knew cut the other way. And he testified falsely, under oath, about how, when, and with how many devices the evidence had been collected. This is not a case about an officer who merely failed to disclose something. It is about an officer who affirmatively created and mischaracterized evidence to frame a man he knew was innocent.

4. Defendants' own files confirm that they were aware of all of these facts. In early August 2018, days before Ray's preliminary hearing, Deputy Mendes himself gave Ray a goat from the Sheriff's Office work farm that he admitted was "too sick."[1] In fact, that goat died that same day, even though a veterinarian had examined it weeks earlier, when it was in Deputy Mendes' custody, and found it healthy. In contemporaneous emails, the prosecutors acknowledged that the episode "reinforces the defendant's story line—Christie buys (takes in) the sick animals from others and does what he can to help them, and that it hurts us in terms of credibility for Dep. Mendes."[2] They resolved to dismiss felony counts against Christie in order to "remove Dep. Mendes as a witness" and to proceed only on charges they could prove "without Mendes."[3] Knowing all of this, Defendants prosecuted Ray for five more years.

5. Defendants targeted Ray for prosecution despite their knowledge of his innocence. For example, Deputy Mendes knew Ray was innocent because Deputy Mendes was himself part of the very trade in sick and injured animals he used to brand Ray an abuser. Week after week at the Humboldt Auction Yard, witnesses saw Deputy Mendes work the pens like a ranch hand, encouraging and helping to move weak, sick, lame, and non-ambulatory animals through the sale, knowing full well that Ray would be there to buy them. Deputy Mendes even brought skinny, failing animals to the Humboldt Auction Yard for sale. This includes the goat cited above, as well as pigs so emaciated that several died in the auction pens on the day of sale. Deputy Mendes, not to be dissuaded, told the auction staff the pigs should be sold anyways while Ray sat waiting as a

[1] August 9, 2018 email from Deputy DA Kamada to Maggie Fleming and others at the District Attorney's Office.

[2] *Id.*

[3] August 10, 2018 emails exchanged by Deputy DA Kamada and Maggie Fleming.

buyer. Deputy Mendes thus knew, better than anyone, that the sick and subpar condition of the animals in Ray's herds was the product of other ranchers' and farmers' operations in Humboldt County, not evidence that Ray abused anything. The goat and pig incidents were not unique; they were how Deputy Mendes operated. And Defendants knew it. At Ray's August 2018 preliminary hearing, the District Attorney's Office stood up in open court and dismissed several felony animal-cruelty counts, conceding on the record that it could no longer rely on Deputy Mendes as a witness because this was the same deputy "who then would allow a sick goat to go into the hands of the defendant."[4] Sheriff Honsal knew it too. For years, ranchers had sent him photographs and video and implored him personally to address the sick, skinny, lame, and weak cattle being run through the auction by other Humboldt County ranchers and farmers, the very animals everyone knew Ray bought. Sheriff Honsal brushed them aside, telling one complainant, who Sheriff Honsal knew was a friend of Ray's, "Good luck my friend."

6. The gulf between how Defendants treated Ray and how they treated the other ranchers and farmers actually bringing sick, skinny, lame, and weak animals to auction shows that they never believed Ray was an animal abuser. For years, Defendants looked past documented, and in some instances admitted, animal abuse by established ranchers and dairies, most notably Alexandre Family Farm, whose mistreatment of cattle the USDA later confirmed. Defendants also looked past the sick, injured, and non-ambulatory cattle run through the Humboldt Auction Yard every week in plain view of the Livestock Deputies. Those operators were never investigated, arrested, or charged, despite Defendants' full knowledge that those operators were the source of the sick, injured, and non-ambulatory animals. Had Defendants genuinely believed that these animals' condition was evidence of a crime, they would have pursued the operators who sold them. They did not. Ray alone was singled out. Defendants intentionally treated Ray differently from every similarly situated operator in Humboldt County, with no rational basis for doing so, and pursued the prosecution of Ray for the purpose of denying him the equal protection of the laws. Their choice to spare every comparable operator—and in the case of Deputy Mendes,

[4] August 14, 2018 Prelim. Trans. at 4:11-5:4.

assisting them with the sale of their mistreated cattle at auction—while relentlessly targeting Ray confirms that the investigation and prosecution were undertaken in bad faith, without probable cause, and for a purpose the law forbids.

7. In December 2023, after the state court suppressed the fruits of a second unlawful raid and permitted Ray to expose Deputy Mendes' evidence-handling and false testimony, the District Attorney dismissed, without a conviction, every felony charge. The remaining misdemeanor convictions were later set aside and that action dismissed. By then the damage was done. Ray spent more than five years and millions of dollars defending himself, lost his largest buyer and his access to credit, and suffered serious illness, while his reputation was destroyed.

8. Ray brings this action under 42 U.S.C. § 1983 for the violation of his clearly established Fourth and Fourteenth Amendment rights alleged below, including his right to the equal protection of the laws and his due process right not to be subjected to criminal charges on the basis of deliberately fabricated evidence. Defendants, determined to shoehorn Ray's case into a fact pattern that suited their arguments, intentionally and irrationally singled Ray out for investigation, arrest, and prosecution while sparing every similarly situated operator, going so far as to deliberately fabricate evidence. Defendants' decision to ignore identical and far worse conduct by similarly situated individuals is not a separate grievance; it is proof that Defendants knew Ray was innocent, lacked any genuine belief in the charges, and pursued him for reasons the Constitution does not permit.

~~5. Once in his possession and control, Ray did his best to rehabilitate these unfortunate animals. Ray has a special gift for determining which animals bought at auction need what kind of care and attention to bring them back from their deplorable condition to good health. In other words, Ray knows how to "beef up" the subpar animals culled out of other ranchers' and dairy farmers' herds. Ray's ability to feed his family and succeed as a businessman depends on him caring for his animals in an active manner. Intentional or even passive neglect of animals would be against Ray's business interests. Neglecting his animals would make no sense. And neglecting his animals would go against everything Ray was, is, and will ever be. Ray is an animal lover.~~

6. Ray spends nearly $1 million each year taking care of his cattle, spending the money on hay, medicines, and ranch hands to watch over and care for the animals. He also employs a man whose full-time job is to maintain and repair the fencing around Ray's pastures. Once the subpar animals initially bought at the auction yards are beefed up, Ray can put those healthy cattle to good use as breeding stock, or as desirable animals for sale to other ranchers, dairy farmers, and meat producers. Ray sells his beefed up cattle at much higher prices than what he spent to buy them and rehabilitate them. Buy low, sell high. That is a good and responsible business model. And it is a model that provides the once-culled cattle with a much better life than what they had experienced previously.

7. Sometimes, Ray buys and rehabilitates animals for his own personal enjoyment, and for the general enjoyment of those in the local community. Just across from the ranch house in which Ray lives, for example, Ray maintains a pasture devoted to exotic cattle and other animals that have been abandoned. That pasture is almost like a zoo. Ray spends time and money caring for those animals, for no monetary gain, so he can step out onto his front porch and enjoy his private zoo. Anyone else on the public road, which separates Ray's ranch house from the zoo pasture by only a few feet, can enjoy Ray's zoo as they pass by on foot, on bicycles, on motorcycles, and in cars and trucks. Ray's animal-centered life and cattle business are not hidden from public view. They are wide open and visible to all.

8. The local cattle ranching community was well aware of the condition of the culled cattle brought to the auction yards. That ranching community included Humboldt County law enforcement personnel. In Humboldt County, one of the deputy sheriffs is typically designated as the Livestock Deputy. During most of the relevant time, Travis Mendes was the Livestock Deputy for Humboldt County. Deputy Mendes was usually at the Humboldt Auction Yard every Wednesday when the animals were auctioned. With his own eyes, Deputy Mendes saw the kinds of animals being brought to the auction yard by other ranchers. Deputy Mendes saw that Ray was buying those animals. Deputy Mendes knew that the herds on the other ranches and farms in Humboldt County looked relatively better with the subpar animals culled out of them, while the herds on Ray's pastures looked relatively worse with the addition of the auction-bought animals.

9. The Livestock Deputies who preceded Deputy Mendes were well aware of how the animals in Ray's herds might look to passersby, as compared to the remaining, non-culled animals in other herds. For at least 15 years, the Livestock Deputies had received occasional public complaints about animals on Ray's pastures looking less desirable than animals on other pastures. Sometimes people complained that an animal was loose and needed to be brought back into a rancher's pasture. In their written reports, the Livestock Deputies reported on their investigations of these complaints. They explained why they dismissed those complaints and took no action on them. None of Deputy Mendes' predecessors concluded Ray was neglecting his animals or was an animal abuser. And none who have held the Livestock Deputy position since Deputy Mendes has believed Ray was an animal abuser. To the contrary, they all knew how and why Ray's herds looked the way they did at any given time. The subpar animals in Ray's pastures were in the process of being beefed up, not abused. It was Deputy Mendes, and Deputy Mendes alone, who claimed Ray was an animal abuser.

10. A local reporter described Deputy Mendes as a "wannabe cowboy."[5] Deputy



[5] John Chiv, *Travis Mendes seems obsessed with being a wannabe cowboy. Maybe he is just jealous that Ray Christie is living the life he wants?*, John Chiv, April 25, 2022, https://johnchiv.blogspot.com/2022/04/travis-mendes-seems-obsessed-with-being.html.

Mendes was no passive observer at the auctions, but was an active participant. He interacted with the people and the animals, acting more like a rancher or an auction hand than the law enforcement officer he was supposed to be. He helped move the animals out of the ranchers' trucks, down the ramps, through the gates, into and out of the auction arena, and into their pens after they were sold and waiting to be picked up.










~~1. These photos show Deputy Mendes at the Humboldt Auction Yard on April 24, 2018, working like he was an auction worker tasked with moving animals around instead of ensuring that animals were protected and ranchers and auction personnel were obeying the law. Here, Deputy Mendes is seen carrying a "cattle paddle." These paddles are the proper means to help move cattle from one place to another. But in this same timeframe, Deputy Mendes was~~

sometimes dissatisfied with how the cattle reacted to his use of a cattle paddle and was seen using an electric cattle prod to move along subpar animals when they were stumbling, standing still, or lying down, unable to walk as he wished they would. An electric cattle prod is the equivalent of a human stun gun. Most cattle ranchers consider it abusive to use an electric prod to shock a sick or weakened animal into unnatural activity.

11. It is unlawful for ranchers to drop off non-ambulatory animals at auction. It is unlawful for auction yards to accept them. Yet, that practice of dropping off and accepting non-ambulatory animals happened consistently and persistently at the Humboldt Auction Yard. Ray and other ranchers in the area have taken hundreds of photos and videos at the Humboldt Auction Yard that prove the unlawful practice has been allowed to continue in Humboldt County for years, perhaps even decades. Deputy Mendes was not just seeing the unlawful activity take place, he was an active participant in the process. Other governmental officials, such as the state brand inspector and the state veterinarian who were on-site, watched the same unlawful practice, over and over again.

12. As reflected in his investigative report, and in his own words, as soon as Sheriff Honsal appointed him as Livestock Deputy, Deputy Mendes began an active investigation into Ray's cattle business and practices. Deputy Mendes' focus on Ray was immediate and single-minded. In his report, Deputy Mendes claims to have talked with his Livestock Deputy predecessors during his five-month investigation. If he had read the dozens of written reports documenting their responses to complaints they had investigated over the prior 15 years, Deputy Mendes would have confirmed what these deputies already knew. Ray's herds were filled with the culled cattle Ray bought at the Humboldt Auction Yard. Those subpar animals were skinny, sick, weak, and injured. Those poor looking animals were on full public display in Ray's prominent pastures. Complaints about downed animals or animals that looked skinny, weak, or sick in Ray's pastures were investigated and dismissed with no action. Everyone knew why some of the animals in Ray's herds looked that way, as Ray worked hard to beef them up. Complaints about loose animals were also largely dismissed. With 4,000 head of cattle scattered over 3,000 acres on 20 pastures, it was inevitable an animal could get loose, for a variety of reasons. Often

the loose animals came from other pastures and were not part of Ray's herds.

13. If Deputy Mendes had been doing his job without any personal animus, he would have also recognized that dead cattle carcasses on a ranch property are not evidence of anything. Cattle are not the hardy creatures they might appear to be. They regularly get sick or injured and die. A "closed" herd, meaning one that is self-contained and self-perpetuating through in-herd reproduction, typically has a 10% mortality rate. An "open" herd of cattle like those Ray maintained would have a higher mortality rate, due to constant additions of culled cattle from other herds, which were already sick and diseased. If a rancher moved 35,000 cattle through his operation in a year, and had around 4,000 on hand at any given time, one would reasonably expect him to end up with hundreds of cattle carcasses every year. Those carcasses would not prove, much less even suggest or hint at neglect or abuse. As has been officially reported, Humboldt County has about 71,000 cattle scattered across various pastures in the county, which would include Ray's 4,000 cattle.

14. In Humboldt County, there is no place to dispose of animal carcasses. The local rendering plants were closed decades ago. No new ones have ever been built. There is no place for the carcasses to go in Humboldt County. Various Humboldt County Supervisors, such as Rex Bohn, have promised to address this problem of a lack of a rendering plant. But, they have failed to do so, leaving cattle ranchers like Ray with no choice but to make "dead piles" on their properties or bury the carcasses as best they can.

15. Even worse, if particular cows happen to die too close to sloughs or other waterways, the ranchers can potentially be cited for "littering" a state-protected waterway. In California, protected state waterways can mean just about anything, especially in the Arcata Bottoms. The lowlands of the Arcata Bottoms are below sea level. During the rainy winter season, it is difficult to be 150 feet away from standing water anywhere in that area. During the wet and rainy winter season, the mud is so thick and deep, vehicles cannot pull animal carcasses weighing thousands of pounds out of the muck. It is an impossible task to clean up carcasses in the Arcata Bottoms. All cattle ranchers or dairy farmers in Humboldt County face the same problem with disposal of their cattle carcasses.

16. On information and belief, no other cattle ranchers or dairy farmers in Humboldt County have been investigated and prosecuted for animal cruelty, on the bases that a handful of their animals looked skinny, sick, or weak or that cattle carcasses were seen on their properties. Nor have any other ranchers or farmers been investigated or charged with littering, on the basis that some of their animal carcasses ended up being too close to state waterways.

17. In spite of his personal knowledge about the source of the subpar culled cattle added to Ray's herds, and about the difficulties with carcass disposal, Deputy Mendes singled Ray out for investigation. Planning and scheming for five months, Deputy Mendes orchestrated and




then led a raiding party onto Ray's properties during the pre-dawn hours of a March 2018 wintery day, during a particularly rainy season. Deputy DA Kamada was part of that 30-person raiding party as they descended on Ray and his ranch house. SWAT-type personnel were in full gear, with automatic assault weapons aimed at Ray and his girlfriend as they were groggily dragged out of the ranch house onto an almost freezing porch. Shivering for 30 minutes in the cold, damp air, they were held under armed guard while the ranch house was searched. Ray was barefoot, dressed in boxers and a T-shirt. His girlfriend was also barefoot, dressed in a thin, satin slip made for

~~sleeping, with nothing on underneath the slip. After those 30 minutes, Ray and his girlfriend were eventually let back into their home to wait out the remaining hours of detention during the raid. Ray asked to speak to a lawyer.~~

~~18. Rather than allowing Ray to make a call or calling a lawyer for him, law enforcement ensured news media would be on the scene. News reports were filed throughout the day, including photos of some of the raiding party.[6]~~




~~19. Once the ranch house was cleared, Ray and his girlfriend were ordered back into the house and seated on a couch. Ray was placed under arrest and a member of the raiding party started to put handcuffs on Ray. Deputy Mendes stopped him, saying "this one is all mine." Deputy Mendes produced a set of handcuffs with Mendes' name engraved on them and smugly snapped them onto Ray's wrists. The other set of handcuffs was put on Ray's girlfriend, who was finally provided with a blanket.~~

~~20. Ray again asked to speak with a lawyer. Undeterred, and in obvious affront to the~~

---

~~[6] Hank Sims, *Cops Raid Notorious Ranch in the Arcata Bottoms; Rancher Ray Christie Arrested at the Scene*, Lost Coast Outpost, Monday, March 19, 2018, 11:47 a.m., https://lostcoastoutpost.com/2018/mar/19/around-20-officers-multiple-agencies-descend-notor/.~~

~~Ray's constitutional rights, Deputy Mendes, Deputy DA Kamada, and other members of the raiding party interrogated Ray while he sat on the couch. They tried to trap Ray into discussing his procedures for caring for subpar animals, like the ones brought to the property in the middle of the night, just hours before the raiding party arrived. The answers to those questions go right to the heart of animal cruelty charges pursued against Ray, which required proof that Ray "deprived" his animals of "necessary sustenance, drink, or shelter" or "otherwise subjects an animal to needless suffering" or "in any manner abuses an animal." Deputy Mendes secretly recorded these unconstitutional inquiries on his cell phone and then hid the recording for the next one and a half years, until it was revealed during his cross-examination in the Humboldt County courthouse. When Deputy Mendes continued to seek answers, Ray tried to explain that the truck outside, which was still backed up to the loading chute, indicated a load of cattle had been delivered in the middle of the night from auction. When that happens, cattle are sometimes already dead or dying, while others are sick, weak, injured, hungry, thirsty, and tired. Ray's explanation fell on deaf ears.~~

~~21. When Ray's unconstitutional interrogation ended, Ray's girlfriend asked if she could get dressed. Deputy Mendes ordered that she could do so in the physical presence of a member of the raiding party. She struggled to walk sideways up the steep staircase to the bedroom, clutching her mid-thigh slip against her leg to protect herself from the prying eyes of male raiding party members following her up the stairs. A female member of the raiding party finally persuaded Deputy Mendes to allow Ray's girlfriend to get dressed in the bedroom closet. After remaining in on-site custody for several hours, Ray was finally escorted out of the ranch house, put into a law enforcement SUV, and transported for booking to the Sheriff's Office in~~

~~downtown Eureka.[7]~~




~~22. Meanwhile, the animals at and near the ranch house were neglected for several hours. Some of those animals had just come from auction. They were hungry, thirsty, tired, sick, skinny, and weak. The raiding party prevented Ray's ranch hands from their normal practice of feeding and caring for the animals, especially those that had arrived from auction overnight. The two state veterinarians on the scene did nothing. Not one of the 30 members of the raiding party fed or watered any of the animals.~~

~~[7] Hank Sims, *Cops Raid Notorious Ranch in the Arcata Bottoms; Rancher Ray Christie Arrested at the Scene*, Lost Coast Outpost, Monday, March 19, 2018, 11:47 a.m., https://lostcoastoutpost.com/2018/mar/19/around-20-officers-multiple-agencies-descend-notor/.~~

23. No animals were taken away for any care, except one goose. The goose had its wing shot off, presumably by hunters or poachers, and it had managed a "lame duck" landing near Ray's ranch house. The goose was a "free-loader" that roamed the hundreds of acres of pastures around Ray's ranch house and joined the free range chickens and other birds who ate the feed Ray put out for them. Deputy Mendes' raiding party locked the goose in a cage and took it away.[8]



24. Ray was photographed, fingerprinted, and booked at the Sheriff's Office. After posting bail, Ray was finally allowed to return to the ranch house. Ray and his ranch hands spent all that night and the next day trying to round up and segregate the animals the raiding party had allowed to roam out of their proper pens and pastures. Several hundred animals were indiscriminately mingled together, with no regard for their relative health or recovery needs. While Ray was trying to clean up the mess left by the raiding party, the raiders moved on to the other properties that

[8] *Id.*

~~same day and the next. At one of those other properties, Deputy Mendes boasted to Ray's ranch hand about what was happening. Deputy Mendes gestured in a sweeping motion to the large number of people in his raiding party, then bragged: "Do you see this? This is all because of me." Later, while the felony animal abuse charges were still pending against Ray, the father of Deputy Mendes, who was also a law enforcement officer with the Ferndale Police Department, boasted to a local cattle rancher that "my son Travis took Ray Christie down." Deputy Mendes began to acquire his own cattle and dress and act like a cowboy.[9] In the meantime, Deputy Mendes beat up a reporter covering a story in the Redwood forest, which resulted in Humboldt County making a substantial payment of taxpayer money to settle a civil rights action brought by the reporter~~





[9] ~~John Chiv, *Travis Mendes seems obsessed with being a wannabe cowboy. Maybe he is just jealous that Ray Christie is living the life he wants?*, John Chiv, April 25, 2022, https://johnchiv.blogspot.com/2022/04/travis-mendes-seems-obsessed-with-being.html.~~

against Deputy Mendes and another officer.[10]



25. While gathering evidence of supposed animal abuse over those two days of the March 2018 raid, Deputy Mendes intentionally altered evidence, in violation of Ray's Fourteenth Amendment rights. For instance, before taking a supposed evidentiary photo, Deputy Mendes moved a cattle ear tag so it would look like it was associated with a bleached out skull on the ground. He also moved a wheelbarrow to take a more dramatic photo of a cow carcass. Worse, Deputy Mendes claimed under oath that only three devices were used to collect photo and video evidence on those two days. But the remaining metadata associated with the photos and videotapes produced by the District Attorney's Office, and eventually used in Ray's prosecution, proved that at least 18 devices had been used. As another example, eight photos were shown to

[10] Kym Kemp, *The Civil Liberties Defense Center Filed Suit Against Humboldt County and Two Sheriff's Deputies Alleging Police Brutality Against a Journalist*, Redheaded Blackbelt, April 15, 2020, https://kymkemp.com/2020/04/15/today-the-civil-liberties-defense-center-filed-suit-against-humboldt-county-and-two-sheriffs-deputies-alleging-police-brutality-against-a-journalist/.

LARSON
LOS ANGELES

Deputy Mendes while he was on the witness stand. He testified he had personally taken those photos during the March 2018 raid. But the available metadata associated with those photos proved they had been altered months earlier, with no way to tell when the photos had actually been taken.

26. Deputy DA Kamada was also guilty of sloppy or intentional alteration of evidence in Ray's investigation and prosecution. Deputy DA Kamada had been ordered by the Humboldt Superior Court to personally preserve whatever evidence was gathered in the raid. Six electronic devices were seized during the raid, some of which were Ray's and some were his girlfriend's. None of those six devices has been returned to this day. A preservation expert's examination of those six devices revealed that at least one had been "wiped" clean, potentially destroying exculpatory evidence that would be favorable to Ray. Deputy DA Kamada was later publicly accused by a colleague in the District Attorney's Office as being reckless or perhaps negligent in his handling of evidence in criminal cases. Before the District Attorney's Office dismissed the felony charges against Ray, it was forced to admit that the Office lost video evidence taken during the raid.

27. When Ray's attorneys sought to examine Deputy DA Kamada in the Humboldt Courthouse about his handling of the evidence, he resisted providing any testimony and growled in a stage-whisper to Ray, sitting beside his attorney at counsel table, "you're a fuckin' joke." Deputy DA Kamada was later fired by the elected District Attorney for violating office policy and procedure with respect to involving himself in an investigation in a way that would make him a potential witness, which is not altogether different from what he did during the raid when he participated in Ray's unconstitutional interrogation.

28. The raiding party also confiscated four guns at the ranch house during. Three of the guns were shotguns, which were used for self-protection. The fourth gun was a rifle, which was used for the sad, but occasionally necessary euthanization of a suffering animal. None of those six guns has ever been returned to Ray.

29. Ray was charged by Deputy DA Kamada with several counts of felony animal abuse, based on the physical condition of fewer than 10 cows, which were never fed nor medically

treated or taken away during the March 2018 raid. Those few "abused" cows were among the 4,000 cattle in Ray's herds that were searched those two days by the 30-member raiding party. Many of them had arrived during the middle of the night from auction and were already in poor condition. Deputy DA Kamada also charged Ray with several misdemeanor counts of littering state waterways, based on various carcasses that were allegedly located within 150 feet of a state waterway.

30. In Ray's 2019 trial, the jury hung on the felony animal abuse counts. The jury convicted on some of the littering counts, acquitted on some of them, and hung on others. As a second trial approached in late 2021, Ray's attorneys challenged the legality of the evidence collected during the March 2018 raid and during a second raid conducted in the fall of 2021. During trial court proceedings to consider those challenges, the court threw out all of the evidence from the second raid in the fall of 2021 and allowed Ray's attorneys to elicit evidence of Deputy Mendes' unconstitutional evidence collection and false testimony about what happened during the first raid in March 2018.

31. Following those challenges by Ray's attorneys, the District Attorney's Office dropped all of the felony animal abuse charges against Ray in December 2023. It also dismissed the remaining littering charges against Ray, and agreed to allow Ray to make a $12,000 donation to a local non-profit called Redwood Pals Rescue in lieu of any fine or other penalty for littering. The littering charges were later set aside pursuant to a California statute that is roughly the equivalent of expungement.

32. Between the time of the March 2018 raid, and the District Attorney's dismissal of the felony animal abuse charges in late 2023, Ray and his girlfriend and their two young boys suffered in many ways. For one thing, Ray was attacked by the local press and public. In their eyes, he was guilty until proven innocent. Ray was openly mocked and belittled as a callous animal abuser. Virtually every press account showed Ray's booking photo and one dead cow in a pasture, as visual proof that Ray was an animal abuser. The dead cow was 18 years old when it died, not from abuse or neglect, but from old age. That particular cow was one of the exotic animals in the zoo pasture across the street from Ray's ranch house. It was a rare Watusi, found in

the eastern and central parts of Africa. Ray loved that animal and cared for it the entire time it was in Ray's possession. Rather than provide those kinds of facts, the North Coast Journal chose instead to publish a cartoon "intended as a commentary on the criminal allegations currently facing local rancher Ray Christie," which depicted a dead cow in a stall at the Humboldt County fair, described as coming from the Christie ranch.[11]




33. As a result of this onslaught of negative publicity, people would drive by Ray's ranch house, honking their horns, shaking their fists, and yelling and cursing at Ray about what a terrible person he was and how he was nothing more than a useless animal abuser. Ray's young boys saw and heard these troubling attacks on their father.

34. A second raid in late 2021 had caused even more terror in the Christie ranch house

[11] North Coast Journal Staff, *Christie Ranch Entry at the County Fair*, North Coast Journal, August 23, 2018, https://www.northcoastjournal.com/humor/christie-ranch-entry-at-the-county-fair-10574542/; North Coast Journal Staff, *Clarification*, North Coast Journal, September 13, 2018, https://www.northcoastjournal.com/news-2/clarification-10947507/.

~~every time someone banged on the door. Plenty of times, the person banging on the door was a law enforcement officer, supposedly checking up on a report of a downed, sick, or escaped animal on one of Ray's pastures.~~

~~35. Ray's health suffered. He contracted cancer and a heart condition, which prevented him from clearing his name in a second trial due to trial continuances while his attorneys uncovered the fatal evidentiary deficiencies in the District Attorney's case against Ray.~~

~~36. Ray spent hundreds and hundreds of thousands of dollars in attorney's fees during those five and a half years and continues to spend money on lawyers as he attempts to vindicate his constitutional rights in this lawsuit.~~

~~37. Ray's business efforts suffered and continue to suffer. As just one example, Ray suffered immediate and lasting damage to his relationships with beef processors. His primary buyer at the time of the raid was Jay Houser at Walt's Wholesale Meats in Woodland, Washington. Mr. Houser called Ray to tell him one of Walt's most important customers, Costco, had called to ask about Ray. When Costco learned that Ray supplied Walt's with beef, Costco said they would no longer buy meat from Walt's if Ray continued to be one of the suppliers. Mr. Houser informed Ray he could no longer buy Ray's beef, which was devastating for Ray and his cattle business.~~

~~38. As another example, several loans have been denied to Ray after the underwriters performed their due diligence on Ray. Not knowing any better, they consider an "animal abuser" to be a uncertain proposition, not worth the risk. Even to this day, if loan underwriters or other people search for Ray Christie on the internet, they will read all about the charges against him. But, other than the thorough local reporting by John Chiv, there is no hint, not even a whisper, that the animal abuse charges against Ray were all dismissed. Many people in the local community, and elsewhere, continue to believe Ray is an animal abuser. Ray is innocent, and no media outlet aside from John Chiv apparently recognizes that fact. The truth is Ray is an animal lover. At this point, Ray has no other realistic choice but to bring this lawsuit to clear his name and defend his rights.~~

~~39. The criminal investigation of Ray was pretextual. The allegations against Ray were~~

false, misleading, and incredible. Deputy Mendes did not have probable cause to arrest Ray. Deputy DA Kamada did not have a good faith basis for pursuing a felony animal abuse case against Ray, in light of the known facts and the unconstitutional methods used in collecting and preserving the "evidence" against Ray. Under color of state law, Deputy Mendes, acting under the supervision of Sheriff Honsal, and Deputy DA Kamada acted for the sole purpose of unlawfully and improperly retaliating against, harassing, and punishing Ray for his exercise of his constitutional right to access and to defend himself in court.

40. Deputy Mendes' and Deputy DA Kamada's wanton disregard of Ray's constitutional rights violates the United States Constitution and 42 U.S.C. § 1983. As a direct and proximate result of their actions, Ray has suffered and will continue to suffer damages. For these reasons, and as set forth below, Ray is entitled to compensatory damages, punitive damages, attorneys' fees and costs, pre-judgment interest, and all other relief provided by law.

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

41.9. This suit is brought under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution., including the Due Process and Equal Protection Clauses of the Fourteenth Amendment. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

42.10. Venue is proper under 28 U.S.C. § 1391(b) because, on information and belief, Deputy Mendes, Deputy DA Kamada, and Sheriff Honsal reside in this judicial district, a substantial part of the events giving rise to this complaint occurred in this district, and the properties searched during the March 2018 raid are located in this district.

43.11. Pursuant to Civil Local Rule 3-2(c), initial assignment of this suit to the Eureka Division of the United States District Court, Northern District of California was proper because the events giving rise to the claims alleged occurred in Humboldt County. However, Plaintiff does not consent to having his case assigned to the Eureka Division. *See* Civil L.R. 73; Dkt.3.

## PARTIES

44.12. Plaintiff Raymond Frank Christie is an individual residing in Arcata, California. He is a cattle rancher who owns, leases, and maintains various ranches in Humboldt County,

California.

~~45.~~13. Defendant County of Humboldt ("Humboldt County") is a municipal corporation organized and existing under the laws of the State of California. Humboldt County is, and was at all relevant times, responsible for all the actions and/or omissions and the policies, procedures, customs, and practices of the Humboldt County Sheriff's Office, the Humboldt County District Attorney's Office, and their respective employees, agents, and officers.

~~46.~~14. At all relevant times, Defendant Travis Mendes was the Humboldt County Sheriff's Office's Livestock Deputy. Deputy Mendes is sued in his individual and official capacity.

~~47.~~15. At all relevant times, Defendant Adrian Kamada was a Humboldt County Deputy District Attorney. Deputy DA Kamada is sued in his individual and official capacity.

~~48.~~16. At all relevant times, Defendant Sheriff William "Billy" Honsal was the Sheriff of the Humboldt County Sheriff's Office's. Sheriff Honsal is sued in his individual and official capacity.

~~49.~~17. Ray is ignorant of the true names and capacities of defendants sued herein as Does 1-10, inclusive, and therefore sues these defendants by fictitious names. Ray is informed and believes, and therefore alleges, that Does 1 through 10 are in some manner responsible for the acts and occurrences set forth herein and are legally liable to Ray. Ray will seek leave to amend this complaint to allege the true names and capacities of those fictitiously named defendants, together with the appropriate allegations, when ascertained.

~~50.~~18. On information and belief, at all relevant times, each defendant was the agent, servant, and/or employee of each and every other defendant, and the acts of such defendants were within the course and scope of said agency and/or employment.

## FACTUAL ALLEGATIONS

### A. Ray Has Cared for Animals All His Life

~~51.~~ Ray is a fourth-generation cattle rancher, who has lived his entire life in Humboldt County, California. ~~His great-grandfather was a dairy farmer in Ireland. His grandfather emigrated from Ireland and entered the dairy business in Humboldt County. Ray's father raised and cared for dairy and beef cattle in the area.~~

LARSON
LOS ANGELES

52. Ray grew up on his family's ranch on Crannell Road in McKinleyville and has been taking care of animals his entire life. From a young age, Ray developed particular interest in and skill with tending to weak, sick, little, hurt, and unwanted animals, both domesticated and wild. He began attending local livestock auctions when he was approximately thirteen years old, where he acquired animals, such as ducks and chickens, for which others no longer had any use. Ray raised these unwanted animals to be resold for a profit.

53.19. Ray operates his cattle ranching business on thousands of acres of pasture land in and around Arcata in Humboldt County. Ray ran tens of thousands of cattle through his operation annually, and spent approximately a million dollars each year to provide food, medicine, hay, and care to his herd and to run his operation.

54.20. Ray's ranch house and related barns and pastures are located in the Arcata Bottoms. This is where the initial unloading, evaluation, rehabilitation, medicating, and branding of cattle from auctions takes places. The land in this area consists of creeks, sloughs, tidelands, and wetlands along the Humboldt Bay. The Arcata Bottoms were salt marsh prior to reclamation of the land for agricultural use by draining, diking, and damming in the late 1800s. Lumber and dairying were the two largest industries in the area. Ray's properties in this area, which he owns as well asor leases from others, are at or below sea level. The Arcata Bottoms area floods throughout the year due to rain and snowmelt, especially during the wet winter months.

55.21. Ray's business model is different and unique in Humboldt County. While other cattle ranchers and dairy farmers are eager to cull the subpar cattle from their herds, Ray built his herds with the culled cattle he bought principally at the auction yards and sometimes directly from other ranchers. Ray acquired the cullculled cattle at reduced prices. Other ranchers would also give their subpar and unwanted cattle to Ray by leaving the animals in a pen in Ferndale where Ray and his workers would collect them, or by leaving them at Jackson Road Ranch Road, Ray's home and main ranch. Some of the cattle left in the pen would be dead by the time Ray picked them up. Some of the cattle would die after other ranchers dropped them off at Jackson Road Ranch Road. If Ray was able to rehabilitate a cow given to him and eventually sell it, he would share the proceeds with the person who gave him the cow.

56.22. The cattle Ray acquired were often weak, sick, or malnourished. Ray would rehabilitate these subpar animals and beef them up for future sale at higher prices. Unlike many other cattle operations, Ray did not work on a rigid timeline for readying his herd for sale. He had the land and resources to nurse cattle back to health, move them from pens to pastures to feedlots, and eventually sell them. With decades of experience in the cattle industry and the resources required to operate a large cattle operation, Ray cornered the "buy low, sell high" market in the area. Ray's business model was neither improper nor illegal but, rather, provided an important service and humane contribution to the overall livestock industry by addressing the issue of subpar cattle that are culled from other ranchers' herds.

57.23. Ray has a gift for assessing what is wrong with a particular animal and then figuring out what treatment that animal needs to survive and then thrive. Ray is able to determine which cows might be kept in organic status and which ones need to be transitioned into conventional status to allow them to be treated with appropriate medicines. This assessment process starts at the auctions, where Ray made snap decisions about which animals to buy based on a brief observation during the rapid-fire auction process. For many years at the local auction yard—the Humboldt Auction Yard in Fortuna—Ray bought most of the animals offered by other ranchers every week. Ray also purchased cattle from other auctions in the region, such as the Shasta Livestock Auction. With his decades of experience working with cattle, Ray created a successful business rehabilitating others' castoffs. The local community took notice.The local community, including Defendants, took notice of Ray's business model. To some, this business model was a blight on the community, leading various community members to call the police over the years with complaints regarding Ray's skinny or loose cattle.

58. Ray has a well-known and lifelong presence in the tight-knit ranching community in Humboldt County. His love for animals—from pet dogs and pot-bellied pigs, to the cattle he raises—has led him to bring home and care for animals of all kinds. For example, across the road from his house he maintains a herd of exotic livestock, including Scottish Highland cattle and Texas Longhorns. Ray is not the only one to who appreciates these animals. A busy public road runs along this field, and locals and tourists alike often slow down and appreciate the unexpected

sight of exotic cows in the middle of the redwoods region.

**B. Humboldt County Cattle Ranchers Operate in a Dysfunctional System**

1. Cows Die

59. All cattle herds have significant mortality rates. Cows dying in cattle herds does not constitute animal abuse. Even though cattle may look sturdy and robust when seen out in the pastures, they are surprisingly vulnerable to a host of natural ailments. They get sick from eating poisonous plants, contract diseases, get injured, become weak, and die.

1. HealthyCattle Operators Dispose of Their Sick, Unhealthy, and Mistreated Animals

60.1. , closed cattle herds experience an annual mortality rate of approximately 10%. Closed herds are bred, born, and raised in contained pastures. Cattle in closed herds do not mix with bulls, cows, and calves from other herds, so the risks of contagious disease are reduced. The math is obvious. If a rancher had a closed herd of 4,000 cattle (which is the approximate number of cattle in Ray's herds at the time of the March 2018 raid), one might expect 400 of them to die in the normal course.

61. For a cattle rancher like Ray who bought and sold cattle all year long, he might run 30,000-40,000 cattle through his operation in a year. Again, the math is obvious. One would expect at least 3,000 of the cattle to die every year, assuming the typical 10% mortality rate applied to an open herd the same way it applies to a closed herd. That same mortality rate would obviously not apply, however, because the mortality rate for an open herd would be as high as 20%. In other words, in one year of Ray's operations, one might expect 3,000 to 8,000 cows to die of natural causes.

2. Humboldt County Knew Ray Purchased Unwanted Cattle

62. A widely known and inescapable fact about Ray's cattle operation is that the undesirable, subpar cattle Ray acquired inevitably resulted in a herd with higher sickness and mortality rates than would be expected in otherwise healthy herds.

63.24. Ray operated his cattle business within a dysfunctional system that existed and continues to exist in Humboldt County. Cattle were and continue to be routinely mistreated and

uncared for by other ranchers, dairymen, and farmers, then were sold at auction to Ray when the animals were no longer desirable or profitable. If the animals could not be sold at auction because they were in too poor of a condition, community members would get rid of their unwanted junk cattle by off-loading them directly to Ray. That way, they did not have to deal with ~~properly~~ disposing of the subpar cattle or their resulting carcasses, which is a significant challenge in Humboldt County. Ray built his business by taking a chance on cattle others did not want and then ~~by~~ rehabilitating them for eventual sale or breeding use. It was well known in the cattle industry in Humboldt County that this was Ray's practice, and many ~~benefitted~~benefited from it.

~~64.~~ Organic dairy cows, old breeding bulls, sick cattle, injured cattle, and also healthy cattle are sold weekly at local livestock auction yards. The older, sick, lame, and injured cattle sell for the lowest price per pound.

~~65.~~25. The Livestock Deputies, State veterinarians, and State brand inspectors regularly attended the weekly auctions at the Humboldt Auction Yard. The Livestock Deputies who regularly attended the weekly auctions during the relevant time period were Deputy Mendes and Sergeant Joshua McCall. ~~The~~ Humboldt County and State officials saw the poor condition of the cattle that were being brought to the auction and sold, and saw who sold these subpar animals at auction. Federal regulations require livestock auction yards to maintain detailed records regarding the brand information for cattle bought and sold and to have these records available for inspection, so this information was readily accessible to the Humboldt County and State officials attending the auction.

~~66.~~26. For years before the 2018 raid, during the pendency of Ray's criminal case, and to the present day, local ranchers and dairymen who purchased animals at the weekly auction, and who sometimes worked with Ray, reported to the Sheriff's Office the problems with the livestock being sold at auction. They sent photos, videos, and detailed descriptions of their observations. They implored Sheriff Honsal himself, along with Sergeant McCall and others, to take action to address the neglected, sick, skinny, lame, and weak cattle being sold at the auction. ~~The~~Sheriff Honsal and the Sheriff's Office did not seriously pursue these reports. Sheriff Honsal dismissed the complaints, stating that he knew that the person reporting them was a friend of Ray, and

wished him "Good luck my friend."

3. There is No Rendering Plant in or Near Humboldt County

2. Deputy Mendes Assists in the Sale of Sick, Unhealthy, and Mistreated Cattle

27. Deputy Mendes was no passive observer at the auctions, but was an active participant. He interacted with the people and the animals, taking on tasks similar to a rancher or an auction hand. For example, he helped move the animals out of the ranchers' trucks, down the ramps, through the gates, into and out of the auction arena, and into their pens after they were sold and waiting to be picked up. At times he was seen carrying a "cattle paddle," which is the proper means for ranchers and auction personnel to help move cattle from one place to another. But in this same timeframe, Deputy Mendes was sometimes dissatisfied with how the cattle reacted to his use of a cattle paddle and used an electric cattle prod to move along subpar animals when they were stumbling, standing still, or lying down, unable to walk as he wished they would. An electric cattle prod is the equivalent of a human stun gun. Most cattle ranchers consider it abusive to use an electric prod to shock a sick or weakened animal into unnatural activity.

28. It is unlawful for ranchers to drop off non-ambulatory animals at auction. It is unlawful for auction yards to accept them. Yet, that practice of dropping off and accepting non-ambulatory animals happened consistently and persistently at the Humboldt Auction Yard. Ray and other ranchers in the area have taken hundreds of photos and videos at the Humboldt Auction Yard that prove the unlawful practice has been allowed to continue in Humboldt County for years, perhaps even decades. Deputy Mendes was not just seeing the unlawful activity take place, he was an active participant in the process. Other governmental officials, such as the state brand inspector and the state veterinarian who were on-site, watched the same unlawful practice, over and over again. And Defendants, including Sheriff Honsal, Deputy DA Kamada, and the District Attorney's Office, were aware of Deputy Mendes' participation in and observance of this unlawful practice, but did nothing to prevent it, with deliberate indifference to Ray's constitutional rights.

29. At times, Deputy Mendes would even take sick, unhealthy, or injured animals to the Humboldt Auction Yard to be sold. For example, in early August 2018, days before Ray's

preliminary hearing, Deputy Mendes brought goats and pigs to the Fortuna auction. Deputy Mendes told the auction staff that one goat he had brought was "too sick" and that he "had no place to put it," so he left it for Ray.[12] A witness later heard Deputy Mendes ask if Ray had purchased the goat and, indeed, Ray had. The goat died that same day. A veterinarian who performed the necropsy had examined the same goat about four weeks earlier—when Deputy Mendes first brought it—and found it healthy at that time. The animal thus sickened in the custody of the Sheriff's Office, not in Ray's care, and Deputy Mendes offloaded a dying animal onto Ray.

3. Ray Buys and Nurses Sick, Unhealthy, and Mistreated Cattle

~~67.~~ As noted above, Ray's business model was distinct in Humboldt County. While other cattle ranchers and dairy farmers are eager to cull the subpar cattle from their herds, Ray built his herds with the culled cattle he bought principally at the auction yards and sometimes directly from other ranchers. ~~The best way to dispose of cattle carcasses is to send them to a rendering plant, where the animals can be safely processed into hides, tallow, grease, and meal by-products. There are no such rendering plants in Humboldt County. None have existed more than 20 years. The Eureka Protein Company was the last local rendering plant in the area. It was housed in the "Tallow Works" building, which has been publicly reviled for its stench and "long deemed a nuisance by the city and a thorn in its side."[13] That plant closed in February 2003. No others have been built since then.~~

~~68. In 2015, a rendering service that picked up carcasses ceased operation in the area. At that time, County Supervisor Rex Bohn and officials from Humboldt County Environmental Health, the Agricultural Commissioner's office, Humboldt Waste Management Authority, and~~

---

[12] August 9, 2018 email from Deputy DA Kamada to Maggie Fleming and others at the District Attorney's Office.

~~[13] Thadeus Greenson, *Tallow Works building to come down*, The Times-Standard, October 24, 2007 (updated July 30, 2018), https://www.times-standard.com/2007/10/24/tallow-works-building-to-come-down/.~~

other Humboldt County officials promised an immediate solution.[14] They proposed using a plant in Sacramento or shipping the byproducts to landfills that took Humboldt County waste.[15] Those plans were never consummated. A decade later Humbolt County still has no plan for carcass disposal.

69.1. There are no other rendering plants nearby. The closest ones are in Sacramento and Petaluma, which are both nearly 300 miles away over mountainous roads, or in Portland, over 400 miles away. It is cost prohibitive and realistically impossible to transport cattle carcasses over that distance on a regular basis before the carcasses deteriorate to the point they cannot be used.

70. On information and belief, many, if not all, Humboldt County ranchers and dairy farmers have dead piles and carcass pits on their properties. There is no other way to dispose of the carcasses. The ranchers and farmers are constrained by a host of conflicting regulations about disposal of carcasses, which come from the State, from Humboldt County, and environmental commissions like the Coastal Commission. State regulations prevent carcasses from being moved more than three miles from where the animals died.[16] Humboldt County guidelines dictate that carcasses should be left "a minimum of 150 feet from the high-water mark of any watercourse or body of surface water" and "at least 5 feet above the seasonally highest level of groundwater. In other words, locate the burial site on the highest ground available."[17]

---

[14] Hunter Cresswell, *North State Rendering halting service to Humboldt County*, The Times-Standard, November 6, 2015 (updated July 30, 2018), https://www.times-standard.com/2015/11/06/north-state-rendering-halting-service-to-humboldt-county/.

[15] *Id.*

[16] *See* Cal. Food & Agr. Code, § 19348(c) ("Nothing in this section shall be interpreted to conflict with any state or federal environmental or zoning law, or to prohibit an owner of a live animal from burying the animal on the owner's property after the animal dies if the burial is within three miles of where the animal died."); Cal. Code Regs., tit. 3, § 1180.18 ("Nothing in this section shall prohibit a person who owned the animal when it was alive from transporting his own dead animal in a vehicle . . . to a burial site on his own property within three (3) miles of where the animal died.")

[17] Department of Agriculture, County of Humboldt and University of California Cooperative Extension, Humboldt - Del Norte, *Guidelines for the Disposal of Dead Animals*, Jeff M. Dolf and Yana Valachovic, August 1, 2012.

~~71. Ray's main ranch is out on the Arcata Bottoms. Much of the land is at or below sea level. During the rainy winter season, there is no way to move animal carcasses when cattle die out in the low-lying pastures, which are wet, muddy, and soggy. Mature cows weigh 1,000-2,000 pounds. Their carcasses cannot be easily moved, even when it is dry. It is impossible to move them during the wet winters. Ranches, farms, and dairies in low-lying land sometimes have no better option than to leave a carcass in the field until conditions are dry enough to collect it. Trucks frequently get stuck in the mud attempting to retrieve cattle carcasses.~~

~~72. At the time of the 2018 raid, there were approximately 71,000 cattle in Humboldt County. At the 10% mortality rate typical to healthy, closed herds, one would expect 7,100 cattle to die in Humboldt County with no way to dispose of them, aside from buying them. But many of the cattle in Humbolt County are sick and mistreated, and on information and belief, a greater than average amount die annually.~~

~~73. In an area where raising cattle for dairy and beef is a longtime main industry, the closure of the rendering plant left ranchers in an impossible position. Humboldt County, local, and State agencies have been aware for decades that Humboldt County's lack of a rendering plant is a significant problem, yet have failed to do anything about it. Humboldt County, local, and State laws and policies do not address the realities and environmental conditions in Humboldt County that make proper disposal of carcasses challenging if not impossible. With tens of thousands of cattle raised and living in the region, it is a failure of Humboldt County not to implement a means of carcass disposal. The lack of carcass disposal options leaves local ranchers and dairymen in an untenable and unsustainable position. Thousands of cattle raised in these operations inevitably die, yet there is nowhere legal to dispose of the carcasses. Humboldt County does nothing to address the issue.~~

~~4. Ray Took in Dying Cattle and Rehabilitated Them~~

~~74.~~30. Ray added new cattle to his herd multiple times per week, often daily. Animals bought at the auction yards were first delivered in cattle trucks to Jackson ~~Road~~ Ranch Road. Drivers for Ray regularly delivered cattle between midnight and 4 a.m. The cattle were unloaded by the truck drivers and immediately segregated by the experienced drivers, and ranch hands if

available, into different movable and adjustable pens based on their size, health, and strength.

75.31. Several of Ray's workers livelived on the Jackson Ranch Road Ranchproperty in trailers Ray has provided for them. These workers would get up early in the morning and begin processing the cows that arrived overnight. Ray then made his own further assessment about which animals should be sent out to pasturegraze in the pastures, which ones should be combined with other existing herds on various properties, and which ones should be kept under close supervision at the barn and in the "sick pen" near the ranch house. Because Ray maintained an open herd, with cattle continuously added to the herd from other cattle operations, all cattle received multiple vaccinations and deworming treatment when they entered Ray's herd.

76. Under Ray's supervision, many of the cull cattle were rehabilitated. But not all. Some, for obvious reasons, died. And, while in the process of being rehabilitated, many of the cattle in Ray's herds looked relatively skinny, sick, weak, and lame, especially compared to the herds from which those animals were culled.

77. In 2018, when the events giving rise to Ray's civil rights claims arose, Ray kept cattle on approximately 3,000 acres of land in 20 different locations in Humboldt County. While Ray kept most of his herd in Humboldt County, he also maintained cattle operations on approximately 15,000 acres of land outside of Humboldt County.

78. Every day, Ray maintained thousands of cattle in his pastures in the Arcata area. Ray and his workers checked the fences surrounding these pastures daily. The approximately 3,000 acres of land on which Ray maintained cattle were enclosed by thousands and thousands of feet of fencing. Ray had a worker whose sole job was to inspect, maintain, and repair fencing. The pastures were typically subdivided to make smaller areas for containing cattle, which increased the amount of fencing to maintain. Additionally, many of the enclosed pastures are double-fenced, with an electric fence inside and a barbed wire fence several feet back. This buffer allows goats to do their work between the two fences, eating the noxious weeds before they infected the pastures, many of which can be deadly to cattle, so that the cattle can graze on the uninfected grass.

79. The fences needed to be maintained constantly. Wild elk destroy them. In the wet

winter months, fences often wash out after storms or when the rivers, creeks, and sloughs flood. Trespassing fishermen and hunters step on the fences and cut wires to illegally enter Ray's land to hunt and fish. Thieves steal the solar equipment used to power the electric fences, causing the fences to die and the cattle to escape. Some of Ray's pastures abut hiking and walking trails, where walkers take their dogs off leash and permit them to run around and chase Ray's cattle. This scares the cattle, who run through the fences – even the electric ones – to escape the dogs. On Ray's pastures along the 101 Highway, cars have crashed and broken through the fences. Due to the size and scope of Ray's cattle operation, Ray is so well known to the California Highway Patrol that they come knock on his door or call him in the middle of the night to notify him if cows got loose in the area. Ray assists the highway patrol officers by rounding the cattle up, even if they are not his, and helps identify their owners.

80.32. Every day, Ray and his workers would give the cows food and water and check on their overall wellbeing. For cattle at Jackson Road Ranch Road, Ray and his workers would provide the animals with fresh hay, bedding, food, and water, and tend to the sick or weak cattle held in the sick pen and the barn. The sick pen is near Ray's ranch house, which is close to the main road. Ray kept other cattle needing close supervision in a pasture near his home. Anyone driving by cancould see these cattle, which arewere the worst in Ray's herd. Because of this, passersby would occasionally report Ray's operation to the Sheriff's Office, which would investigate the complaint.

4. While Ray Performs a Service for the Community, Not All Previously Mistreated Cattle Survive

33. Under Ray's supervision, many of the culled cattle were rehabilitated. But not all. Some, unfortunately, died. A large part of this was due to the state of the sick, unhealthy, and previously mistreated cattle that Ray purchased. Once in his possession and control, Ray did his best to rehabilitate these unfortunate animals. Ray has extensive experience in determining which animals bought at auction need what kind of care and attention to bring them back from their deplorable condition to good health. In other words, Ray knows how to "beef up" the subpar animals culled out of other ranchers' and dairy farmers' herds. However, at times his efforts

unfortunately failed, and he was not able to rehabilitate the delicate cattle.

34. Furthermore, healthy, closed cattle herds experience an annual mortality rate of approximately 10%. Closed herds are bred, born, and raised in contained pastures. Cattle in closed herds do not mix with bulls, cows, and calves from other herds, so the risks of contagious disease are reduced. The math is obvious. If a rancher had a closed herd of 4,000 cattle (which is the approximate number of cattle in Ray's herds at the time of the March 2018 raid), one might expect 400 of them to die in the normal course.

35. For a cattle rancher like Ray who bought and sold cattle all year long, he might run 30,000-40,000 cattle through his operation in a year. Again, the math is obvious. One would expect at least 3,000 of the cattle to die every year, assuming the typical 10% mortality rate applied to an open herd the same way it applies to a closed herd. That same mortality rate would obviously not apply, however, because the mortality rate for an open herd would be as high as 20%. In other words, in one year of Ray's operations, one might expect 3,000 to 8,000 cows to die of natural causes. And this math does not take into account the delicate state of the sick, unhealthy, and previously mistreated animals purchased by Ray.

36. The cattle that Ray was unable to rehabilitate, and that passed away despite his efforts, posed an additional problem. The best way to dispose of cattle carcasses is to send them to a rendering plant, where the animals can be safely processed into hides, tallow, grease, and meal by-products. However, there are no such rendering plants in Humboldt County, and none have existed for more than 20 years. In an internal email, Deputy Mendes himself acknowledged that "the county does not have any means of removal or storage for that many carcasses" and "that Humboldt county does not have a carcasse [sic] disposal factory anymore."[18] There are no other rendering plants nearby. The closest ones are in Sacramento and Petaluma, which are both nearly 300 miles away over mountainous roads, or in Portland, over 400 miles away. It is cost prohibitive and realistically impossible to transport cattle carcasses over that distance on a regular

[18] October 24, 2018 email from Deputy Mendes to an employee at the United States Department of Agriculture.

basis before the carcasses deteriorate to the point they cannot be used.

37. On information and belief, many, if not all, Humboldt County ranchers and dairy farmers have dead piles and carcass pits on their properties. There is no other way to dispose of the carcasses. The ranchers and farmers are constrained by a host of conflicting regulations about disposal of carcasses, which come from the State, from Humboldt County, and environmental commissions like the Coastal Commission. State regulations prevent carcasses from being moved more than three miles from where the animals died.[19] Humboldt County guidelines dictate that carcasses should be left "a minimum of 150 feet from the high-water mark of any watercourse or body of surface water" and "at least 5 feet above the seasonally highest level of groundwater. In other words, locate the burial site on the highest ground available."[20] These regulations do not account for Ray's ranches, most of which are at or below sea level. Per the guidelines, Ray maintained carcasses on the highest spot of land "and his disposal practices on his Jackson Ranch Road property were field verified by the Humboldt County Sherriff's Department" as compliant with the County's guidelines.[21]

38. An Engineering Geologist with the North Coast Regional Water Quality Control Board, Scott Gergus, met with Ray to discuss carcass disposal in the spring of 2015. Gergus verified that Ray followed the County's guidelines and noted that while "I understand cattle operations lose animals, that's part of the business," he would work with Ray "to find a better

---

[19] *See* Cal. Food & Agr. Code, § 19348(c) ("Nothing in this section shall be interpreted to conflict with any state or federal environmental or zoning law, or to prohibit an owner of a live animal from burying the animal on the owner's property after the animal dies if the burial is within three miles of where the animal died."); Cal. Code Regs., tit. 3, § 1180.18 ("Nothing in this section shall prohibit a person who owned the animal when it was alive from transporting his own dead animal in a vehicle . . . to a burial site on his own property within three (3) miles of where the animal died.")

[20] Department of Agriculture, County of Humboldt and University of California Cooperative Extension, Humboldt - Del Norte, *Guidelines for the Disposal of Dead Animals*, Jeff M. Dolf and Yana Valachovic, August 1, 2012.

[21] Scott Gergus, North Coast Regional Water Quality Control Board, *Conversation with Raymond Christie regarding cattle carcass disposal*, May 6, 2015 at p.3-4.

method of carcass disposal."[22] Gergus shared Ray's predicament with the Humboldt County Department of Health and Jeff Dolf, the Humboldt County Agricultural Commissioner, and discussed obtaining for Ray a waiver to" to the applicable regulations.[23] Gergus "explained to Mr. Dolf that Mr. Christie owns several ranch properties in Humboldt County and would prefer not to bury carcasses on his Jackson Ranch Road property. He would rather dispose of carcasses on his remote ranch in the hills east of Eureka," but that Ray could not due to the restriction contained in California Food and Agriculture Code section 19348(c).[24] In response, "Mr. Dolf said that he works directly with the California Department of Food and Agriculture on an advisory committee and will present this issue to the committee. He cautioned that since he would be proposing a waiver to California Code, it might require time consuming legislative action. **Mr. Dolf said that he would keep me updated on this issue because all the dairies and grazing operations in the Humboldt Bay area are experiencing this same problem**."[25]

39. County officials from multiple departments were aware of Ray's carcass disposal problems and his compliance with the County's carcass disposal guidelines, as verified by the Humboldt County Sheriff's Office, the North Coast Regional Water Quality Control Board, the Humboldt County Department of Health, and the Humboldt County Agricultural Commissioner. But Ray did not know about the proposed conditional waiver contemplated by Humboldt County officials because no one ever informed him about it. Though the County knew about Ray's operations and his compliance with the County's guidance, the County did not address the obvious and pervasive carcass disposal problems faced by Ray and other ranchers and dairies.

---

[22] Scott Gergus, North Coast Regional Water Quality Control Board, *Conversation with Raymond Christie regarding cattle carcass disposal*, May 6, 2015 at p.1-2.

[23] Scott Gergus, North Coast Regional Water Quality Control Board, *Conversation with Raymond Christie regarding cattle carcass disposal*, May 6, 2015 at p.3.

[24] Scott Gergus, North Coast Regional Water Quality Control Board, *Conversation with Raymond Christie regarding cattle carcass disposal*, May 6, 2015 at p.4.

[25] Scott Gergus, North Coast Regional Water Quality Control Board, *Conversation with Raymond Christie regarding cattle carcass disposal*, May 6, 2015 at p.4 (emphasis added).

### C. Ray's Operation Became a Target in Humboldt County

#### 1. Livestock Deputies Inspected Ray's Operation for Decades and Never Found Animal Abuse

40. For more than fifteen years, every livestock deputy who examined Ray's operation treated him as other ranchers were treated and found no abuse. Deputy Mendes broke from that uniform practice and singled Ray out for different, and far harsher, treatment.

~~81.~~41. The Sheriff's Office has been monitoring and investigating Ray's cattle business for decades. The Sheriff's Office investigation records provided by Deputy DA Kamada and the District Attorney's Office to Ray during his criminal prosecution date back to 2004. The investigations followed an identical fact pattern: people drive by Ray's ranch, make assumptions, and report Ray. Multiple Sheriff's Office investigative reports reflect that Ray acquired subpar animals and rehabilitated them. Livestock Deputies and other Sheriff's Office deputies visited Ray's properties many times in response to complaints concerned about the condition of the cattle in his herd and calls regarding loose livestock from his pastures. With thousands of cattle in Ray's herd, some cattle would break through fences and gates and get loose. Locals would contact the Sheriff's Office regarding the loose cattle.

~~82.~~42. Each time, the Livestock Deputy or other deputy investigating found no issues with Ray's operation. Given their numerous visits to Ray's multiple properties, and their knowledge of his cattle operation and livestock purchases, the Livestock Deputies understood Ray's business in the context in which it operated. Livestock Deputy Todd Fulton, for example, "personally saw" Ray purchase animals "in poor health" every week "for a low price at the auction," and observed that the animals put on weight after Ray acquired them.[26] Ray "takes them home, worms them, gives them any antibiotics, medications or supplements they may need. i.e. vitamins and minerals, checks there [sic] feet then turns them out on pasture. Where they are expected to gain weight to

[26] Investigation Report, Case No. 200606942, Humboldt County Sheriff's Office, November 9, 2006.

be resold at a later date or kept depending on the sex for breeding purposes."[27] The Livestock Deputies knew that some of the cattle Ray acquired were "in extremely poor health when purchased. He doctors these animals after purchasing them and turns them out in hopes they gain weight to be resold or added to his personal herd at a later date."[28]

~~83.~~43. For years, Livestock Deputies Todd Fulton and Kevin Kastler "found no neglect of any animals that I observed on the Christie Ranch."[29] Repeatedly, over the years, they "did not see any signs of criminal neglect of the animals."[30] They knew for 15 years before the March 2018 raid that Ray did not "purchase the healthiest cattle at the auction, because he doesn't make any money purchasing the expensive livestock. After purchasing the cattle he vaccinates them and places them in the field located closest to the rd (Jackson Ranch rd.)."[31] They knew that "people who pass by immediately think he doesn't feed or care for his livestock at this location."[32] They knew that, as observed by Livestock Deputy Phillip Buihner, during the rainy winter season, "there is mud everywhere livestock are being fed" and the pastures often flood.[33] The animals the Livestock Deputies observed on Ray's ranch had sufficient food and water, and the "cattle and horses did not appear to be overly thin."[34] In response to the Sheriff's Office's inquiries and

---

[27] *Id.*

[28] *Id.* (emphasis in original).

[29] *Id.*

[30] Investigation Report, Case No. 201306117, Humboldt County Sheriff's Office, December 10, 2013; Investigation Report, Case No. 201600079, Humboldt County Sheriff's Office, January 6, 2016; Investigation Report, Case No. 201603315, Humboldt County Sheriff's Office, June 29, 2016.

[31] Investigation Report, Case No. 201306117, Humboldt County Sheriff's Office, December 10, 2013.

[32] *Id.*

[33] Investigation Report, Case No. 200400289, Humboldt County Sheriff's Office, January 11, 2004.

[34] Investigation Report, Case No. 201600079, Humboldt County Sheriff's Office, January 6, 2016.

investigations, Ray provided detailed documentation of where the animals came from via auction and veterinary records, and showed officers the sick pen near his home, where he kept a close watch on the highest-need animals in his herd, the ones that had recently arrived from other ranchers, dairies, and the local auctions.

2. Ray is Acquitted at a Cockfighting Trial

~~84.~~44. In 2008, Ray was investigated by the Sheriff's Office for running a supposed cockfighting operation on his properties. After hearing these suspicions by word of mouth, the Sheriff's Office raided two of Ray's properties. While officers did not uncover any cockfighting, they found paraphernalia that they suspected to be related to cockfighting. Armed with this circumstantial evidence, they obtained an arrest warrant for Ray.

~~85.~~45. News regarding Ray's cockfighting case spread quickly through the community. Ray entered his not guilty plea in a courtroom packed with community members who came to observe the proceedings, including law enforcement personnel from the Sheriff's Office and prosecutors from the District Attorney's Office. This fervor continued throughout Ray's case. The controversial trial drew an array of colorful characters, including a Humane Society official, a cockfighting expert, and even one of Ray's own brothers, who was set to testify in court. On the day the jury delivered its verdict, the courtroom was again packed with many community members, once again including law enforcement personnel from the Sheriff's Office and prosecutors from the District Attorney's Office, who were invested in the case and had convinced themselves of Ray's guilt.

~~86.~~46. The jury acquitted Ray. The court declared a mistrial. The District Attorney evaluated the evidence leading to trial, the trial itself, and the outcome. The District Attorney elected not to retry the case. Many in the community were upset that Ray had not been convicted, convinced by the media coverage and publicity that Ray must be guilty. Ray was displeased and, not one to fade into the background, he celebrated his vindication by ordering large, custom-made decals of a rooster to adorn the front fenders of trucks he drove around town.

~~3. An Unauthorized and Intrusive Drone Flyover Puts Ray on the Map~~

~~87. In April 2015, local news site *The Lost Coast Outpost* posted an article titled~~

"(VIDEO) Drone Flight Reveals Mass Open Grave of Cattle Carcasses in Arcata Bottoms." The article contained a video taken by a drone, which flew low over Ray's property without authorization, of a pile of cattle carcasses on Ray's ranch.

88. Ray maintained the pile of carcasses on the highest spot of land at Jackson Road Ranch in an effort to comply with Humboldt County's disposal guidelines, which mandated that carcasses should be buried at least five feet above the seasonally highest level of groundwater, i.e. the highest ground available.[35] At the time, the Humboldt County Environmental Health Director acknowledged that Humboldt County's disposal guidelines "would prohibit him from burying cows anywhere on his property."[36]

89. The Sheriff's Office did not investigate Ray following the release of the footage. Although the Sheriff's Office did not investigate, the 2015 drone footage led to heightened community scrutiny of Ray's operations and increased the negative public perception of Ray and his business.

## D. Defendants Formulate a "Game Plan" for "Christie's Day of Reckoning"

### 1. Increased and Widespread Community Disdain for Ray Ignites Investigation

47. In March 2017, Humbolt County Sheriff's Deputies and Sheriff William Honsal, with District Attorney Maggie Fleming aware and "on board," began "to compile all of the CFS/Cases involving Christie for the DA." On information and belief, until this time and without exception, all of the Humbolt County Sheriff's Office investigative reports regarding Ray's livestock operation "found no neglect of any animals"[37] and "did not see any signs of criminal

[35] Department of Agriculture, County of Humboldt and University of California Cooperative Extension, Humboldt - Del Norte, *Guidelines for the Disposal of Dead Animals*, Jeff M. Dolf and Yana Valachovic, August 1, 2012.

[36] Ryan Burns, *(VIDEO) Drone Flight Reveals Mass Open Grave of Cattle Carcasses in Arcata Bottoms*, Lost Coast Outpost, April 21, 2015, https://lostcoastoutpost.com/2015/apr/21/video-drone-flight-reveals-mass-open-grave-cattle/.

[37] Investigation Report, Case No. 200606942, Humboldt County Sheriff's Office, November 9, 2006.

neglect of the animals."[38]

48. What the Humboldt County Sheriff's Office and the District Attorney's Office did have, however, were numerous community complaints about Ray's livestock operation, particularly from disgruntled neighbors frustrated by loose cattle who constantly reported Ray to the Humboldt County Sheriff's Office and the Humboldt County District Attorney. Ray maintained his cattle operation on approximately twenty ranches in the area, which increased his operation's visibility and the possibility that cattle would escape from pastures. On information and belief, prior to 2017, the Humboldt County Sheriff's Office never issued Ray a citation for loose cattle.

49. These community complaints were "one of the driving forces behind the Christie investigation."[39] District Attorney Fleming complained that Ray's livestock operation is "an ongoing problem that I hear about continually" because community members reached out to her directly.[40]

50. On November 1, 2017, District Attorney Fleming contacted Sheriff Honsal regarding citizens "concerned there is no livestock deputy," and expressed her "hope that something can be done."[41]

D.2. Mendes Becomes Livestock Deputy and Immediately Pursues Ray

90.1. In late 2017, the Sheriff's Office's investigations of Ray changed when Deputy Mendes assumed the role of Livestock Deputy on November 5, 2017. Deputy Mendes immediately began investigating Ray. He made his first contact with Ray three days after starting

[38] Investigation Report, Case No. 201306117, Humboldt County Sheriff's Office, December 10, 2013; Investigation Report, Case No. 201600079, Humboldt County Sheriff's Office, January 6, 2016; Investigation Report, Case No. 201603315, Humboldt County Sheriff's Office, June 29, 2016.

[39] March 23, 2018 email from District Attorney Investigator Wayne Cox to Sheriff Honsal, Deputy DA Kamada, Deputy Mendes, and Maggie Fleming.

[40] November 1, 2017 email from Maggie Fleming to Sheriff Honsal and Sheriff's Deputy John Ford.

[41] *Id.*

in his new assignment. Deputy Mendes claimed he had spoken with prior Livestock Deputies Fulton, Kastler, and Wilcox regarding Ray's cattle operation. These Livestock Deputies, as well as former Livestock Deputy Phillip Buihner, had interacted with Ray many times and visited his property many times in response to various reports regarding Ray, his herd, and his ranch. All of these other Livestock Deputies, who had interacted with Ray since at least the early 2000s, never found animal abuse or neglect.

91. Deputy Mendes personally saw Ray's purchases at the Humboldt Auction Yard, watching as sick, lame, weak, and malnourished cattle from other ranches' and dairies' herds passed through the ring before Ray purchased them and transported them back to his ranch. Deputy Mendes did not just watch Ray's buying practices at the auctions. Deputy Mendes frequently moved cattle around the auction yard. On multiple occasions, Deputy Mendes used an electric prod to do so.

92. Deputy Mendes wanted to be a cattle rancher. Sometime before Deputy Mendes became the Livestock Deputy, Deputy Mendes' father, Alan Mendes, a former Humboldt County Sheriff's Deputy, who was now an officer with the Ferndale Police Department, approached Ray regarding Ray's business. He told Ray that his son, Travis, was interested in entering the cattle business and wanted to know how Ray acquired animals from local ranchers and dairies.

93.51. It was only after the inexperienced Livestock Deputy Mendes, directed and supported by the vindictive Sheriff's Office, including Sheriff Honsal, and a rogue prosecutor, Deputy DA Kamada, launched a crusade to single out Ray, that this case truly began. Deputy Mendes' first action as Livestock Deputy was to review prior Sheriff's Office investigative reports related to Ray and speak with prior Livestock Deputies about him. Deputy Mendes also spoke with Deputy DA Kamada about the 2015 drone footage of Ray's property. Sheriff Honsal was elected Sheriff in May 2017 and appointed Deputy Mendes as his Livestock Deputy in November 2017. Sheriff Honsal directed Deputy Mendes to target Ray and encouraged Deputy Mendes' pursuit of Ray.

52. In tandem, theyDeputy Mendes assumed the role of Livestock Deputy on November 5, 2017 and immediately began investigating Ray. He made his first contact with Ray

three days after starting in his new assignment. Deputy Mendes received information from prior Livestock Deputies Fulton, Kastler, and Wilcox regarding Ray's cattle operation and read their investigative reports regarding their observations of and interactions with Ray. These Livestock Deputies, as well as former Livestock Deputy Phillip Buihner, had interacted with Ray many times and visited his property many times in response to various reports regarding Ray, his herd, and his ranch. All of these other Livestock Deputies, who had interacted with Ray since at least the early 2000s, never found animal abuse or neglect.

53. Deputy Mendes personally saw and assisted in Ray's purchases at the Humboldt Auction Yard, watching as sick, lame, weak, and malnourished cattle from other ranches' and dairies' herds passed through the ring before Ray purchased them and transported them back to his ranch. Deputy Mendes did not just watch Ray's buying practices at the auctions. Deputy Mendes frequently moved cattle around the auction yard. He helped move the animals out of the ranchers' trucks, down the ramps, through the gates, into and out of the auction arena, and into their pens after they were sold and waiting to be picked up.

~~94.~~54. In tandem, Deputy Mendes, Sheriff Honsal, the Sheriff's Office, Deputy DA Kamada, and the District Attorney's Office worked to piece together an investigation of Ray. Deputy DA Kamada, who would go on to be selected as the 2017 Wildlife Prosecutor of the Year several months after the 2018 raid, was taking steps to run for election as District Attorney. Ray was an easy target for an environmentally-focused investigation, because Ray maintained cattle on his land, and his land often flooded. When Ray's land flooded, all of it could be deemed a waterway under state law. If Ray had carcasses on his land, which Deputy Mendes, Sheriff Honsal, and Deputy DA Kamada knew he did, then Ray would be liable for misdemeanor littering violations of California Fish and Game Code section 5652(a), which prohibits littering in state waterways. This code provision functions essentially as a strict-liability statute—if Ray had a carcass or even an old cattle bone on any part of his property that had water on it, he was guilty.

~~95. While~~ Deputy Mendes ~~wanted to be a rancher,~~ , Sheriff Honsal, and Deputy DA Kamada ~~played investigator rather than staying in his lane as a prosecutor. This proved to be a dangerous mix: state actors who had an abnormally personal interest in trying to bring Ray down~~

LARSON
LOS ANGELES

due Ray's victory in the cockfighting trial and Ray's successful business, coupled with the community's growing resentment of Ray's ongoing success despite his acquittal. Together, these factors led Deputy Mendes and Deputy DA Kamada to pursuepursued, single-mindedly and with increasing tunnel vision, Ray's prosecution as an animal abuser.

96.55. Deputy Mendes investigated Ray's cattle operation at Ray's various properties at least 20 times between November 2017 and March 2018—an average of once per week. In the more than a dozen years leading up to Deputy Mendes' appointment as Livestock Deputy, Livestock Deputies investigated Ray's operation an average of one and a half -times per year. In Deputy Mendes' reports detailing his investigations of Ray, Deputy Mendes cited every conceivable local, Humboldt County, and state violation, civil or criminal, that he could think of to recommend to Deputy DA Kamada to bring charges.

97.56. In December 2017, three months before the March 2018 raid, Deputy Mendes visited Ray's property in McKinleyville after receiving a report that a cow was in distress while giving birth. Both Deputy Mendes and the ranch hand who resided at the property agree that Deputy Mendes was there in the barn, saw a dead cow whose carcass had not been moved during the wet winter, and saw a cow that was struggling to give birth, with two of the calf's legs sticking out of the cow. The ranch hand says Deputy Mendes put on some gloves and began pulling with all of his might to drag the calf out by the hooves. Deputy Mendes says it was the ranch hand who attempted to pull the calf out. But both agree that Ray was called, talked with Deputy Mendes, and Deputy Mendes left the barn and never returned or did anything else while the animal was in distress.

98.57. When Ray arrived, he instantly determined the calf was in a breech position, turned it around so that it could come out headfirst, and tried to assist with the birth. By that time, however, the cow had lost too much blood and both animals died.

99.58. Deputy Mendes and Deputy DA Kamada later used this evidence in support of felony charges against Ray and at Ray's trial. During the March 2018 raid, Deputy Mendes took photos of the cow carcasses in the barn. Deputy DA Kamada used this evidence for one of the felony counts, alleging that these cows were abused by Ray in some undisclosed way. This

approach—of vaguely alleging that Ray abused animals in some undefined way—would come to shape Deputy Mendes', Deputy DA Kamada's, and Sheriff Honsal's approach to their investigation of Ray.

59. Deputy Mendes' and the other Defendants' own contemporaneous communications, produced in discovery, confirm that their objective was not to investigate suspected crime but to build a case against a predetermined target disliked by Deputy Mendes and the community at large. Within weeks of becoming Livestock Deputy, Deputy Mendes told the District Attorney's Office that he was "fed up with Ray," "had 3 weekends in a row become interrupted by Rays [sic] animals in some way shape or form," and was "doing everything in [his] power to make sure that this investigation is rock solid."[42] Deputy Mendes told the District Attorney that he "plan[ned] on charging [Ray] with as many crimes as I can find."[43] When a Sheriff's Office dispatcher forwarded him a community complaint about Ray's property, Deputy Mendes replied, "Make these go away lol."[44]

60. The investigation was reverse-engineered to manufacture probable cause. Before the raid, the District Attorney's chief investigator Wayne Cox advised Deputy Mendes that having a veterinarian examine a sick cow believed to be Ray's would "play[] right into our theory that he doesn't care for his animals properly" and would "make a nice little paragraph in the SW [search warrant] when we ask for authorization to go onto his properties."[45] Defendants planned the operation months in advance as the "Ray Christie project," and Deputy DA Kamada advised that the search-warrant affidavit would need "some refreshing to avoid any staleness issues" before it was served.[46] Deputy DA Kamada coached a neighbor who frequently complained about Ray's

---

[42] January 29, 2018 email from Deputy Menes to Maggie Fleming and Wayne Cox.

[43] February 20, 2018 email from Deputy Mendes to Maggie Fleming, Wayne Cox, and Deputy DA Kamada.

[44] April 1, 2018 email from Deputy Mendes to a colleague.

[45] February 22, 2018 email from Wayne Cox to Deputy Mendes.

[46] February 14, 2018 email from Deputy DA Kamada to Deputy Mendes, Wayne Cox, and Maggie Fleming.

cattle operation to annotate photographs "from over the years" so that they could be used as prior-acts evidence "down the road."[47]

61. Defendants strove to convict and to punish Ray regardless of the merits. The District Attorney directed that "updated photos" be gathered to support motions "to increase bail"; to make "part of his bail terms NO animals"[48]; "to prevent Christie from own/possessing animals as part of his bail conditions"[49]; and asked whether a civil proceeding could be commenced "pre-charging to prevent his purchasing animals."[50] They looked for "ANY legal process to seize his animals" as well as "a process by which we could get him banned from engaging in livestock transactions" while prosecuting Ray.[51] Defendants knew of Ray's prior history and were motivated by it. Deputy DA Kamada framed the effort around "Christie's history in the courts."[52] In addition, an outside animal-welfare organization that had been involved in Ray's earlier "cock fighting bust"[53] pressed Defendants to secure a conviction.

62. Deputy Mendes pursued Ray while personally acknowledging the facts that negated any inference of criminal cruelty. Notably, Deputy Mendes admitted that Humboldt County "does not have a carcasse [sic] disposal factory anymore" and that Humboldt County had no means to remove or store the hundreds of carcasses that a cattle operation of Ray's size would inevitably generate.[54] Despite this knowledge, Deputy Mendes went on to repeatedly cite

---

[47] March 23, 2018 email from Deputy DA Kamada to Wayne Cox and Maggie Fleming.

[48] June 21, 2018 email from Maggie Fleming to various recipients, including Deputy Mendes and Deputy DA Kamada.

[49] June 22, 2018 email from Deputy DA Kamada to various recipients, including Deputy Mendes.

[50] April 10, 2018 email from Maggie Fleming to Deputy DA Kamada.

[51] March 23, 2018 email from Wayne Cox to Sheriff Honsal, Deputy DA Kamada, and Deputy Mendes.

[52] March 23, 2018 email from Deputy DA Kamada to Wayne Cox and Maggie Fleming.

[53] May 9, 2018 email from an employee of the Humane Society.

[54] October 24, 2018 email from Deputy Mendes to an employee at the United States Department of Agriculture.

carcasses on Ray's land as evidence of animal abuse.

**E. Deputy Mendes', Deputy DA Kamada's, and Sheriff Honsal's Five-Month Investigation Ends with the 2018 Raid**

~~100.~~63. Deputy Mendes' "five-month investigation" of Ray, as it was described in a press release issued by the Sheriff's Office following the raid, commenced the moment Deputy Mendes started the job as Livestock Deputy. ~~Supported~~Directed, supervised, and supported by Deputy DA Kamada ~~and,~~ Sheriff Honsal, the Sheriff's Office, and the District Attorney's Office, this investigation culminated in a two-day, multiagency raid of Ray's properties.

1. Lacking Probable Cause, Deputy Mendes and Deputy DA Kamada Intentionally or Recklessly Omit Material Information or Include Misstatements to Secure Search Warrants

~~101.~~64. Deputy Mendes and Deputy DA Kamada secured warrants to conduct a raid of Ray's properties. But ~~Deputy Mendes~~ they did not have probable cause that Ray neglected or abused animals. Deputy Mendes and Deputy DA Kamada intentionally or recklessly put together affidavits that—through material omissions or misstatements—made it seem there could be probable cause that Ray neglected or abused animals, when in fact there was none. Deputy Mendes included statements regarding carcasses that were allegedly located within 150 feet of a state waterway. But these misdemeanor counts of littering state waterways would not carry the day in securing far-reaching search and seizure warrants. What Deputy Mendes and Deputy DA Kamada needed was a warrant based on suspected animal neglect or abuse. Through carefully-worded affidavits, reviewed and signed by Deputy DA Kamada, Deputy Mendes littered in hints about potential animal neglect or abuse, while omitting, or, at times, misstating, material information that would undermine his narrative. The omitted information would have cast doubt on a finding of probable cause. Knowing this, Deputy Mendes intentionally or recklessly excluded this material information, allowing him to move forward with the case. The affidavits' many material omissions, and at times misstatements, include the following detailed below.

65. These omissions and misstatements were not random or isolated. Each ran in the same direction to cast innocent conditions as evidence of abuse while suppressing the exculpatory

context Deputy Mendes, Deputy DA Kamada, Sheriff Honsal, and others at the Humboldt County Sheriff's Office and the District Attorney's office knew. As a result, the affidavits presented a deliberately slanted picture designed to manufacture the appearance of probable cause and to manipulate the inferences the reviewing magistrate would draw. The cherry-picked, one-sided language Deputy Mendes included in the affidavits was itself a mischaracterization of the evidence, not a mere failure to disclose, and amounted to judicial deception.

~~102.~~66. *Deputy Mendes cited the presence of sick, weak, skinny, and injured animals as evidence of animal neglect or abuse. But he omitted the material information that ~~Ray purchased~~he observed and assisted Ray's purchase of animals in that state to rehabilitate them~~, based on the age-old wisdom of "buy low, sell high."~~.* Ray obtained many such animals at the weekly auctions at the Humboldt Auction Yard. The Livestock Deputies who attended the weekly auctions during the relevant time period included Deputy Mendes. In this role, Deputy Mendes saw the poor condition of the cattle that were being brought to the auction and sold, and saw who sold these subpar animals at auction. Deputy Mendes regularly attended and participated in these weekly auctions~~.~~, assisting in the sale of these animals to buyers including Ray. Federal regulations require livestock auction yards to maintain detailed records regarding the brand information for cattle bought and sold and to have these records available for inspection, so ~~this~~ information regarding the source of these mistreated animals was readily accessible to the Humboldt County and State officials attending the auction.

~~103.~~67. For years before the March 2018 raid, during the pendency of Ray's criminal case, and to the present day, local ranchers and dairymen who purchased animals at the weekly auction, and who sometimes worked with Ray, reported to the Sheriff's Office the problems with the livestock being sold at auction. They sent photos, videos, and detailed descriptions of their observations. They implored Sheriff Honsal himself, along with Sergeant McCall and others, to take action to address the neglected, sick, skinny, lame, and weak cattle being sold at the auction. The Sheriff's Office did not seriously pursue these reports. Sheriff Honsal dismissed the complaints, stating that he knew that the person reporting them was a friend of Ray, and wished him "Good luck my friend." It was well known that animals were sold in this

state at the weekly auctions, and that it was often Ray who purchased them.

~~104.~~68. Various witnesses saw Deputy Mendes working behind the scenes at those same auctions to try to sell weak, sickly, or injured animals, with the knowledge that Ray would often purchase the subpar animals. Instead of taking these vulnerable animals to a veterinarian to get care, Deputy Mendes—still wearing his law enforcement uniform—instead encouraged, and often aided, in the sale of these animals. On several occasions before the March 2018 raid, community members saw Deputy Mendes bring in skinny pigs to the auction yard, where many of them died in the auction pens on the day of sale. Despite the pigs' weak and emaciated conditions, Deputy Mendes informed the auction's staff that the pigs should be sold, while Ray sat waiting in the auction as a potential buyer. On various other occasions before the March 2018 raid, witnesses saw Deputy Mendes use an electric prod on sick, injured, and lame animals to try to force them up into the trailers, so they could be sold and potentially purchased by Ray.

~~105.~~69. It was also well known that various ranchers would give their subpar and unwanted cattle to Ray by leaving the animals in a pen in Ferndale where Ray and his workers would collect them, or by leaving them at Jackson ~~Road~~ Ranch Road, Ray's home and main ranch.

~~106.~~70. The community knew this. The state Brand Inspector and Veterinarian who attended the weekly auctions knew this. And Deputy Mendes and Sheriff Honsal knew this. But, Deputy Mendes intentionally or recklessly omitted from his affidavits this material information about what happened at the auction yard, what kind of animals Ray purchased there, and how Ray ended up with subpar animals from the auction and elsewhere.

~~107.~~71. *Deputy Mendes cited the presence of dead cattle as evidence of animal neglect or abuse. But he omitted the material information that this was an unfortunate norm in the Humboldt County cattle industry.* Deputy Mendes regularly visited cattle ranches in his role as Livestock Deputy, and thus would have known that cattle are not the hardy creatures they might appear to be. Cattle regularly get sick or injured and die. A "closed" herd, meaning one that is self-contained and self-perpetuating through in-herd reproduction, typically has a 10% mortality rate. An "open" herd of cattle like those Ray maintained would have a higher mortality rate, due to constant additions of culled cattle from other herds, many of which were already sick and

diseased. Thus, if a rancher moved 35,000 cattle through his operation in a year, and had around 4,000 on hand at any given time (as Ray did), one would reasonably expect him to end up with hundreds of cattle carcasses every year. Those carcasses would not prove, much less even suggest or hint, at neglect or abuse.

~~108.~~72. The best way to dispose of cattle carcasses is to send them to a rendering plant, where the animals can be safely processed into hides, tallow, grease, and meal by-products. But, there are no such rendering plants in Humboldt County. None have existed more than 20 years. And there are no other rendering plants nearby. The closest ones are in Sacramento and Petaluma, which are both nearly 300 miles away over mountainous roads, or in Portland, over 400 miles away. It is cost prohibitive and realistically impossible to transport cattle carcasses over that distance on a regular basis before the carcasses deteriorate to the point they cannot be used. As a result, cattle ranchers like Ray have no choice but to make "dead piles" on their properties or bury the carcasses as best they can. In addition, the particularly long and muddy winters of Humboldt County make it so that it is difficult to bury, or even move, the animal carcasses weighing thousands of pounds out of the mud. Thus, in the winter—including the months leading up the March 2018 raid—ranchers may have to leave dead cattle where they are until spring.

~~109.~~73. The community knew this. And Deputy Mendes and Sheriff Honsal knew this. Deputy Mendes stated that "to my knowledge, the county does not have any means of removal or storage for that many carcasses. Addinionally [sic], i know that Humboldt county does not have a carcasse [sic] disposal factory anymore."[55] But Deputy Mendes intentionally or recklessly omitted from his affidavits this material information about the lack of rendering plants and the ~~meaninglessness~~pervasiveness of cattle carcasses on ranches in Humboldt County.

~~110.~~74. *Deputy Mendes cited a lack of grass for grazing as evidence of animal neglect or abuse. But he omitted the material information that the lack of grass was attributable to Humboldt County's winter conditions and that Ray, like many ranchers in the area, fed his cattle in their pens in the evenings after letting them out to the pastures during the day.* In

[55] October 24, 2018 email from Deputy Mendes to an employee at the United States Department of Agriculture.

Humboldt County, winters are long months of rain, fog, and mud. In the months leading up to the March 2018 raid, these were the conditions on Ray's pastures, as well as the land of his neighbors. Dr. Gallego, a veterinarian who participated in the March 2018 raid, recognized the wet conditions on Ray's ranch property and recommended returning in drier weather to assess the conditions again. In addition to the weather conditions, the lack of grass was due to the thousands of Aleutian geese that settle in Humboldt County over the winter months, eating Ray's and his neighbors' grass and leaving the ground bare. This problem with the geese in Humboldt County was well known, due to their consumption of large amounts of grass and clover, which creates competition with local cattle for forage.[56] In addition, in the months leading to the March 2018 raid, Deputy Mendes had gone by Ray's land on many evenings and seen him feeding his cattle in their pens.

~~111.~~75. The community knew this. And Deputy Mendes and Sheriff Honsal knew this. But Deputy Mendes intentionally or recklessly omitted from his affidavits this material information about the winter conditions, the Aleutian geese eating the grass in Humboldt County pastures during the winter months, and Ray's supplemental feeding of his cattle in their pens.~~[57]~~

~~112.~~76. *Deputy Mendes cited Ray's loose cattle as evidence of animal neglect or abuse. But he omitted the material information from his affidavits that loose ~~bulls~~cattle in the area were a norm for all Humboldt County cattle ranchers, not just Ray.* Ray, like other ranchers in the area, kept his cattle enclosed in fenced pastures. But those fences were imperfect and needed to be maintained constantly. Wild elk destroyed them. In the wet winter months, fences would often wash out after storms or when the rivers, creeks, and sloughs would flood. Trespassing fishermen and hunters stepped on the fences and cut wires to illegally enter Ray's land to hunt and fish. Thieves stole the solar equipment used to power the electric fences, causing the fences to die and the cattle to escape. Some of Ray's pastures abutted hiking and walking trails, where walkers would take their dogs off leash and permit them to run around and chase

---

[56] Alan Bower, *Effects of Aleutian Geese on Humboldt County Pastures*, Sustainable Agricultural Research and Education Projects (SARE), https://projects.sare.org/sare_project/fw08-312/.

~~[57] Alan Bower, *Effects of Aleutian Geese on Humboldt County Pastures*, Sustainable Agricultural Research and Education Projects (SARE), https://projects.sare.org/sare_project/fw08-312/.~~

Ray's cattle. This scared the cattle, who would run through the fences—even the electric ones—to escape the dogs. On Ray's pastures along the 101 Highway, cars crashed and broke through the fences.

~~113.~~77. Due to the size and scope of Ray's cattle operation, Ray was so well known to the California Highway Patrol that they would come knock on his door or call him in the middle of the night to notify him if cattle got loose in the area. Even when the officers knew that the loose cattle were not near Ray's land, they often called Ray since they knew he may have knowledge regarding to which rancher the cattle belonged. And, many times, Ray would assist them in collecting the loose cattle, even if they did not belong to Ray. For years, those officers did not accuse Ray—or other ranchers in the area—of animal neglect or abuse based on these loose cattle. It was simply part of living in cattle country.

~~114.~~78. The community knew this. Local law enforcement knew this, including Deputy Mendes, Sheriff Honsal, as well as the several Livestock Deputies who preceded Deputy Mendes. But Deputy Mendes intentionally or recklessly omitted from his affidavits this material information about how and why cattle get loose from their pastures.

~~115.~~79. *Deputy Mendes cited a goat with injured legs as evidence of animal neglect or abuse. But he omitted from his affidavits ~~how common such~~ the circumstances of the injuries ~~are~~.* The goat cited by Deputy Mendes was actually a ram, and had been attacked by ~~a dog~~an animal and had developed foot rot before the ~~goat~~ram came into Ray's possession. Ray instinctively proceeded to care for the ~~goat~~ram. After witnessing the ram's state, Deputy Mendes reached out to Ray; at that time, Ray explained how the ram had obtained its injuries before entering Ray's care. Such types of injuries were not uncommon in the community. Coyotes and dogs often were a risk to Ray's and his neighbors' animals, which Deputy Mendes was repeatedly called on to address in his role as Livestock Deputy.

~~116.~~80. The community knew this. And Deputy Mendes and Sheriff Honsal knew this. But Deputy Mendes intentionally or recklessly omitted from his affidavits the material information about how domesticated animals in Humboldt County are often attacked by wild animals or loose dogs, and how this particular goat came under Ray's care.

~~117.~~81. *Deputy Mendes cited a cow that died as a result of a difficult birth as evidence of animal neglect or abuse. But he omitted material information in his account of what lead to the death.* The cow belonged to Ray's employee, not to Ray. Ray did not contribute to this difficult birth, as Deputy Mendes well knew. A witness watched Deputy Mendes, arriving mid-birth, trying to pull out the calf by its legs. Deputy Mendes' inexperience showed in this moment, as a cattle rancher would have known to push in and turn around the baby calf to avoid an impossible breech birth. This is what Ray attempted to do shortly after, when his employee called for his aid, but it was unfortunately too late.

~~118.~~82. The ranching community knew a breech birth was impossible. Deputy Mendes apparently did not know this, but he did know what caused this particular cow to die, which was not abuse or neglect~~.~~, but rather a breech birth exacerbated by Deputy Mendes's own actions. Deputy Mendes omitted from his affidavits this material information about how and why this cow died. The omitted information would have cast doubt on a finding of probable cause. Knowing this, Deputy Mendes intentionally or recklessly excluded this material information, allowing him to move forward with the case.

83. Individually, each of these omissions and misstatements was material to the probable cause determination. Cumulatively, they confirm deliberate design. Deputy Mendes stripped from his affidavits the exculpatory facts he possessed: for example, Ray's rehabilitation operation and the source of his subpar animals, the industry-wide problem of cattle deaths, the increased mortality rate of the subpar animals Ray acquired, the absence of any rendering plant, the lack of carcass disposal options, the winter conditions and the Aleutian geese, and the ordinary causes of loose and injured animals. By including only select, slanted information in the affidavits, Deputy Mendes recast those innocent conditions as evidence of a crime. An affiant who reports less than the total story in order to manipulate the inferences a magistrate will draw does not merely withhold information; he deliberately mischaracterizes the evidence. Deputy Mendes' affidavits were thus a deliberate fabrication secured through judicial deception. Deputy Mendes intentionally painted a false portrait of a crime by distorting the facts that he included in his affidavits.

2. Deputy Mendes Leads a SWAT-Style Raid with Dozens of Agents

~~119.~~84. The raid on Ray and his properties began approximately 7:00 am on March 19, 2018. Even though the Sheriff's Office's investigation of Ray did not involve weapons, drugs, or violence, more than 30 armed law enforcement personnel from nine different local, state, and federal agencies descended on Ray and his girlfriend, who were asleep in the ranch house. These included members of the Humboldt County Sheriff's Office Special Services Division; members of the Humboldt County District Attorney's Office, including Deputy DA Kamada; members of the Humboldt County Drug Task Force; members of the Humboldt County Code Enforcement; members of the Humboldt County Department of Health and Human Services; members of the California Department of Food and Agriculture; members of the California Department of Fish and Wildlife; members of the US Bureau of Land Management; and members of the United States Department of Agriculture.

~~120.~~85. This 30-member raiding team descended on Jackson ~~Road~~ Ranch Road. Officers surrounded the home's entrance. Deputy Mendes banged on the side of the home, demanding entry. It was still dark. Ray and his girlfriend, who were inside the home asleep, were startled awake. Ray's girlfriend initially thought that an officer reporting a loose cow was at the door. Then she looked outside and saw more than a dozen law enforcement vehicles in the road, with a swarm of armed figures moving toward them.

~~121.~~86. Ray and his girlfriend immediately went downstairs to the door. Ray wore boxers and a T-shirt. His girlfriend wore only a thin, mid-thigh length satin night slip with a light robe of the same length.

~~122.~~87. Armed officers greeted them at the door. They were dressed in full tactical SWAT-style gear,~~-~~ with helmets, bullet proof vests, and assault rifles drawn. The officers grabbed Ray and his girlfriend roughly by their arms and yanked them out onto the porch. Ray asked what was going on. The raiders burst into his home and began ransacking it.

~~123.~~88. The raiders detained Ray and his girlfriend outside on the porch for approximately 30 minutes while law enforcement personnel tore their home apart during the initial part of the search, purportedly to secure the property. They used assault rifles and other automatic

firearms to guard the area, occasionally pointing those weapons at Ray and his girlfriend. Dawn was just breaking. On information and belief, it was only 40 degrees Fahrenheit. Both Ray and his girlfriend were shoeless, and his girlfriend, nearly naked, shivered while they waited outside in the damp cold.

~~124.~~89. Shortly after the raid began, press showed up at Jackson ~~Road~~ Ranch Road. The porch where Ray and his girlfriend stood was only a few feet from the main road. They were in full view.

~~125.~~90. In executing the search warrant, the raiding party forcibly kicked doors open, breaking doors, door locks, and door frames. By the end of the search, the raid party had completely ransacked Ray's residence. The unnecessary and excessive displays of force and absolute disregard for their home demeaned and traumatized Ray and his girlfriend.

~~126.~~91. Eventually, Ray and his girlfriend were brought back inside, where they were ordered to sit on their living room couch. Ray said that he wanted to talk to a lawyer.

~~127.~~92. A member of the raiding party started to handcuff Ray while Ray sat on the couch. Deputy Mendes immediately stopped him, saying "this one is all mine." Deputy Mendes then put custom-made handcuffs engraved with Deputy Mendes' name on Ray. Ray's girlfriend was also handcuffed. Someone finally brought her a blanket to wrap around herself.

3. Deputy Mendes Secretly Records Custodial Interrogation of Ray

~~128.~~93. Ray, having invoked his constitutional right to speak to an attorney, sat silently on his couch wearing ~~only his underwear and~~ Deputy Mendes' personalized handcuffs as the agents continued to ransack his home. Ray was soon surrounded by Deputy DA Kamada, Deputy Mendes, and District Attorney Investigator Wayne Cox.

~~129.~~94. Deputy DA Kamada, Deputy Mendes, and DA Investigator Wayne Cox began to interrogate Ray. Investigator Cox began the questioning by acknowledging that "[he] underst[ood] that . . . [Ray] want[ed] to talk to [his] attorney," and that he thus did not "want to talk to [him] about [his] case." With this meaningless caveat, Investigator Cox, Deputy DA Kamada, and Deputy Mendes proceeded to do just that, questioning Ray regarding issues that went to the heart of the case.

~~130.~~95. Investigator Cox, Deputy DA Kamada, and Deputy Mendes interrogated Ray specifically about the cows later identified in the felony charges. The three men told Ray that four of his cows were in dire shape, and that veterinarians who were part of the raid indicated that those four animals should be "put down." Ray responded that he did not know which cows they were questioning him about or the condition of the cattle because the cows had just arrived from auction. Investigator Cox acknowledged this, asking Ray where the cows that "came in last night" had been placed.

~~131.~~96. In the midst of his questioning, Investigator Cox again acknowledged that "[Ray] had said [he] wanted to talk to [his] attorney," and that Investigator Cox did not "want to violate that in any way." Yet, he continued to interrogate Ray about the cows. Ray repeatedly responded that he did not know which cows they were asking him about, or what the conditions of the cows were, because the cows had just arrived in the middle of the night. Refusing to take this as an answer, Investigator Cox asked Ray "how would [he] do it if [he] were going to do it," meaning how he would put a cow down. He also asked Ray about his care of his animals, namely, if he treated cows himself or if he had a local veterinarian. He also pressed Ray about what he would do if veterinarians said "ethically and morally" a cow needed to be put down.

~~132.~~97. After nearly eight minutes of this custodial interrogation, Ray, still in his underwear and T-shirt, asked if he could put on clothes so he could check on the cows himself, rather than continue to be interrogated. Investigator Cox, Deputy DA Kamada, and Deputy Mendes told Ray not to "worry about it," and ended their interrogation.

~~133.~~98. Deputy Mendes secretly recorded this interrogation on his cell phone. Deputy Mendes hid this recording on his cell phone for a year and a half before turning it over during trial. In obvious contravention of his obligations to accurately document the execution of the search warrant and the raid, Deputy Mendes' 14-page investigative report detailing the raid does not reference this secretly recorded interrogation. Deputy Mendes' report includes one cherry-picked, incomplete reference to the conversation, as Deputy Mendes writes that Ray was asked if he wanted to call his veterinarian but declined. Deputy Mendes never mentioned that it was Deputy DA Kamada who asked Ray this question after Ray invoked his right to an attorney,

while Investigator Cox, with Deputy Mendes and Deputy DA Kamada present, twice acknowledged that he understood that Ray had invoked his right to an attorney.

~~134.~~99. After Deputy Mendes disclosed the interrogation evidence during Ray's trial in November 2019, District Attorney Inspector Alan Aubuchon documented the evidence in an investigative report. Inspector Aubuchon said the quality of the recording was so "poor" that he had to re-record it using a handheld recorder. The original recording was never turned over to Ray. Any metadata contained in the file Deputy Mendes provided to Inspector Aubuchon was lost. Inspector Aubuchon's rerecording further altered the evidence in contravention of the Sheriff's Office's evidence preservation policies and standard chain-of-custody procedures for evidence preservation. Deputy Mendes and Deputy DA Kamada knew about this evidence from the time it was created because Deputy Mendes, Deputy DA Kamada, and Investigator Cox conducted the interrogation. In his investigative report documenting the receipt of this evidence, Investigator Aubuchon obscured Deputy DA Kamada's name and involvement, describing the conversation as having occurred between Deputy Mendes, "Chief Investigator Wayne Cox (possibly one additional person) and Christie."

~~135.~~100. Deputy Mendes' and Deputy DA Kamada's failure to turn over this crucial exculpatory evidence to Ray constituted prosecutorial misconduct and violated Ray's right to a fair trial.

~~136.~~101. Sometime after the improper interrogation, Deputy Mendes allowed Ray's girlfriend to get dressed. The home was filled with armed law enforcement personnel, who were mostly male and led by Deputy Mendes. Ray's girlfriend was uncomfortable and felt vulnerable going up the steep stairs to her bedroom. Concerned that law enforcement officers below her could see that she was not wearing anything under her night slip, she went up the stairs sideways, clutching her slip to her leg. Deputy Mendes and Sheriff's Officer Megan Nims followed her up the stairs, where Deputy Mendes removed her handcuffs. Deputy Mendes instructed Officer Nims to stand in the bedroom with Ray's girlfriend while she dressed. Officer Nims expressed her discomfort in watching her get dressed, and stayed near the hallway with Deputy Mendes while Ray's girlfriend changed her clothes inside of her closet. Ray's girlfriend was not a target of the

investigation. Yet law enforcement tore apart her closet, searched through her handbags, and left her possessions in complete disarray.

~~137.~~102. Soon after, Deputy Mendes arrested Ray and took him away for booking. The officers informed Ray's girlfriend that she was released and free to go. During the raid, Ray's girlfriend had her iPhone with her the whole time before they released her. The officers had not taken her phone as evidence and had no reason to do so. The raiders had detained Ray and his girlfriend for hours before Ray was taken in for booking, and his girlfriend released.

~~138.~~103. Ray's girlfriend left the home to get into her car. A Sheriff's Deputy followed her outside and stood by her car window after she got in. She began to call Ray's brother. The Sheriff's Deputy, watching her use her phone, abruptly opened the door and grabbed her phone out of her hand. He asked her what she was doing. She replied that she was calling Ray's brother to try to figure out how to get Ray out of jail. The Deputy Sheriff did not give her back her phone but kept it. The phone has never been returned. Ray's girlfriend was not named in the warrant, was not a subject of the investigation, and had already been released and told by the Sheriff's Office she was free to go. She did not have the phone number for Ray's brother memorized and now had no way to contact him for help.

~~139.~~104. -Raiding party personnel prevented Ray and his ranch hands from feeding, watering, caring for, or assisting the cows for at least eight hours during the raid. Because some of the animals had been dropped off mere hours before the raid, they were in sick, weak condition when they arrived. It was especially important for Ray and his ranch hands to take care of these high-needs cattle. The raiding officers did not allow anyone to care for these animals, compounding their suffering. Raid personnel did nothing for the animals during the raid. They did not ~~put one pitchfork of hay~~feed or ~~one bucket of~~ water ~~anywhere near~~ any of the animals they claimed were suffering. They did not provide any medication to the cows they alleged were sick and in need of treatment. They did not remove any cattle from the property for care and treatment. Indeed, the only animal taken away during the raid was an injured free range Aleutian goose that roamed around Ray's pastures and ate the food Ray put out for free range chickens. Neither the veterinarians nor the other raiders collected any evidence from the cattle carcasses or tested the

carcasses. They never investigated or attempted to determine the causes of death. The veterinarians never treated the animals, removed the animals, or put them down, even though they were supposedly convinced some of the new auction animals needed to be put out of their misery.

~~140.~~105. When Ray and his workers were finally allowed to care for the cattle in the evening once the raid had concluded, they found the ranch in complete disarray. Cattle were everywhere, in places where they were not supposed to be, crowded in pens and loose in fields that the raiders permitted them to enter by leaving gates open and latches undone. Ray and his ranch hands worked late into the night, re-sorting cattle into the proper pens and pastures, tracking down loose cattle, and fixing destroyed fences.

~~141.~~106. The March 2018 raid occurred during a period of unusually wet weather. It had been raining for weeks. Jackson ~~Road~~ Ranch Road and Ray's other properties were extremely wet and muddy at the time. Dr. Gallego, one of the on-site veterinarians during the raid, noted the wet conditions at the ranch and commented it would be good to return in drier weather to assess the conditions then. He emphasized that he only observed Ray's properties on one day. At Jackson ~~Road~~ Ranch Road, Dr. Gallego observed approximately 60 "very healthy" cattle that appeared ready for market. These cattle "had good conditioning" and Dr. Gallego stated "that if we are interpreting th[ese cattle] in light of what Mr. Christie's practice is, he buys everyone's junk at the auction yard. All the cattle that don't have a useful production life and the highest bidder will purchase them. In the context of that, the animals in the corral had good flesh and were useful."

~~142.~~107. The raiding party also searched several other properties on which Ray maintained cattle. Tenants resided in homes on some of the properties. The raiders showed up at their homes with more than a dozen vehicles, detaining and handcuffing the tenants. At the McKinleyville property where Deputy Mendes had pulled on the calf's legs in the barn a few months before, the raiders forced Ray's ranch hand and his wife and young child to wait outside their home for hours. When Deputy Mendes arrived at the McKinleyville property supported by multiple law enforcement vehicles and personnel, he boasted to the ranch hand about the raid, saying "You see all of this, you see all these people? It's all because of me."

4. Cows are Delivered Hours Before the Raid

~~143.~~108. On the evening of March 18, 2018, Ray's ranch hand was at Jackson ~~Road~~ Ranch Road, feeding the cattle and laying down hay, checking on the property, and walking the fence line, checking for holes. The ranch hand left the gates on the paddocks and pens closed.

~~144.~~109. Using a semi-truck Ray borrowed from a friend, an experienced driver for Ray picked up, transported, and delivered cows from a far-off auction yard and from the pens in Ferndale during the night. They were dropped off at 2:00 am or 3:00 am, just a few hours before the raid began.

~~145.~~110. The driver first picked up cattle from the Shasta Livestock Auction Yard and took them back to Jackson ~~Road~~ Ranch Road. The animals from the Shasta auction were a mix of both healthy and sick, weak, and hurt cattle. The driver then picked up cattle from the Ferndale pens, where another rancher had left several cattle earlier that day for Ray to pick up. The cattle in the Ferndale pen were in terrible condition. Several of the calves were already dead when the driver arrived. As Ray and his workers always did for community members who left subpar cattle in the Ferndale pen, the driver collected the cattle, dead and alive, and brought them back to Jackson ~~Road~~ Ranch Road.

~~146.~~111. At the ranch, the truck driver created temporary pens with movable cattle pen panels so that he could segregate different categories of animals. He put a mother and a calf in a separate pen to protect them from being crushed by other larger cattle. He put the sick and weak cattle in the barn. He laid some dead calf carcasses next to the ranch house, in violation of Ray's protocol for handling dead cattle, because he was too tired to take them to the dead pile behind the barn.

~~147.~~112. The driver left the borrowed truck at the ranch in front of the cattle chute near the barn. The raiding party descended on the property not long thereafter.

5. Deputy Mendes, Deputy DA Kamada, and Sheriff Honsal Searched Unlawfully and Mishandled Evidence

~~148.~~113. The evidence collected and presented at trial by Deputy Mendes, Sheriff Honsal, and Deputy DA Kamada was rife with problems. The myriad issues included the

following detailed below.

~~149.~~114. While Ray and his girlfriend were detained, the dozens of raid personnel fanned out across Jackson ~~Road~~ Ranch Road. They searched the barn, pens, paddocks, and fields. In the process, they were opening gates, undoing latches, and allowing cattle to move into areas of Jackson ~~Road~~ Ranch Road where they should not be.

~~150.~~115. Many raiders took photos and videos during their search. A forensic expert proved that as many as 13 different devices were used to take the photos and videos. The first video taken, which the District Attorney's office provided in discovery, begins at 8:10 a.m., which, on information and belief, was at least an hour after the raid began. It is not presently known what the raiding party was up to before they started filming, other than their detainment of Ray and his girlfriend and unconstitutional interrogation by Deputy Mendes and Deputy DA Kamada.

~~151.~~116. What is known is that cattle were in different places than where the driver delivering them had left them hours before the raid. The raiding party opened gates, which allowed cattle to go where they were not supposed to go and to crowd into pens on the property. Ray's cattle were separated into different pens, paddocks, and pastures on his properties for good reason – to keep them safe. Segregating the sick, weak, and infirm cattle from the healthy, vigorous cattle protects the weaker animals and helps prevent the spread of diseases.

~~152.~~117. The raiders moved the animals around into different pens to make their investigation movements easier, but took no care to segregate weak and sick and small animals from larger healthier ones. Because the raiders had unlatched and opened gates, which permitted cattle to move around the property, the cattle filmed during the raid, and the property generally, were not depicted as they had been left hours before the raid and how they would typically be housed on the property.

~~153.~~118. For example, during the raid, a Sheriff's Deputy called the owner of the truck left by the driver at the ranch in the middle of the night, telling him to come pick up his truck. When the truck owner arrived, the Sheriff's Deputy instructed him to move the truck and trailer away from the cattle chute where the driver had left it. The owner refused. He did not want

to leave an opening for the cattle to get out. The owner of the truck frequently visited Jackson ~~Road~~ Ranch Road and Ray's other properties and was very familiar with Ray's operations. He saw the cattle gates opened and unlatched, and saw cattle in places he did not typically see them at the ranch.

~~154.~~119. Deputy Mendes "staged" at least two photographs taken during the raid, which were later used as evidence against Ray. In one of the staged photographs, Deputy Mendes moved a cattle ear tag from its original location to a closer spot next to a cow skull, so that the resulting photograph would more strongly suggest the tag was associated with that animal. The other photograph was taken of a carcass, but only after Deputy Mendes moved some items, including a wheelbarrow, to get a more dramatic photograph of the carcass. When Deputy Mendes was examined under oath in the Humboldt County Courthouse, he did not truthfully disclose how the evidence was collected and when and where the photos were taken.

~~155.~~120. Deputy Mendes took two cell phones, two computers, and two iPads from the ranch house during the raid, including the pink iPhone and pink iPad of Ray's girlfriend, who was not under investigation and was not named in the warrant. After Deputy Mendes seized a computer from upstairs in the ranch house, he ran down the stairs shouting "I got it, I got it!" Deputy Mendes and Deputy DA Kamada never justified why they took Ray's girlfriend's possessions, even though she was not a target of the investigation. The Sheriff's Office and the District Attorney's Office have never returned the seized property to Ray and his girlfriend, in spite of several requests from Ray and his counsel during the pendency of the criminal case.

~~156.~~121. Sometime after the raid, Ray's iPad was "factory reset," meaning someone in the Sheriff's Office or the District Attorney's Office wiped all of the data from Ray's iPad. On information and belief, the iPad contained exculpatory evidence relevant to the felony charges, which was forever deleted when the iPad was wiped clean.

~~157.~~122. Similarly, the photographs and videos taken by law enforcement personnel during the raid were not preserved under a proper chain of custody or supervision. Deputy Mendes testified under oath at a *Brady* hearing that only three devices were used to record photos and videos during the raid. He claimed that all of the images from those three devices were

personally transferred by him to a memory stick in their native format. But a forensic expert at the *Brady* hearing proved that up to 13 different devices were actually used to record the images, not three.

~~158.~~123. Deputy Mendes did not truthfully disclose when some of the photographs were taken. During the *Brady* hearing, Deputy Mendes was shown eight particular photographs of carcasses from the prosecution's exhibits. He said he took the photographs himself during the March 2018 raid. But a forensic expert proved with metadata that the photographs had been taken months earlier and were last modified two months before the raid.

~~159.~~124. Deputy Mendes had responsibility for this evidence in the Sheriff's Office. Someone in the Sheriff's Office or the District Attorney's Office stripped or modified the relevant metadata from most of the photographs produced as evidence in Ray's criminal case. A forensic expert proved that many of the photographs were modified in some unknown way before they were produced to Ray's attorneys. The images on the memory stick were not original source electronic images. As a result, most of the digital photograph and video evidence comprising the prosecution's exhibits was missing critical metadata.

~~160.~~125. Despite their constitutional and statutory duties to provide all relevant evidence to Ray, Deputy DA Kamada and the District Attorney's Office never produced the native files for the evidence used to support a felony charge against Ray. The District Attorney's Office later admitted that Deputy DA Kamada lost this critical video, which is the sole evidence used to support one of the four felony charges.[58] The evidence for this charge consists of a photograph supposedly created from a still image from a video purportedly taken during the raid. Deputy DA Kamada failed to produce the original video from which the still image is supposedly sourced, and provided no source information for this image. The only image Ray's attorneys received for this evidence is a scanned copy of a grainy still image with three hole punches along the top contained in an Adobe PDF file.

~~161.~~126. The raid did not provide evidence to support a finding of animal abuse or

[58] People's Opposition to Defendant's Motion Re The People's Evidence at 13:21, filed May 6, 2022.

LARSON
LOS ANGELES

neglect. Knowing that the evidence for Ray's case was scant and weak, Deputy DA Kamada showed the jury dozens of inflammatory photographs of moldering cattle carcasses unrelated to the felony counts~~, despite agreeing to dismiss the remaining misdemeanor counts related to the cattle carcasses.~~. He got the photographs admitted into evidence using the weak argument that the evidence suggested "that for some reason or other cattle in the area tended to be unhealthy and die." Deputy Mendes wrote in his report of the raid that "[b]ased on the fact that a large number of bovine carcasses and bone piles were located, I believe that the animals located on the properties may not be provided with the proper care and attention needed" and said in a media interview after the March 2018 raid that the "number of deceased cattle located is very significant."

~~162.~~127. During the raid, a Sheriff's Office officer named SA Miller stayed with Ray and his girlfriend while other officers and agents raided their home. SA Miller chatted with Ray during this time. Several months after the raid, SA Miller returned to Jackson ~~Road~~ Ranch Road and spoke with Ray. SA Miller told Ray that he did not know if Ray would remember him, but that SA Miller "babysat" Ray and his girlfriend during the raid. SA Miller admitted that what happened with the raid "wasn't right" and that the raiders "made a lot of mistakes."

128. Deputy Mendes and Deputy DA Kamada knew that Ray's business model of buying others' junk cattle, which had a higher mortality rate, combined with Humboldt County's lack of carcass disposal options and the wet and muddy conditions on Ray's properties at the time of the March 2018 raid, meant that Ray would inevitably have a higher number of carcasses on his land. They knew that the only way to deal with the carcasses was to pile them up or bury them. Deputy Mendes' predecessors, Livestock Deputies Buihner, Fulton, and Kastler, observed Ray's cattle operation for over a decade before Deputy Mendes and Deputy DA Kamada started their own "investigation." Every one of the previous Livestock Deputies understood the broader context in which Ray's business operated and correctly concluded that Ray did not neglect his animals. In spite of this history, Deputy Mendes and Deputy DA Kamada continued to harass and intimidate Ray, for their own personal reasons, and all under color of state law. ~~For example, Deputy Mendes continued to show up at the weekly auctions in the Humboldt Auction Yard. On~~

one occasion, witnesses saw him bring in a sick, potentially poisoned goat for sale, which a witness later heard Deputy Mendes ask if Ray had purchased it.

129. Deputy Mendes' conduct confirms both his animus and the pretextual nature of the charges. Even while the felony charges were pending, Deputy Mendes continued to appear at the weekly Humboldt Auction Yard. In early August 2018, days before Ray's preliminary hearing, Deputy Mendes brought goats and pigs from the Sheriff's Office work farm to the Fortuna auction. Deputy Mendes told the auction staff that one goat he had brought was "too sick" and that he "had no place to put it," so he left it for Ray, who took the goat in.[59] The goat died that same day. A veterinarian who performed the necropsy had examined the same goat about four weeks earlier—when Deputy Mendes first brought it—and found it healthy at that time. The animal thus sickened in the custody of the Sheriff's Office, not in Ray's care, and Deputy Mendes offloaded a dying animal onto Ray, exactly as Ray had long maintained other ranchers, and even law enforcement, did.

130. The prosecutors recognized, in their own contemporaneous communications, that this episode confirmed Ray's account and exposed the weakness of their case. On August 9, 2018, Deputy DA Kamada wrote to then-District Attorney Maggie Fleming, copying Deputy DA Joel Buckingham and Investigator Wayne Cox, that the goat incident "hurts us in terms of credibility for Dep. Mendes" and "reinforces the defendant's story line—Christie buys (takes in) the sick animals from others and does what he can to help them."[60] The next day, Deputy DA Kamada advised that the prosecution should "attempt to remove Dep. Mendes as a witness," dismiss felony counts 1 through 3 and potentially count 4, and proceed only on charges it could prove "without Mendes," acknowledging that Deputy Mendes' "close working relationship with Christie also

[59] August 9, 2018 email from Deputy DA Kamada to Maggie Fleming and others at the District Attorney's Office.

[60] August 9, 2018 email from Deputy DA Kamada to Maggie Fleming and others at the District Attorney's Office.

compromises the charges."[61] District Attorney Fleming agreed that the office "must proceed with any counts [it could] prove without Mendes," and directed Investigator Wayne Cox to alert Sheriff Honsal "asap as that will now be the news story."[62]

131. At the preliminary hearing, Deputy DA Kamada dismissed several felony animal cruelty charges against Ray "because of issues of proof" that undermined the prosecution's "ability to rely on Deputy Mendes as one of our witnesses as it relates to his expert opinion on the care of livestock."[63] Because the felony animal cruelty charges "rest in a significant way upon the observations and opinions of that same deputy, who then would allow a sick goat to go into the hands of the defendant, we're not gonna be proffering the deputy's opinion to have the defendant held to answer on those related charges."[64] After the preliminary hearing, despite knowing the issues with using Mendes as the key witness for the felony counts, Sheriff Honsal wrote to Deputy Mendes: "Good Job Travis. I knew you would do a great Job. I'm sorry that you didn't get a shot to explain it from the beginning. Christie's day of reckoning is near! Great JOB!"

132. These communications confirm that Deputy Mendes, Sheriff Honsal, and the District Attorney's Office knew, no later than August 2018, that Ray took in sick animals in order to care for them rather than to abuse them, and that their central witness, Deputy Mendes, lacked credibility and had himself supplied Ray with a dying animal. They nonetheless continued to prosecute Ray for more than five additional years.

133. Deputy Mendes' personal control over the evidence against Ray is confirmed by Defendants' own disclosures in this action. Among the materials Defendants identified as a source of case evidence is a "Travis Mendes Flash Drive" that Deputy Mendes retained in his personal possession rather than in any secure, audited evidence system. It was Deputy Mendes

---

[61] August 10, 2018 email from Deputy DA Kamada to Maggie Fleming and others at the District Attorney's Office.

[62] August 10, 2018 email from Maggie Fleming to Deputy DA Kamada and others at the District Attorney's Office.

[63] August 14, 2018 Prelim. Trans. at 4:19-21.

[64] August 14, 2018 Prelim. Trans. at 4:27-5:4.

who collected, curated, and controlled the photographs and data later used to charge Ray—the very evidence he staged, altered, and testified falsely about—confirming that the case against Ray was the product of his deliberate manipulation rather than any neutral investigative process.

134. Deputy DA Kamada's contemporaneous handwritten notes further reflect that the prosecution of Ray was selective. His notes recognized that other operations—including the Alexandre Family Farm, whose dead and dying cattle were left along the Eel River—were not pursued, and flagged as "selective" the decision to single Ray out while treating the very same conditions elsewhere as the industry standard. At trial, the District Attorney succeeded in excluding evidence of selective prosecution against Ray, despite knowing from at least the time of the August 2018 preliminary hearing that the issue of selective prosecution was squarely relevant to Ray's case.

135. On information and belief, Deputy Mendes and Deputy DA Kamada did not provide Ray with a copy of the affidavits supporting the search warrants at the time of the raid. As such, at the time of the raid and his arrest, Ray was not aware of the material omissions or misstatements contained in the affidavits. Ray's counsel later requested copies of all affidavits and probable cause statements in support of any and all search warrants related to Ray's case. The District Attorney's Office provided "all of the available discovery for"[65] Ray's case on October 30, 2018, two months after the preliminary hearing. On information and belief, the underlying affidavits were not reasonably available to Ray until at least this date.

~~163.~~136. Even though they lacked evidence or even probable cause of animal abuse or neglect, Deputy Mendes and Deputy DA Kamada, supported by Sheriff Honsal and Humboldt County, continued to move forward with their case. They hurt Ray's business, ~~they~~ ruined his reputation in the community, and ~~they~~ publicly blamed him for the dysfunctional livestock industry that existed in Humboldt County at the time and continues to exist today.

**F. Ray is Under Felony Charges for Five Years Before the District Attorney**

[65] October 30, 2018 email from District Attorney Legal Office Assistant Katrina Horton to Ray's counsel John Cognorgo and Deputy DA Kamada.

**Dismisses**

1. The Felony Animal Abuse ~~Allegations~~Charges Generate Significant Local Attention

137. On June 13, 2018, the Humboldt County District Attorney's Office filed a criminal complaint charging Ray with seven felony counts of cruelty to an animal under Penal Code section 597(b) and twenty-eight misdemeanor counts of littering within 150 feet of state waters under Fish and Game Code section 5652(a). After the August 2018 preliminary hearing, the District Attorney's Office dismissed three of the felony charges and proceeded to trial with four felony counts of cruelty to an animal under Penal Code section 597(b) and twenty-eight misdemeanor counts of littering.

~~164.~~ Reminiscent of the earlier cockfighting investigation and trial, the 2018 raid and ensuing 2019 trial of the felony animal cruelty and misdemeanor littering charges drew significant media attention in Humboldt County. Local news outlets extensively documented the raid, publishing numerous photographs of the raid and Ray's properties.

~~165.~~138. The felony animal cruelty charges subjected Ray, already well-known in his community, to intense public scrutiny and disdain. By the time Ray arrived at the Humboldt County Courthouse for his arraignment, he was being heralded as a "cockfight kingpin" and a "notorious" "accused animal abuser" in local newspapers. His mugshot became synonymous with his family name.

~~166.~~139. Community backlash against Ray was swift. Numerous area news outlets and local journalists covered Ray's case, such as *The Times-Standard*, *The Lost Coast Outpost*, *The North Coast Journal*, and *Redheaded Blackbelt*. John Chiv's *Words Worth*, among all the local media outlets, was the only balanced reporting available at the time. Several of these outlets maintain comment sections, where members of the community wrote about their hatred of Ray, disparaging him, calling him an animal abuser, and advocating for his animals to be taken away and for Ray to spend the rest of his life in prison.

~~167.~~140. When Ray's trial occurred in late 2019, several local news outlets covered every day of Ray's trial in extensive detail. Their reporting on Ray's case was almost exclusively

negative. This bad publicity further enflamed the already-strong community animus against Ray. Ray's reputation in his community was forever damaged.

~~168.~~141. Following a month-long trial, the jury hung on the felony animal abuse charges. The jury convicted on some of the misdemeanor littering counts, acquitted on some of them, and hung on others. The court declared a mistrial on the felony charges. Deputy DA Kamada pledged to retry the felonies.

~~169.~~142. The community was again outraged by Ray's acquittal.

~~170.~~143. The Covid-19 pandemic delayed Ray's retrial. Deputy DA Kamada was fired from the District Attorney's Office in 2020 for violating office policy and procedure. New prosecutors took over Ray's case. Ray then developed cancer, and a heart ailment, which necessitated continuances of the trial while he received treatment.

2. The Sheriff's Office's 2021 Raid Found No Evidence of Neglect

~~171.~~144. During the pendency of Ray's criminal case, the Sheriff's Office continued to pursue Ray, and only Ray. In October 2021, while the District Attorney's Office was still preparing Ray's case for retrial, personnel from the Sheriff's Office, Humboldt County Animal Control, and the California Department of Food and Agriculture tagged along for a raid in a federal investigation conducted at Jackson ~~Road~~ Ranch Road and related properties. On information and belief, of the approximately two dozen agents that conducted the 2021 raid, fourteen of the agents were from the United States Department of Agriculture, three were from the California Department of Food and Agriculture, and the remaining seven agents were from the Sheriff's Office, including two officers from the Animal Control Division, as well as one from the Fortuna Police Department. The USDA's warrant focused on a search for business records located in outbuildings on Ray's properties. The search warrant did not authorize a search of Ray's home or searches of any other homes on Ray's properties. The agents unlawfully searched these residences anyway and seized evidence from them.

~~172.~~145. Like the 2018 raid, the agents arrived in full tactical gear with guns drawn, including at least one AR-15 style semi-automatic rifle. And like the 2018 raid, the agents arrived before daybreak, ensuring that they would startle Ray and his family in the dark. The agents

banged on the door of Ray's home, stating that they had a search warrant and demanding that the occupants open the door. This time, Ray and his girlfriend were not alone. Their two young sons were present. The young children were traumatized by the armed agents who forcibly entered their home and, after forcing their father to put his hands up, detained the whole family. The agents separated Ray and his girlfriend from their children. A USDA agent insisted on supervising one of the children while he played in the playroom, instead of allowing Ray or his girlfriend to stay with their young son. The playroom had a separate door to the outside, where agents were gathered. The raid was so chaotic and disorganized that an agent standing outside of the playroom nearly shot the agent supervising Ray's son inside the playroom, mistaking her for an unidentified person. The agent inside with Ray's son yelled "It's me!" and ran into the living room, looking understandably concerned for her life. She abandoned Ray's young son alone in the playroom, leaving the child unprotected in the event agents had burst in to subdue or detain her or worse.

~~173.~~146. After the raid, Ray's children would get upset and cry whenever there was a knock on the door or visitors to the home, scared that the agents had returned.

~~174.~~147. Following the federal raid, the USDA did not further investigate Ray, file charges against him, or return for additional evidence.

~~175.~~148. The state agents, who did not have a warrant of their own, joined the 2021 raid with their own agenda. Rather than assist the federal agents in their search for business records, the state agents sought evidence to save the State's prosecution of Ray. The state agents inspected Ray's home, his dogs, and the cattle on the properties. No one present for the 2021 raid issued Ray a *Miranda* warning. In spite of this, Ray invoked his right to his attorney, stated that he would not speak to agents without his attorney, and insisted that his counsel had advised him not to answer their questions. De facto Livestock Deputy Sergeant McCall attempted to question Ray anyway, in violation of Ray's constitutional rights. Sergeant McCall approached Ray, pointed a recording device at him, and inquired about allegedly sick cows needing assistance. As during the 2018 raid, Ray asked Sergeant McCall if he was referring to cattle that had recently arrived from auction. When Ray told Sergeant McCall that if he wanted the real culprit, he should

look to the Humboldt Auction Yard, where the cows had recently come from, Sergeant McCall immediately turned off the recorder and left.

~~176.~~149. The new Deputy District Attorney on the case, Steven Steward, confirmed that the state agents tagged along on the 2021 raid with the intent to gather evidence to prove that Ray had continued his alleged practice of abusing animals during the pendency of his criminal case. Deputy DA Steward also requested that Sergeant McCall provide Deputy DA Steward with his investigative report so he could consider additional charges against Ray.

~~177.~~150. The Sheriff's Office and the District Attorney's Office knew well before the 2021 raid that Ray did not have charge and custody of the cattle on his properties at that time. In the aftermath of the 2018 raid, in 2019, Ray entered into a lease with another rancher so that the other rancher would have responsibility for the future care and control of the cattle while the criminal charges remained pending against Ray. Nevertheless, the Sheriff's Office and the District Attorney's Office moved forward, trying to build their animal cruelty case even though they knew he was no longer responsible for the animals.

~~178.~~151. Like the numerous Livestock Deputies who investigated Ray's cattle operation before Deputy Mendes and who consistently found no evidence of animal cruelty, Sergeant McCall similarly understood Ray's buying practices, herd makeup, and treatment of the livestock.

~~179.~~152. In his report detailing the 2021 raid, Sergeant McCall found no evidence that the animals on Ray's properties were willfully neglected. Sergeant McCall acknowledged that the livestock were under another rancher's care, and noted that during his time handling livestock investigations for the Sheriff's Office as the de facto Livestock Deputy, Sergeant McCall was aware that Ray "often purchases cows that are in poor condition with the presumed/alleged intent of trying to improve the animals [sic] health/condition for later sale." Sergeant McCall described ranch hands "supplying feed to the animals," including "placing feed in front of the animals that were unable to move." Sergeant McCall found that, "[b]ased on the condition of a majority of cows on the parcel not being of such a state that would suggest the animals are being willfully neglected, I am unable to determine if the documented cows in poor condition came onto

the property in this condition or if the condition developed after."

~~180.~~153. On information and belief, following the 2021 raid, Sergeant McCall spoke with the other rancher about the investigation and the cattle on Ray's properties. In this conversation, Sergeant McCall confirmed what the Sheriff's Office has known all along:

- That just because there's a downed animal does not mean that animal is being neglected or abused.
- ~~That animals get sick, have issues, and die.~~
- ~~That a typical closed herd mortality rate is 10%.~~
- That the majority of the animals in Ray's herd looked fine.
- That while there were some thin cows, Sergeant McCall could not say that they were not purchased in that condition.
- That if the cows were all being underfed, that there would be many more in that condition, rather than only a few here and there.
- That Ray cared for the sickest, weakest animals in his herd in a sick pen next to his home.
- That cows will sometimes go down, and it is difficult when running a cattle operation on multiple properties to be out with the cattle around the clock, so there must be leeway to allow for the operators to discover an issue and deal with it.
- That Ray's properties often flooded due to the water table level and that cattle would sometimes die by the waterways.
- That the closure of the tallow works caused a big hassle for local cattle operations, and that a realistic or clear answer for carcass disposal no longer existed.
- That maintaining ~~a pile of~~ carcasses was a common local method of dealing with dead livestock and was not indicative of animal abuse.
- That Ray and his properties were subject to heightened scrutiny by those in the community, especially after the March 2018 raid and felony charges.
- That people would drive by Ray's properties, see what they thought were downed cattle from the road, jump to conclusions, and report Ray.

- ~~That when the Sheriff's Office would investigate, either they did not find anything, or if there was a downed cow, it had not been down very long and was one downed cow out of forty in the field.~~
- That cows got loose from their enclosures on Ray's properties, which angered neighbors.
- And that, fundamentally, investigating officers had to ~~consider the letter of the law and the spirit of the law, and~~ be realistic about how things worked in the Humboldt County livestock industry.

~~181.~~154. The Sheriff's Office's investigation of Ray in the 2021 raid harassed and demeaned Ray, and terrorized his family.

~~182.~~155. The court identified numerous issues with the 2021 raid evidence and its potential use in Ray's prosecution, and accordingly excluded all evidence from the 2021 raid from Ray's then-anticipated retrial.

3. The 2022 District Attorney's Race Reveals the Extent of Deputy DA Kamada's Prosecutorial Misconduct

~~183.~~156. Deputy DA Kamada's lack of professionalism and habit of overstepping his prosecutorial position to take on the role of a rogue investigator—which were on full display during Ray's case—finally caught up to him. He was fired from the District Attorney's Office in 2020 due to his violation of ethical standards and office policies. In 2022, he went on to run for, and lose, the position of Humbolt County District Attorney in a contentious race.

~~184.~~157. During the race, the scope of Deputy DA Kamada's missteps came to light through revelations from Deputy DA Kamada's colleague, Deputy DA Roger Rees. Deputy DA Rees was the prosecutor who eventually took over Ray's case and responsibly dismissed it in light of Deputy Mendes' and Deputy DA Kamada's misdeeds. Deputy DA Rees bravely came forward to write a letter to the public in support of Stacy Eads, Deputy DA Kamada's opponent in the race, who serves today as the elected District Attorney for Humboldt County. Deputy DA Rees emphasized Deputy DA Kamada's "inexperience and ineptitude," whose "pure hubris" led him to mismanage cases and department resources. Deputy DA Rees explained that, after Deputy DA

Kamada was fired, staff spent days trying to sort through and patch together the case files and evidence that Deputy DA Kamada had mishandled. A subpoena clerk at the District Attorney's Office also came forward to write a letter to the public, explaining that Deputy DA Kamada did not know how courts operated and was willing to make false and uninformed statements.

~~185.~~158. The circumstances of Deputy DA Kamada's firing came to light as well. It was revealed that he had spoken with a potential witness alone and off the record, which jeopardizes the integrity of the case and risks its dismissal. This, coupled with Deputy DA Kamada's lack of professionalism, led to his dismissal. The behavior that led to Deputy DA Kamada's firing is similar to the prosecutorial misconduct he displayed in Ray's case.

~~186.~~159. The improper preservation of evidence in Deputy DA Kamada's cases resulted in lost evidence in Ray's case. Before Ray's trial, Judge Kaleb V. Cockrum publicly ordered Deputy DA Kamada to properly preserve evidence in Ray's case, stating, "I am going to order, Mr. Kamada, that evidence you are now in possession of is not destroyed or mayhemed in any way and that you be a good custodian – your office be a good custodian of that office." In response, Deputy DA Kamada tried to push responsibility for the evidence onto the Sheriff's Office and even onto the Court itself, stating "to be clear, my office doesn't possess any of those things. The sheriff's office has them and they're actually under the possession of the Court." Judge Cockrum reminded Deputy DA Kamada that "it is your case. . . . I'm looking at you, Mr. Kamada." In the aftermath of Deputy DA Kamada's mishandling of Ray's case, the District Attorney's Office revealed that critical evidence was no longer available because it "appear[ed] to have been lost."[66]

4. The District Attorney Dismisses the Felony Charges Against Ray in December 2023, Resolving the Case in Ray's Favor

~~187.~~160. On December 1, 2023, nearly six years after the March 2018 raid, the District Attorney's Office dismissed the four felony charges against Ray~~. With respect~~ and agreed to ~~the misdemeanor convictions for littering,~~allow Ray ~~paid~~to make a $12,000 donation to a local

[66] People's Opposition to Defendant's Motion Re ~~The~~the People's Evidence at 13:21, filed May 6, 2022.

organization dedicated to the protection of animalsnon-profit called Redwood Pals Rescue in lieu of aany fine. or other penalty for littering.

188.161. A year later, the court set Ray's guilty verdict for the misdemeanor littering convictions aside and dismissed the action, thereby clearing Ray's record related toand terminating in his favor the unlawful, yearslong campaign against him.

**G. Nothing Has Changed in Humboldt County, and Sheriff Honsal, the Sheriff's Office, and the District Attorney's Office Continue to Ignore Animal Abuse by Others**

1. -The Humboldt County Sheriff's Office Failed to Investigate Other Cattle Owners

162. Humboldt County's cattle industry is largely shaped by the frequent, and visible, culling of undesirable cattle. Every Wednesday, ranchers, dairies, and other operators bring their unwanted animals to the Humboldt Auction Yard in Fortuna, where the weakest animals sell for the lowest price per pound. These discarded animals include organic dairy cows past their productive life, old breeding bulls, and cattle that are sick, lame, injured, or emaciated. For years, and on hundreds of occasions, non-ambulatory, sick, and injured cattle were run through the ring in a condition that made their sale unlawful: it is unlawful for ranchers to sell non-ambulatory animals at auction, and unlawful for the yard to accept them. That practice continued openly, week after week, for years and likely decades, as the hundreds of photographs and videos taken at the yard confirm.

163. The Sheriff's Office saw all of it. The Livestock Deputies who worked the Humboldt Auction Yard during the relevant period, Deputy Mendes and Sergeant Joshua McCall, attended the weekly sales, alongside the State veterinarian and State brand inspector. They personally observed the poor condition of the animals being sold at Humboldt Auction Yard and the operators who sold them. Federal law requires Humboldt Auction Yard to keep brand records identifying who bought and sold each animal, and those records were available to the officials on site. The Sheriff's Office thus knew precisely which ranchers and dairies were the source of the sick, injured, and non-ambulatory animals in Humboldt County, because its own deputies watched

those animals being sold, week after week.

164. The community told the Sheriff's Office as well. For years before the 2018 raid, throughout Ray's prosecution, and continuing to today, local ranchers and dairymen sent the Sheriff's Office photographs, videos, and detailed descriptions of the neglected, sick, skinny, lame, and weak cattle run through the auction, and implored Sheriff Honsal personally to act. The Sheriff's Office did not seriously pursue a single one of those reports. Sheriff Honsal brushed aside one complainant, whom he knew to be a friend of Ray's, with "Good luck my friend."

165. Nothing was done to the operators responsible. The ranchers, dairies, and auction-yard employees who produced and sold the sick, injured, and non-ambulatory animals were never investigated, arrested, or charged, and neither was Humboldt Auction Yard, which unlawfully accepted those animals in plain view of the Livestock Deputy and State officials. This includes Deputy Mendes, who was never investigated for his aiding of the unlawful sale of these animals.

166. The same is true of carcasses. Because Humboldt County has had no rendering plant for more than twenty years, and the nearest facilities are hundreds of miles away over mountainous roads, carcass disposal is a problem shared by every cattle operation in Humboldt County. On information and belief, many, if not all, Humboldt County ranchers and dairy farmers maintain dead piles and carcass pits on their properties. This is unavoidable, as the dairies and grazing operations throughout the Arcata Bottoms and Lower Eel River Plains all face the same carcass-disposal problem because of shallow groundwater.[67] With approximately 71,000 cattle in Humboldt County and a typical mortality rate of roughly ten percent, thousands of animals die each year with nowhere lawful to put them. Yet, on information and belief, the Sheriff's Office investigated, arrested, and charged no other operator for maintaining a dead pile or carcass pit.

167. These operators were similarly situated to Ray in every respect material to animal-cruelty and carcass-disposal enforcement. They kept cattle in the same or worse condition than the animals found on Ray's land—indeed, they produced those very animals and sold or delivered them to Ray—and they maintained the same kind of carcasses and dead piles for which Ray was

[67] Scott Gergus, North Coast Regional Water Quality Control Board, *Conversation with Raymond Christie regarding cattle carcass disposal*, May 6, 2015 at pp.2, 4.

charged. Many were the direct source of Ray's herd: they culled their worst animals at Humboldt Auction Yard, or left dead and dying cattle in the Ferndale pen and at Jackson Ranch Road for Ray to collect and attempt to rehabilitate. Ray was, in effect, Humboldt County's trashman for the sick and unwanted cattle these operators discarded. If the condition of such animals and the presence of carcasses were evidence of a crime, the operators who created them were culpable, not the man who took them in to rehabilitate them.

168. Defendants nonetheless treated Ray categorically differently, intentionally and without a rational reason. Defendants reserved investigation, arrest, and prosecution for Ray alone, while declining to investigate, arrest, or charge any of the similarly situated operators who supplied the animals and maintained the carcasses. This was despite the Sheriff's Office's knowledge of their identities, obtained through years of complaints and photographic evidence about them. There was no rational basis for singling Ray out. Defendants did not pursue Ray because they believed that he, uniquely, had committed a crime. Rather, they pursued him because of Deputy Mendes' personal animus, the community hostility that followed Ray's cockfighting acquittal, and their determination to make an example of a visible and convenient target. Defendants' choice to prosecute the rehabilitator while sparing every operator who produced the sick animals confirms that the enforcement decision was arbitrary, pretextual, and driven by an impermissible purpose, and that Defendants did not believe their charges against Ray were valid. By intentionally singling Ray out for disparate treatment on that basis, with no rational basis for the distinction, Defendants denied Ray the equal protection of the laws and supplied the improper purpose and the absence of probable cause at the heart of Ray's malicious prosecution claim.

### 2. The Humboldt County Sheriff's Office Failed to Investigate Animal Abuse Confirmed by the USDA at Well-Known Dairy Alexandre Family Farm

~~189.~~169. While pursuing their unsupported animal abuse charges against Ray, Deputy Mendes and Deputy DA Kamada ignored the obvious signs of animal abuse in Humboldt County at Alexandre Family Farm, which is a nationwide supplier to stores including Whole Foods. Alexandre was similarly situated to Ray for enforcement purposes: it kept cattle in

documented poor condition and supplied the very sick and injured animals Ray bought and rehabilitated, yet the Sheriff's Office investigated Ray while refusing to investigate Alexandre.

~~190.~~170. Alexandre is a family farm, run by generations of the Alexandres on multiple sites in Del Norte and Humboldt Counties. One of the largest organic dairy farms in the country, Alexandre is renowned for its carefully curated marketing image of happy, healthy cows. Alexandre's business is validated by California Certified Organic Farmers, Certified Humane, and the Regenerative Organic Alliance. Consumers seek out its high-quality products, feeling gratified that their splurge for Alexandre's higher sticker price means that they are, in their own way, promoting animal welfare. If they were to visit Alexandre's sites, they would likely be presented with the serene scene of cows spending their days chewing grass and sleeping near the Pacific Ocean and the redwood forest. However, the underbelly of Alexandre's operations reveals something more sinister.

~~191.~~171. Despite its picture-perfect branding, Alexandre has faced a litany of accusations regarding animal abuse, which largely came to life thanks to whistleblowers who worked on the dairies and came forward. The allegations include: a cow with mastitis having her teat cut off with a knife; a live, alert cow being dragged across the ground by a machine; a cow that could not walk being left in a field for two weeks without being euthanized; cows being sprayed with diesel fuel in an attempt to thwart flies; ailing cows being denied antibiotics for infections and illnesses because of the economic incentive to maintain their milk as organic; cows with infections having their eyes packed with salt then having denim patches glued to their skulls to hide their injuries; adult cows being forcibly dehorned with a Sawzall, without anesthetics; dead animals being composted—i.e. left out in a field, stacked in a dead pile, or buried in a pit—in pastures where livestock grazed; a mass death that resulted from a herd of cows who, after being denied food for days, trampled each other once feed was finally provided to them; the killing of approximately 80 pregnant heifers due to their "[being] so skinny, and their calves . . . so big that the heifers couldn't successfully calve." Alexandre touted its 2023 cull rate of 23%—nearly a quarter of its herd— as "relatively low for the industry and a testament to the longevity in our herd."

~~192.~~172. Alexandre sells its injured or otherwise unwanted cattle at the Humboldt Auction Yard, where Ray purchased the cattle Alexandre neglected, and then attempted to rehabilitate them. Some cattle, which came to the auction with cancerous eyes, infected udders, abscesses, and rotted hooves, were too far gone to be saved.

~~193.~~173. Numerous community members reported Alexandre's practices to the Sheriff's Office for years, but those reports were and continue to be ignored. Whether it was because of an unwillingness to admit that Deputy Mendes' and Deputy DA's prosecution of Ray was unjustified, an allegiance to Alexandre, or a hesitancy to further open the Pandora's box of mistreatment of cattle in a cattle-raising town, the Sheriff's Office delayed in opening a case against Alexandre. When *The Atlantic* published an article in April 2024, "The Truth About Organic Milk," exposing Alexandre's cruel practices—and thus making the scandal publicly known—the well-documented abuses became national news.[68] This reporting, in conjunction with an investigation of Alexandre's practices by Farm Forward, a nonprofit with a mission to reduce the suffering of farm animals, eventually forced the Sheriff's Office to pay attention, at least superficially. Farm Forward filed a cruelty complaint with the Sheriff's Office in April 2024 and provided Farm Forward's investigative findings, which included hundreds of photographs and videos documenting the condition of Alexandre's cattle, properties, and the cattle Alexandre sold at auction. Alexandre vigorously denied these claims publicly.

~~194.~~174. In response, the Sheriff's Office opened a perfunctory investigation into the allegations. The Sheriff's Office's conclusory investigation claimed that there was no context regarding who took the videos and photographs, when the videos and photographs were taken, where the videos and photographs were taken, or how the cattle came to be in that condition. The photographs and videos contained location data in their files. Hundreds of videos and pictures documenting Alexandre's abuses were provided to the Sheriff's Office, yet, on information and belief, the Sheriff's Office chose not to investigate a single one. The Sheriff's Office's assessment

[68] Annie Lowrey, *The Truth About Organic Milk*, The Atlantic, April 12, 2024, https://www.theatlantic.com/ideas/archive/2024/04/alexandre-farms-treatment-of-animals/677980/.

of the well-documented abuse at Alexandre was "Unfounded." According to the Sheriff's Office, it "was unable to detect any malicious or intentional harm done to dairy cows by the Alexandre Family Farm."

~~195.~~175. The United States Department of Agriculture, however, determined the opposite. Following the USDA's investigation of the allegations against Alexandre, Alexandre admitted to most of the allegations of abuse and mistreatment as part of a settlement agreement.

~~196.~~176. Deputy Mendes, Deputy DA Kamada, the Sheriff's Office, and the District Attorney's Office, were willing to build a whole case against Ray based on flimsy, defective evidence and the unfounded pretext that cattle carcasses meant that "for some reason or other cattle in the area tended to be unhealthy and die." Those same state actors chose to ignore mountains of evidence regarding animal abuse perpetuated by Alexandre, which regularly brought subpar cattle to the Humboldt Auction Yard for Ray to purchase and left dead or dying cattle in the Ferndale pen for Ray to dispose.

177. Deputy Mendes, Deputy DA Kamada, Sheriff Honsal, the Sheriff's Office, the District Attorney's Office, and many other County officials, despite knowing the sources of mistreated and subpar cattle in the County, did not investigate or prosecute those responsible. They only pursued Ray.

3. The Humboldt County Sheriff's Office's Investigation of Allegations of Animal Abuse at Miranda Rescue

178. On May 1, 2026, following decades of reports from community members, the Humboldt County Sheriff's Office's opened an investigation into alleged animal abuse at a local animal rescue, Miranda's Rescue, which primarily houses dogs and cats.[69] Local and national news media has covered the investigation, which concerns allegations of felony animal abuse, animal cruelty, fraud, and conspiracy. So far, the investigation has uncovered a mass grave

[69] LoCo Staff, *Search Warrant Served at Miranda's Rescue Amid Allegations of Felony Animal Abuse, Fraud and Conspiracy*, Lost Coast Outpost, May 2, 2026, https://lostcoastoutpost.com/2026/may/2/search-warrant-served-mirandas-rescue-amid-allegat/.

containing the remains of more than 120 dogs and nearly 100 microchip trackers.[70]

179. The Humboldt County Sheriff's Office did not arrest the owner of Miranda's Rescue, Shannon Miranda, when the search warrant was executed on May 1, and have not arrested him since.

180. Sheriff Honsal's numerous public statements regarding the investigation plainly state the Sheriff's Office's policies and procedures for investigations of animal abuse:

- "We have a lot of animals that are dead, but now we have to figure out individually every single one of those animals, how they trace back to Miranda's Rescue."
- "It's not just simple to prove that an animal is dead, but the circumstances surrounding how the animal got there, what their temperament was like, were there any health issues or those kinds of things."
- "Every single one of these dogs has to have a full necropsy as well … to determine the actual cause of death. We have to prove in court that these dogs died a certain way and that they didn't have any ailments or injuries . . . So that's a case that we have to prove, and we're taking that very, very seriously."
- "I understand that people want instant justice, but I also want to remind people generally about how the criminal justice system works. And that is, when we do arrest someone for a felony, essentially, we have to provide all the evidence that proves that case to the prosecuting agency."
- "We believe it's going to take several months in order for us to gather all the essential information to present to a prosecuting agency in order to determine whether or not there is evidence to support charges. We believe, based upon the the evidence that we are currently seeing, that there are criminal violations. We are confident of that, but we are taking our time to make sure that we do everything correctly to ensure that the prosecuting agencies have the amount of evidence they

[70] Matthias Gafni, *Exclusive: She called Miranda's Rescue a dream job. Then she saw it from the inside*, San Francisco Chronicle, September 22, 2026, https://www.sfchronicle.com/california/article/mirandas-rescue-dog-workers-22398549.php.

LARSON
LOS ANGELES

need to proceed."

- "We're preserving all these dogs to do more evidence, more necropsies, and we also have the original eight dogs that were provided to us that still have to be forensically provided that autopsy or necropsy, so to speak, and to determine their cause of death. And that is our best evidence right there."
- "We look at what we can prove in court."
- "The evidence is going to be what is presented in this case, and we want to make sure that the truth comes out. We know that a lot of people are frustrated with this case. But we appreciate everyone's patience. Things are going to take time. We want to do things correctly. The last thing we want to do is proceed when we don't have the evidence to support any of the charges."

181. Sheriff Honsal's statements lay out how to investigate and prosecute an animal cruelty case. His statements regarding the proper way to conduct an investigation of alleged animal cruelty starkly contrast the manner in which the Sheriff's Office, the District Attorney's Office, and the County investigated and prosecuted Ray for animal cruelty. In Ray's case, the Sheriff's Office, Sheriff Honsal, Deputy Mendes, Deputy DA Kamada, and the County did not do a single thing Sheriff Honsal states as a necessary component of a proper animal abuse investigation.

182. In investigating their case against Ray, the Sheriff's Office and the County:

- Never removed or tested any dead animals. Not a single cow had a necropsy or testing of any kind "to determine the actual cause of death."
- Did not collect, preserve, or maintain the "best evidence" – evidence of how animals died. The Sheriff's Office and the District Attorney's Office did not even save the video or photo file for one of the felony counts. The District Attorney's Office instead presented a grainy photocopied exhibit as the sole physical evidence in support of a felony charge, and later admitted that they lost the video.
- Did not have evidence about "the circumstances surrounding how the animal got there, what their temperament was like, were there any health issues or those kinds

of things" before arresting and charging Ray.

- Made no efforts to trace the origin of any of the animals at Ray's properties. If they had, they would have learned that ones they focused on for felony charges arrived hours before the raid. Additionally, they could have traced cattle brands and auction backtags to determine the source of the cattle. They expended zero effort to determine the story behind the animals they allege Ray abused.

183. Seemingly, Sheriff Honsal, the Sheriff's Office, the District Attorney's Office, and the County learned something from Ray's case – that they have to have actual evidence to prove animal cruelty, which they did not for Ray.

184. Sheriff Honsal's statements about how to investigate and prosecute an animal cruelty case clearly demonstrate that the Sheriff's Office and the County have policies, procedures, and practices for such investigations. They resolutely did not follow their own policies in their investigation and prosecution of Ray.

185. The care Sheriff Honsal and the Sheriff's Office are devoting to the Miranda investigation, and the restraint shown in declining to charge until the evidence supported charges, is the same care and restraint they withheld from Ray, a similarly situated subject of an animal-welfare complaint.

4. The Humboldt County Sheriff's Office, the District Attorney's Office, and the County Continue to Ignore Mistreatment of Animals

~~197.~~186. Nothing has changed all these years later. The Humboldt Auction Yard continues to put weak and injured cattle through the ring for sale, week after week, every Wednesday. On information and belief, hundreds, and even thousands of cattle in horrible condition have been run through the Humboldt Auction Yard for sale since Deputy Mendes, Sheriff Honsal, and Deputy DA Kamada began their investigation of Ray in 2017. Concerned community members continue to reach out to the Sheriff's Office regarding the welfare of livestock at the Humboldt Auction Yard. Sheriff Honsal came into office in May 2017. Just a few months later he assigned Deputy Mendes to become the Livestock Deputy for Humboldt County. In all the years since, Sheriff Honsal has turned a blind eye to the animal abuse occurring on other

dairy farms and ranches. Ranchers continue to cull their herds by taking their worst animals to the Humboldt Auction Yard, knowing that Ray will be there to purchase and rehabilitate them.

~~198.~~187. There is still no rendering plant in Humboldt County. The closest rendering plants remain over a full working day's drive there and back, which is not economically feasible for dairy operators and cattle ranchers in the area. As a result, dairy farmers and cattle ranchers have no choice but to dispose their cattle carcasses on their land. Humboldt County, despite assuring the community years ago that it would look into solutions for the lack of a rendering plant, has failed to address the problem.

188. The Alexandre and Miranda investigations, as well as the ongoing sale of non-ambulatory and injured cattle at the Humboldt Auction Yard, provide color regarding Defendants' motive in pursuing Ray. The Humboldt County Sheriff's Office, the District Attorney's Office, and Humboldt County ignored significant evidence of animal abuse by established ranchers and dairies for years, while singling out Ray, against whom they lacked sufficient evidence of abuse, for investigation, arrest, and prosecution. This contrast is not incidental; it is evidence of Defendants' purpose. When the Sheriff's Office received hundreds of photographs and videos documenting abuse at Alexandre—abuse the USDA later confirmed and that Alexandre admitted in a settlement—it declined to examine a single image and branded the allegations "Unfounded." When it uncovered a mass grave of more than 120 dogs at Miranda's Rescue, it undertook painstaking tracing for each animal, ordered necropsies to establish cause of death, preserved the "best evidence," and declined to arrest or charge until it had evidence to support the charges. Against Ray, Defendants did none of these things, yet arrested and charged him anyways. These established ranchers, dairies, and auction-yard sellers were similarly situated to Ray in every respect material to animal-cruelty and carcass-disposal enforcement, yet Defendants intentionally treated Ray differently from all of them, with no rational basis for the distinction.

189. Deputy Mendes and Deputy DA Kamada singled Ray out and scapegoated him for the systemic issues created by Humboldt County's lack of planning and oversight. Ray served as the local trashman for unwanted, sick, and mistreated cattle that have been cast aside by local ranchers and dairy farmers when the animals lost their usefulness. Rather than addressing the root

of the systemic issues—potentially mistreated cattle being sold at the Humboldt Auction Yard, and the lack of a rendering plant forcing ranchers to dispose of carcasses on their land—Deputy Mendes, acting under Sheriff Honsal's supervision, and Deputy DA Kamada chose to target Ray as their scapegoat, for their own personal gain and all under the color of state law. ~~Ray was a visible, convenient, and satisfying target. But in their overzealousness to bring Ray down, Deputy Mendes and Deputy DA Kamada's misconduct and obvious abuse of their positions of power violated Ray's constitutional rights. Ray Christie, and the mistreated and ignored cattle of Humboldt County, deserved better.~~ Defendants knew that Ray bought sick and injured cattle at the Humboldt Auction Yard to rehabilitate them, and knew that the very animals they attributed to Ray originated with the ranchers and dairies, including Alexandre, that they refused to investigate. Defendants' decision to build felony charges against the rehabilitator, while ignoring the documented abusers who supplied those animals, shows that Defendants did not believe their charges against Ray were valid and pursued the prosecution primarily for an improper purpose and out of malice toward him. As such, Defendants treated Ray differently from the operators who supplied those animals, denying him equal protection.

190. Sheriff Honsal's public statements in the Miranda investigation set out the standards Defendants apply to a legitimate animal-cruelty investigation: tracing each animal's origin, determining cause of death by necropsy, preserving the "best evidence," and refusing to "proceed when we don't have the evidence to support any of the charges." Sheriff Honsal knew these standards, articulated them publicly, and enforced them for others. Defendants disregarded every one of these standards when they investigated and prosecuted Ray.

~~199.~~191. Defendants' selective, result-driven enforcement was the moving force behind the violation of Ray's constitutional rights. By singling Ray out for investigation, arrest, and prosecution while sparing every similarly situated operator, and by doing so with no rational basis and for the purpose of imposing on Ray a burden they imposed on no one else, Defendants denied Ray the equal protection of the laws. Ray was a class of one.[71] He does not contend that

[71] Ray does not assert a stand-alone cause of action for violation of the Equal Protection Clause.

Defendants acted against him because of his race, religion, or any other protected characteristic. He contends that Defendants intentionally singled him out as an individual, treating him worse than every comparable cattle rancher, dairy, and livestock operator in Humboldt County. Defendants investigated, arrested, and prosecuted Ray on evidence they would not have acted on—and did not act on despite having such evidence—against anyone else, and declined to apply to him the investigative standards (tracing each animal, necropsies, preservation of "best evidence," and charging only on sufficient proof) that they applied to others. There was no rational basis for that difference in treatment. Further, as alleged above, Defendants even went so far as to deliberately fabricate evidence in their single-minded pursuit of Ray.

## CLAIMS FOR RELIEF

### First Cause of Action

### (Unreasonable Seizure of Person – 42 U.S.C. § 1983)

### Against All Defendants

~~200.~~192. Ray re-alleges and incorporates the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

~~201.~~ Defendants unlawfully arrested Ray and/or caused him to be arrested without probable cause and without a valid warrant.

~~202.~~193. Defendants violated Ray's right to be secure in his person against unreasonable searches and seizures as guaranteed to Ray under the Fourth Amendment of the United States Constitution and applied to state actors by the Fourteenth Amendment.

~~203.~~194. Defendants lacked probable cause to support an arrest of Ray. Defendants knew that Ray was innocent, or were deliberately indifferent to Ray's innocence. Defendants knew that Ray purchased injured and weak cattle at the Humboldt Auction Yard, and that Ray did not have access to a rendering plant to dispose of cow carcasses. Nevertheless, they relied on the presence of injured and weak cattle, and carcasses, to improperly claim that this evidence

---

Rather, the allegations that Defendants singled Ray out as a "class of one" and treated him differently from every similarly situated cattle rancher, dairy, and livestock operator in Humboldt County, without any rational basis, are pleaded to establish the improper motive underlying Plaintiff's malicious-prosecution claim.

constituted probable cause that Ray had criminally neglected or abused his animals.

~~204.~~195. Defendants, with a reckless disregard for truth, omitted material information or included misstatements regarding Ray's cattle in order to obtain search warrants. These acts and omissions, carried out under color of law, have no justification, and constitute a gross abuse of governmental authority and power, shock the conscience, are fundamentally unfair, arbitrary, and oppressive, and unrelated to any activity in which governmental officers may appropriately and legally undertake in the court of protecting persons or property, or ensuring civil order.

196. This claim is timely. Section 1983 does not contain a statute of limitations, so federal courts "apply the forum state's statute of limitations for personal injury actions, along with the forum state's law regarding tolling." *Butler v. National Community Renaissance of California*, 766 F.3d 1191, 1198 (9th Cir. 2014). California's statute of limitations for personal injury claims is two years. *See* Cal. Civ. P. § 335.1. Ray's arrest and the raid of his properties occurred on March 19, 2018. Eighty-six days later, on June 13, 2018, the District Attorney's Office filed the accusatory pleading against Ray. The limitations period was tolled under California Government Code section 945.3 while the criminal charges were pending against Ray before the superior court. *See Torres v. City of Santa Ana*, 108 F.3d 224, 226 (9th Cir. 1997). The District Attorney's Office dismissed the felony charges against Ray on December 1, 2023. The limitations period was further tolled by the California Judicial Council's Emergency Rule 9, adopted in response to the COVID-19 pandemic. Emergency Rule 9 applies to Section 1983 actions in federal court and provides an additional 178 days of tolling. Accounting for this tolling, this action, filed on December 1, 2025, is timely.

197. In addition, in the alternative, on information and belief, Deputy Mendes and Deputy DA Kamada did not provide Ray with a copy of the affidavits supporting the search warrants at the time of the raid. As such, at the time of the raid and his arrest, Ray was not aware of the material omissions or misstatements contained in the affidavits. Ray's counsel later requested copies of all affidavits and probable cause statements in support of any and all search warrants related to Ray's case. The District Attorney's Office provided "all of the available discovery for" Ray's case on October 30, 2018, two months after the preliminary hearing. On

information and belief, the underlying affidavits were not reasonably available to Ray until at least this date.

~~205.~~198. Defendants' unlawful conduct caused Ray's injuries. The harm to Ray from Defendants' illegal actions includes lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, physical harm, mental harm, emotional harm, psychological harm, and other compensatory damages, in an amount to be proven at trial. As a result of their misconduct, Defendants are liable for Ray's injuries.

~~206.~~199. The conduct of Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Ray, and therefore warrants the imposition of exemplary and punitive damages.

~~207.~~200. At all relevant times, Defendants were acting under the color of state law.

**Second Cause of Action**

**(Unreasonable Search and Seizure of Property – 42 U.S.C. § 1983)**

**Against All Defendants**

~~208.~~201. Ray re-alleges and incorporates the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

~~209.~~202. Defendants, acting with deliberate falsehood and reckless disregard for the truth, caused the unreasonable and unlawful search and seizure of Ray's property, without probable cause and without a valid warrant. Defendants knew that Ray was innocent, or were deliberately indifferent to Ray's innocence. Defendants knew that Ray purchased injured and weak cattle at the Humboldt Auction Yard, and that Ray did not have access to a rendering plant to dispose of cow carcasses. Nevertheless, Defendants presented false and misleading information or omitted materials facts regarding Ray's operation to obtain a warrant and to search and seize Ray's property.

~~210.~~203. Defendants, with a reckless disregard for truth, omitted material information or included misstatements regarding Ray's cattle in affidavits used to obtain search warrants. These acts and omissions, carried out under color of law, have no justification, and constitute a gross abuse of governmental authority and power, shock the conscience, are fundamentally unfair,

arbitrary, and oppressive, and unrelated to any activity in which governmental officers may appropriately and legally undertake in the court of protecting persons or property, or ensuring civil order.

~~211.~~204. Defendants violated Ray's right to be sure in his property against unreasonable seizures, as guaranteed to Ray under the Fourth Amendment of the United States Constitution and applied to state actors by the Fourteenth Amendment.

205. This claim is timely for the reasons alleged in paragraph 196 above. The limitations period was tolled under California Government Code section 945.3 while the criminal charges arising from the same conduct were pending against Ray before the superior court—from the filing of the accusatory pleading on June 13, 2018 until the dismissal of the felony charges on December 1, 2023—and was further tolled by the California Judicial Council's Emergency Rule 9.

~~212.~~206. In addition, in the alternative, on information and belief, Deputy Mendes and Deputy DA Kamada did not provide Ray with a copy of the affidavits supporting the search warrants at the time of the raid. As such, at the time of the raid and his arrest, Ray was not aware of the material omissions or misstatements contained in the affidavits. Ray's counsel later requested copies of all affidavits and probable cause statements in support of any and all search warrants related to Ray's case. The District Attorney's Office provided "all of the available discovery for" Ray's case on October 30, 2018, two months after the preliminary hearing. On information and belief, the underlying affidavits were not reasonably available to Ray until at least this date. Ray was present at his residence during the March 2018 search and had a reasonable expectation of privacy. Defendants conducted the search of Ray's residence and properties with the intent to intimidate, punish, harass, and embarrass Ray and his family. Defendants conducted the search of Ray's residence and properties in an unreasonable manner serving no legitimate law enforcement purpose. Defendants lacked probable cause to search and seize Ray's property. Further, their unreasonable search and seizure of Ray's property exceed the scope of their invalid warrant.

~~213.~~207. Defendants' unlawful conduct caused Ray's injuries. The harm to Ray from Defendants' illegal actions includes lost income, lost business opportunities, loss of

reputation, litigation expenses including attorneys' fees, physical harm, mental harm, emotional harm, psychological harm, and other compensatory damages, in an amount to be proven at trial. As a result of their misconduct, Defendants are liable for Ray's injuries.

~~214.~~208. The conduct of Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Ray, and therefore warrants the imposition of exemplary and punitive damages.

~~215.~~209. At all relevant times, Defendants were acting under the color of state law.

**Third Cause of Action**

**(Malicious Prosecution – 42 U.S.C. § 1983)**

**Against ~~All Defendants~~Deputy Mendes, Sheriff Honsal, and Humboldt County**

~~216.1. Ray re-alleges and incorporates the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.~~

210. Ray re-alleges and incorporates the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

211. As alleged herein, ~~the investigation of Ray was not undertaken to obtain evidence of a crime, but instead~~Defendants initiated and continued the prosecution of Ray with malice and without probable cause, knowing that Ray was innocent or in deliberate disregard of Ray's innocence, and not to pursue any genuine suspicion of a crime. Defendants initiated and continued the prosecution of Ray for the purpose of depriving Ray of his clearly established Fourteenth Amendment due process right not to be subjected to criminal charges on the basis of deliberately fabricated evidence. In addition, in the alternative, Defendants initiated and continued the prosecution of Ray for the purpose of denying him a further specific constitutional right: the right to the equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution.

~~217.~~212. In addition, in the alternative, Defendants initiated and continued the prosecution of Ray to retaliate against Ray, and harass and punish Ray for exercising his constitutional rights, including his right to access and defend himself in court in the cockfighting case.

213. Defendants acted with malice. For example, Deputy Mendes initiated and pressed the prosecution not out of any genuine belief that Ray was guilty, but out of personal animus and a fixed determination to bring Ray down. By no later than August 2018, as the contemporaneous prosecution communications alleged above confirm, Deputy Mendes and the prosecutors knew that Ray took in sick animals to rehabilitate rather than abuse them, and that Deputy Mendes' own conduct in providing sick animals to Ray had compromised the charges. The decision to dismiss felony counts in order to "remove Dep. Mendes as a witness," while pressing the remaining counts against Ray for five more years, reflects a prosecution continued primarily for an improper purpose rather than out of any genuine belief that the charges were valid.

~~218.~~214. Defendants, lacking probable cause and acting with deliberate falsehood or reckless disregard for the truth, made false and misleading statements or withheld material information to pursue criminal charges against Ray. Defendants knew that Ray was innocent, or were deliberately indifferent to Ray's innocence. Defendants knew that Ray purchased injured and weak cattle at the Humboldt Auction Yard, and that Ray did not have access to a rendering plant to dispose of cow carcasses. Nevertheless, Defendants relied on the presence of the injured and weak cattle, and carcasses, to illegally and maliciously prosecute Ray.

~~219.~~215. Defendants, with a reckless disregard for truth, omitted material information or included misstatements regarding Ray's cattle in order to obtain search warrants. These acts and omissions, carried out under color of law, have no justification, and constitute a gross abuse of governmental authority and power, shock the conscience, are fundamentally unfair, arbitrary, and oppressive, and unrelated to any activity in which governmental officers may appropriately and legally undertake in the court of protecting persons or property, or ensuring civil order. In particular, Deputy Mendes procured search and arrest warrants through affidavits that, as alleged above, deliberately or recklessly omitted material information and included material misstatements. A warrant obtained by such judicial deception does not establish probable cause. Independent of the warrants, Defendants lacked probable cause to believe that Ray had criminally neglected or abused any animal, as the prior fifteen years of Livestock Deputy reports, Defendants' own knowledge of Ray's rehabilitation operation and the auction yard, and Humboldt

County's lack of any means of carcass disposal all confirmed.

216. In addition, Defendants intentionally singled him out as an individual, treating him worse than every comparable cattle rancher, dairy, and livestock operator in Humboldt County. There was no rational basis for the difference in Defendants' treatment. Rather, there existed a rational basis to investigate the other cattle operators who were the source of the mistreated animals. The distinction between Ray and the operators Defendants declined to pursue did not rest on any legitimate law-enforcement objective; rather, it rested on Deputy Mendes' personal animus toward Ray, on Defendants' desire to scapegoat Ray for systemic problems created by the County's own lack of a rendering plant and oversight of the Humboldt Auction Yard, and on the fact that Ray was a visible, convenient, and satisfying target. Defendants' selective investigation, arrest, and prosecution of Ray thus had a discriminatory effect, as similarly situated operators could have been, but were not, investigated or prosecuted. By prosecuting Ray for the purpose of denying him the equal protection of the laws, Defendants deprived him of a specific constitutional right sufficient to support this claim under 42 U.S.C. § 1983, independent of the due-process and retaliation grounds alleged above.

217. Defendants' unlawful conduct caused Ray's injuries. The harm to Ray from Defendants' illegal actions includes lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, physical harm, mental harm, emotional harm, psychological harm, and other compensatory damages, in an amount to be proven at trial. As a result of their misconduct, Defendants are liable for Ray's injuries.

218. The conduct of Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Ray, and therefore warrants the imposition of exemplary and punitive damages.

~~220.~~ At all relevant times, Defendants were acting under the color of state law.~~Defendants violated Ray's rights against being subjected to malicious prosecution as guaranteed to Ray under the Fourteenth Amendment to the United States Constitution.~~

~~221. Defendants' unlawful conduct caused Ray's injuries. The harm to Ray from Defendants' illegal actions includes lost income, lost business opportunities, loss of reputation,~~

~~litigation expenses including attorneys' fees, physical harm, mental harm, emotional harm, psychological harm, and other compensatory damages, in an amount to be proven at trial. As a result of their misconduct, Defendants are liable for Ray's injuries.~~

~~222. The conduct of Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Ray, and therefore warrants the imposition of exemplary and punitive damages.~~

~~223. At all relevant times, Defendants were acting under the color of state law.~~

219.

**Fourth Cause of Action**

**(Deliberate Fabrication of Evidence ~~and Withholding of Material Information~~ – 42 U.S.C. § 1983)**

**Against ~~All Defendants~~Deputy Mendes, Sheriff Honsal, and Humboldt County**

220. Ray re-alleges and incorporates the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

221. As alleged above, Deputy Mendes deliberately fabricated evidence that was then used to criminally charge and prosecute Ray. This claim rests on Deputy Mendes' affirmative acts of fabrication, not on any mere failure to disclose. Among other things, Deputy Mendes (a) staged photographs of the scene and then presented those staged photographs as true depictions, including moving a cattle ear tag next to an unrelated skull to suggest a connection that did not exist, and moving a wheelbarrow and other items to make a carcass appear more dramatic; (b) manipulated, stripped, or altered the metadata of photographs so that images taken months before the raid would appear to document conditions found during it; and (c) testified falsely under oath about how, when, and with how many devices, photographic evidence was collected. Deputy Mendes thereby deliberately mischaracterized what the evidence was when it was created.

222. Deputy Mendes fabricated this evidence knowing that Ray was innocent, or in deliberate disregard of his innocence. Deputy Mendes knew that Ray purchased injured and weak cattle at the Humboldt Auction Yard to rehabilitate them, that cattle in an operation of Ray's size inevitably die in large numbers, and that Humboldt County had no means of carcass disposal. He

knew that the conditions he photographed were not evidence of animal cruelty, even acknowledging that "the county does not have any means of removal or storage for that many carcasses." He fabricated and mischaracterized the evidence anyways, to create the false appearance of a crime. In addition, Deputy Mendes deliberately slanted his affidavits in a single direction by affirmatively casting innocent conditions as evidence of abuse while suppressing the exculpatory facts he knew. Because Deputy Mendes continued and pressed the investigation of Ray despite knowing, or having every reason to know, that Ray was innocent, his conduct supports the inference that he acted with an unlawful purpose to frame an innocent man. To the extent Deputy Mendes also omitted or concealed material information, those omissions were part of, and in furtherance of, his affirmative fabrication and mischaracterization of evidence; this claim does not rest on omission alone.

223. Deputy Mendes' deliberate fabrication also included the warrant affidavits and investigative reports themselves. As alleged above, Deputy Mendes deliberately slanted those affidavits in a single direction by affirmatively casting innocent conditions as evidence of abuse while suppressing the exculpatory facts he knew. Mendes thereby created a false portrait of a crime and manipulated the inferences the reviewing magistrate and the prosecutor would draw. Deputy Mendes' deliberate, one-directional omissions constitute a deliberate mischaracterization of the evidence, not a mere failure to disclose.

~~224.1.~~ As alleged above, Defendants unlawfully continued their criminal~~Ray re-alleges and incorporates the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.~~

~~225. As alleged above, Defendants deliberately fabricated evidence that was then used to criminally indict and prosecute Ray. They also deliberately withheld material information, which allowed them to move forward with the indictment and prosecution of Ray.~~

~~226. For example, Defendants knew that Ray purchased injured and weak cattle at the Humboldt Auction Yard, and that Ray did not have access to a rendering plant to dispose of cow carcasses. Nevertheless, Defendants presented false and misleading information or omitted materials facts regarding Ray's operation to illegally and maliciously prosecute Ray. Defendants~~

~~withheld material evidence from Ray, Defendants destroyed material, exculpatory evidence favorable to Ray, Defendants deliberately failed to preserve material evidence, and Defendants altered and manufactured evidence against Ray.~~

~~227.~~224. ~~As alleged above, Defendants unlawfully continued their investigation of Ray and conducted a crimination~~ investigation of Ray~~,~~ despite the fact that they knew that Ray was innocent, or were deliberately indifferent to Ray's innocence, and the results of the investigation were then used to criminally ~~indict~~charge and prosecute Ray.

~~228.~~225. Defendants violated Ray's rights against being subjected to criminal charges without probable cause and on the basis of false or misleading evidence or material omissions as guaranteed to Ray under the Fourteenth Amendment to the United States Constitution.

~~229.~~226. Defendants' unlawful conduct caused Ray's injuries. The harm to Ray from Defendants' illegal actions includes lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, physical harm, mental harm, emotional harm, psychological harm, and other compensatory damages, in an amount to be proven at trial. As a result of their misconduct, Defendants are liable for Ray's injuries.

~~230.~~227. The conduct of Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Ray, and therefore warrants the imposition of exemplary and punitive damages.

~~231.~~228. At all relevant times, Defendants were acting under the color of state law.

**Fifth Cause of Action**

**(Retaliation – 42 U.S.C. § 1983)**

**Against ~~All Defendants~~Deputy Mendes, Sheriff Honsal, and Humboldt County**

~~232.~~229. Ray re-alleges and incorporates the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

230. Defendants retaliated against Ray for exercising his constitutional right to access the courts and defend himself in the cockfighting matter by later conducting, in an unlawful and retaliatory manner, a criminal case against Ray for alleged animal neglect or abuse, by causing the

unlawful search of Ray's property, by causing Ray's unlawful arrest, and by causing the filing of an unfounded criminal complaint against Ray.

~~233.~~231. Ray's defense of himself in the cockfighting prosecution was a substantial and motivating factor in Defendants' conduct. Defendants knew of, and were motivated by, that prior proceeding. Deputy DA Kamada expressly framed the investigation of Ray around "Christie's history in the courts." In Deputy Mendes' investigation reports and in the affidavits in support of the warrants, Deputy Mendes homed in on Ray's prior "suspected fighting cock operation." An animal-welfare organization that had been involved in Ray's earlier "cock fighting bust" urged the District Attorney's Office to secure a conviction. And Sheriff Honsal later directed his staff to gather Ray's "previous cock fighting report" as part of building the case against him. Deputy Mendes resented Ray's continued success despite his acquittal. But for this retaliatory animus, Defendants would not have investigated, arrested, and caused the prosecution of Ray for animal cruelty.

~~234.~~232. Ray's constitutionally protected activity was a substantial or motivating factor in the Defendants' conduct as it was clear that they had animus against Ray for prevailing in the cockfighting prosecution.

~~235.~~233. Defendants' actions would chill a person of ordinary firmness from engaging in the constitutionally protected use of the courts.

~~236.~~234. Defendants' unlawful conduct caused Ray's injuries. The harm to Ray from Defendants' illegal actions includes lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, physical harm, mental harm, emotional harm, psychological harm, and other compensatory damages, in an amount to be proven at trial. As a result of their misconduct, Defendants are liable for Ray's injuries.

~~237.~~235. The conduct of Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Ray, and therefore warrants the imposition of exemplary and punitive damages.

~~238.~~236. At all relevant times, Defendants were acting under the color of state law.

**Sixth Cause of Action**

**(Conspiracy – 42 U.S.C. § 1983)**

**Against All Defendants**

239. Ray re-alleges and incorporates the allegations contained in the preceding paragraphs of this complaint as though fully set forth herein.

240. On information and belief, Defendants conspired and agreed with each other to deprive Ray of his constitutional rights, including his right to be free from an unconstitutional, retaliatory investigation, his right to be free from unreasonable searches and seizure, his right to access the courts, his right to defend himself in the cockfighting prosecution, and his right to due process. The object of the conspiracy was to be carried out by unlawfully investigating and arresting Ray and unlawfully causing a baseless criminal complaint to be filed against Ray, all in violation of Ray's constitutional rights.

241. Defendants combined, colluded, conspired, and/or agreed to act in concert to wrongfully investigate Ray for the purpose of retaliating against him for defending himself in litigation against Humboldt County, and for prevailing in the cockfighting prosecution, all as alleged herein.

242. Defendants performed overt acts in furtherance of the conspiracy as alleged herein.

243. This conspiracy was the proximate cause of the illegal retaliation against Ray and the deprivation of Ray's constitutional rights, as alleged herein.

244.1. SixthDefendants' unlawful conduct caused Ray's injuries. The harm to Ray from Defendants' illegal actions includes lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, physical harm, mental harm, emotional harm, psychological harm, and other compensatory damages, in an amount to be proven at trial. As a result of their misconduct, Defendants are liable for Ray's injuries.

245.1. The conduct of Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Ray, and therefore warrants the imposition of exemplary and punitive damages.

246. At all relevant times, Defendants were acting under the color of state law.

## ~~Seventh~~ Cause of Action

**(*Monell* Claim – 42 U.S.C. § 1983)**

**Against Defendant Humboldt County**

~~247.~~237. Ray re-alleges and incorporates the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

~~248.~~ Humboldt County's official policies, practices, customs, and/or usages violated Ray's rights, and the rights of those similarly situated under the Fourth and the Fourteenth Amendments~~.~~, including his right to the equal protection of the laws. Humboldt County's official policies, practices, customs, and/or usages directly and proximately injured Ray, as alleged, entitling Ray to recover damages, pursuant to 42 U.S.C. § 1983.

~~249.~~238. ~~Ray exercised his Fourteenth Amendment right to access and defend himself in court in the cockfighting prosecution. The individual Defendants, acting under color of state law, then retaliated against, harassed, and punished Ray in the manner alleged herein for Ray's exercise of his Fourteenth Amendment right.~~

~~250.~~239. Humboldt County had in place official, widespread, and/or longstanding policies, practices, and/or customs that amounted to deliberate indifference to Ray's right to exercise his constitutional rights. These persistent and widespread policies, practices, and/or customs were a moving force behind the individual Defendants' illegal conduct. For example, Humboldt County maintained or permitted persistent and widespread policies, practices, customs, and/or usages that included, but was not limited to, the following:

~~a. Authorizing or permitting the District Attorney's Office to indiscriminately use its law enforcement teams to execute search warrants without first evaluating the reasonableness of their intrusion of individuals' reasonable expectation of privacy and/or their use of heightened force;~~

~~b. Permitting, condoning, and/or ratifying Humboldt County employees, members of the District Attorney's Office, and/or members of the Sheriff's Office to execute unreasonable searches, seizures, and detentions of residences and persons in a manner intended to~~

~~retaliate against, punish, harass, and embarrass individuals;~~

~~c. Condoning and encouraging officers to violate the rights of persons such as Ray with impunity and with intent to retaliate against, punish, harass, and embarrass individuals by imposing intrusive searches;~~

~~d. Failure to provide adequate training or protocols to the District Attorney's Office and/or the Sheriff's Office with respect to intrusion of individuals' reasonable expectation of privacy, threat assessment, and constitutional limits on the use of force;~~

~~e. Failure to provide adequate training or protocols to the District Attorney's Office and/or the Sheriff's Office with respect to collecting and preserving evidence;~~

~~f. Authorizing and encouraging members of the Sheriff's Office, and/or members of the District Attorney's Office, to withhold evidence from criminal defendants to retaliate against, harass, and punish them for exercising their constitutional rights, including their right to access and defend themselves in court;~~

~~g. Ratification by the highest levels of authority of the specific unconstitutional acts alleged in this First Amended Complaint.~~

<u>a. Maintaining a longstanding custom of selectively enforcing animal-cruelty and carcass-disposal laws against disfavored individuals (such as Ray)—thereby intentionally treating them differently from similarly-situated operators with no rational basis—while declining to enforce them against established ranchers and dairies (such as Alexandre); for example, (1) for years, and on hundreds of occasions, non-ambulatory, sick, and injured cattle were unlawfully run through the Humboldt Auction Yard in plain view of the Livestock Deputy and state officials, who took no enforcement action, (2) community complaints about animals at Humboldt Auction Yard and at other operations were investigated and closed with no action, if investigated at all, and (3) documented abuse at Alexandre was ignored;</u>

<u>b. Maintaining a longstanding custom of selectively bypassing legitimate animal-cruelty investigation standards in the investigation of disfavored individuals (such as Ray), thereby intentionally treating such individuals differently from similarly-situated individuals with no rational basis; for example, Sheriff Honsal publicly articulated Humboldt County's animal-</u>

cruelty investigation standards while discussing the 2026 investigation of Miranda's Rescue (e.g., individually tracing each animal to its source, conducting a full necropsy to determine each animal's actual cause of death, collecting and preserving the animals and related materials as the "best evidence," developing evidence of the condition of each animal, and declining to arrest or seek charges until the evidence supports them), yet in Ray's case Defendants selectively did not adhere to those standards and Humboldt County, while aware of this custom of non-compliance that violated Ray's constitutional rights, did nothing to correct it;

c. Authorizing or permitting the custom of repeatedly targeting certain individuals (such as Ray) without probable cause and by improper means; for example, despite lacking probable cause, Defendants targeted Ray over a multi-year period with repeated and warrantless or pretextual investigations, the 2018 and 2021 raids, and the repeated collection, mishandling, and presentation of evidence against Ray;

d. Authorizing or permitting the custom of failing to train its livestock and criminal investigators on the constitutional limits governing searches and seizures, the preparation of truthful warrant affidavits, and the collection and preservation of potentially exculpatory evidence, with deliberate indifference to actual or constructive notice that the omission would cause constitutional violations;

e. Maintaining a custom of collecting, handling, and preserving evidence in a manner that disregarded its exculpatory value and Humboldt County's own evidence-handling requirements (e.g., staging and manipulating photographs, re-recording and failing to retain original audio, allowing image metadata to be overwritten or deleted during collection and retention, and failing to preserve the video underlying a felony charge), with deliberate indifference to actual or constructive notice that the omission would cause constitutional violations; and

f. Maintaining the custom of enforcing carcass-disposal requirements while providing no lawful means of compliance.

240. These policies, practices, and customs were longstanding, persistent, and widespread in Humboldt County. As alleged above, before, during, and after Ray's prosecution,

Humboldt County, through the Sheriff's Office and the District Attorney's Office, maintained a persistent and widespread custom of ignoring documented animal abuse by other ranchers and dairies while singling Ray out, and of failing to train and supervise its deputies and prosecutors in the lawful collection, preservation, and presentation of evidence and in the preparation of truthful warrant affidavits. Humboldt County's sustained course of conduct toward Ray over many years is itself evidence of this custom. That is, Humboldt County repeatedly investigated Ray without cause, and then fabricated and mishandled evidence to prosecute him. These policies and customs were the moving force behind, and a direct and proximate cause of, the violations of Ray's Fourth and Fourteenth Amendment rights alleged above, including his right to the equal protection of the laws and his due process right not to be subjected to criminal charges on the basis of deliberately fabricated evidence. Humboldt County's final policymakers knew of and ratified this conduct, with deliberate indifference to the violation of Ray's constitutional rights.

~~251.~~241. As a legal and proximate result of the described official policies, practices, customs, and/or usages, Humboldt County violated Ray's rights to privacy ~~and~~ to be free from unreasonable searches and seizures, and to due process of law, secured by the Fourth and Fourteenth Amendments. Ray is therefore entitled to compensatory and punitive damages in an amount to be proven at trial.

~~252.~~242. Humboldt County has and will continue to permit and/or execute each of the aforementioned policies, patterns, practices, customs, or usages in violation of Ray's civil rights and the civil rights of others. Ray therefore also seeks injunctive relief from Humboldt County's ongoing policies, patterns, practices, customs, and/or usages alleged.

243. In addition, Sheriff Honsal, who had final policymaking authority concerning Deputy Mendes' unlawful prosecution of Ray, knew of and made the deliberate choice to approve the specific unconstitutional acts alleged in this First Second Amended Complaint. For example, after the preliminary hearing, Sheriff Honsal emailed Deputy Mendes, "Christie's day of reckoning is near! Great JOB!"[72]

[72] August 16, 2018 email from Sheriff Honsal to various recipients, including Deputy Mendes.

253. 244. As a result of Defendants' Humboldt County's conduct, Ray suffered harm and is entitled to declaratory relief, injunctive relief, compensatory damages, punitive damages, attorneys' fees, costs, and any other available remedies and relief. Humboldt County's unlawful conduct caused Ray's injuries. The harm to Ray from Humboldt County's illegal actions includes lost income, lost business opportunities, loss of reputation, litigation expenses including attorneys' fees, physical harm, mental harm, emotional harm, psychological harm, and other compensatory damages, in an amount to be proven at trial. As a result of their misconduct, Humboldt County is liable for Ray's injuries.

245. Humboldt County's conduct was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Ray, and therefore warrants the imposition of exemplary and punitive damages.

246. At all relevant times, Humboldt County was acting under the color of state law.

254.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff Raymond Frank Christie prays for the following relief and judgment against Defendants:

1. A judgment declaring Humboldt County's policies, practices, customs, and usages unconstitutional;

2. An order enjoining Humboldt County's policies, practices, customs, and usages as follows:

- An injunction prohibiting Humboldt County from allowing the District Attorney's Office to indiscriminately allow law enforcement teams to execute search warrants without first evaluating the reasonableness of intrusion of a reasonable expectation of privacy, and heightened force, on a case-by-case basis;
- An injunction prohibiting Humboldt County from allowing its employees, members of the District Attorney's Office, and/or members of the Sheriff's Office to execute unreasonable searches, seizures, and detentions of residences and persons as punishment, harassment, and embarrassment in retaliation for their having

exercised their constitutional rights to access and defend themselves in court;

- An injunction prohibiting Humboldt County from failing to adequately train or provide protocols to the District Attorney's Office and/or the Sheriff's Office with respect to the intrusion of a reasonable expectation of privacy, threat assessment, and constitutional limits on the use of force;
- An injunction prohibiting Humboldt County from authorizing and encouraging members of the Sheriff's Office, and/or members of the District Attorney's Office, to withhold evidence from criminal defendants to retaliate against, harass, and punish them for exercising their constitutional rights, including their right to access and defend themselves in court;
- An injunction prohibiting Humboldt County from ratifying the specific unconstitutional acts alleged herein; and
- Such further injunction as the Court shall find just and proper;

3. Damages in an amount ultimately to be proven at trial, including, but not limited to:

a. Compensatory damages, including for injury to person, emotional distress, medical expenses, and loss of reputation; and

b. Punitive damages under 42 U.S.C § 1983, federal, and state law in an amount according to proof and which is fair, just, and reasonable;

4. An award of reasonable attorneys' fees, costs, and expenses to Plaintiff, pursuant to 42 U.S.C. § 1988, in an amount to be proven at trial;

5. Costs of suit herein incurred;

6. Pre-judgment interest; and

7. Such other and further relief as this Court shall find just and proper.

Dated: October 20, 2026

LARSON LLP

By: -/s/ Rick Richmond

Rick Richmond
R.C. Harlan
Caroline G. Glennie-Smith
Donna Zamora-Stevens
Attorneys for Plaintiff Raymond Frank Christie

**DEMAND FOR JURY TRIAL**

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury with respect to all issues and claims, asserted by any party, triable of right by a jury, in the above-captioned action.

Dated: October 20, 2026

LARSON LLP

By: /s/ *Rick Richmond*
Rick Richmond
R.C. Harlan
Caroline G. Glennie-Smith
Donna Zamora-Stevens
Attorneys for Plaintiff RAYMOND FRANK CHRISTIE